## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: MCKINSEY & CO., INC. NATIONAL PRESCRIPTION OPIATE CONSULTANT LITIGATION | MDL No. 2996 |
| | Case No. 3:21-md-02996-CRB |
| This document relates to: | Hon. Charles R. Breyer |
| | Case No.: _____ |
| SAN MIGUEL HOSPITAL CORPORATION d/b/a ALTA VISTA REGIONAL HOSPITAL, on behalf of itself and all others similarly situated, | |
| Plaintiff | |
| v. | |
| MCKINSEY & COMPANY, INC.; MCKINSEY HOLDINGS, INC.; MCKINSEY & COMPANY, INC. UNITED STATES; and MCKINSEY & COMPANY, INC. WASHINGTON D.C., | **CLASS ACTION COMPLAINT** |
| Defendants | **JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................1

II.     JURISDICTION AND VENUE ..................................................................................5

III.    PARTIES......................................................................................................................6

     A.      Plaintiff............................................................................................................6

     B.      Defendants .......................................................................................................7

     C.      Other Enterprise Members ...............................................................................8

          1.      Janssen ..................................................................................................8

          2.      Noramco ..............................................................................................10

          3.      Purdue..................................................................................................10

          4.      Endo ....................................................................................................10

          5.      Other Manufacturers ...........................................................................11

IV.     THE FALSE NARRATIVE ENTERPRISE CREATED ILLEGITIMATE
       DEMAND FOR OPIOIDS. ......................................................................................13

     A.      McKinsey worked with other members of the False Narrative Enterprise to
          increase the sale of prescription opioids. ......................................................13

          1.      McKinsey devises strategies and directs their implementation. ........13

          2.      McKinsey worked with Purdue...........................................................17

               a.      McKinsey began working with Purdue in 2004.......................17

               b.      Purdue pleaded guilty to misbranding OxyContin. .................18

               c.      Purdue hired McKinsey to evade the Corporate Integrity Agreement.
                    ........................................................................................................19

               d.      McKinsey devised multiple strategies to increase OxyContin sales...22

               e.      Purdue implemented McKinsey's strategies...........................26

               f.      Project Turbocharge ...............................................................28

               g.      McKinsey's efforts tripled Purdue's sales of OxyContin. ......32

               h.      McKinsey advised Purdue to buy off health insurers. ............32

               i.      Purdue pleaded guilty again. ..................................................33

           3.      McKinsey worked with other Manufacturers. .....................................34

               a.      Endo........................................................................................34

               b.      Janssen ....................................................................................39

               c.      Noramco...................................................................................40

           4.      McKinsey worked with the FDA. .......................................................43

           5.      McKinsey worked to increase the overall size of the opioid market..............47

6.      McKinsey's hedge fund created a conflict of interest.......................................47

B.      Members of the False Narrative Enterprise set out to change the best practices for the use of opioids..................................................................................49

C.      The False Narrative Enterprise spread falsehoods about the risks and benefits of prescription opioids...............................................................................53

1.      Falsehood #1: The risk of addiction to opioids is low....................................53

2.      Falsehood #2: It is easy to identify people at high risk for addiction.............55

3.      Falsehood #3: Signs of addictive behavior are "pseudoaddiction" requiring more opioids........................................................................................55

4.      Falsehood #4: Addicted patients are "untrustworthy" "abusers".................57

5.      Falsehood #5: Opioid withdrawal can be avoided by tapering........................58

6.      Falsehood #6: Opioid doses can be increased without limit or increased risk..........................................................................................................59

7.      Falsehood #7: Long-term opioid use improves functioning. .........................60

8.      Falsehood #8: Opioids are safer than other pain medications. ......................61

9.      Falsehood #9: Ostensibly "abuse-deterrent" formulations are safer.............62

10.     Falsehood #10: Short-acting opioids should be used to treat chronic, noncancer "breakthrough" pain. ......................................................................64

11.     Falsehood #11: Despite heightened risk factors, the elderly and veterans can safely use opioids...........................................................................64

D.      The False Narrative Enterprise used a campaign of misinformation to publicize these falsehoods and convince prescribers, legislators, and the public of their truth. ..............................................................................................66

1.      Members of the False Narrative Enterprise used "detailers" to disseminate their misrepresentations directly to prescribers. ...........................67

2.      Members of the False Narrative Enterprise used Front Groups to promote greater opioid use..................................................................................69

a.      American Pain Foundation ....................................................................71

b.      American Academy of Pain Medicine and the American Pain Society ..................................................................................................................75

c.      The University of Wisconsin Pain and Policy Study Group..............77

d.      Alliance for Patient Access .................................................................78

e.      American Geriatrics Society..................................................................79

f.      American Chronic Pain Association......................................................81

g.      C.A.R.E.S. Alliance ..............................................................................82

3.      Members of the False Narrative Enterprise captured independent organizations...................................................................................................83

|  |  |  | a. | Federation of State Medical Boards | 83 |
|  |  |  | b. | The Joint Commission | 86 |
|  | 4. | Members of the Opioid Promotion Enterprise paid Key Opinion Leaders to deceptively promote opioid use. | 89 |
|  |  |  | a. | Dr. Russell Portenoy | 89 |
|  |  |  | b. | Dr. Lynn Webster | 91 |
|  |  |  | c. | Dr. Perry Fine | 91 |
|  |  |  | d. | Dr. Scott Fishman | 92 |
|  | 5. | Members of the False Narrative Enterprise disseminated their misrepresentations through Continuing Medical Education programs. | 93 |
|  | 6. | Members of the False Narrative Enterprise promoted specific opioid products to doctors and consumers. | 93 |
|  | 7. | Members of the False Narrative Enterprise used unbranded advertising to promote opioid use. | 98 |
|  | 8. | Members of the False Narrative Enterprise funded, edited, and distributed publications that supported their misrepresentations. | 101 |
|  | 9. | Members of the False Narrative Enterprise used speakers' bureaus and programs to spread their deceptive messages. | 104 |
| E. | The Members of the False Narrative Enterprise misrepresented their involvement in promoting opioids. | 105 |
| F. | Members of the False Narrative Enterprise directly targeted hospitals. | 106 |
| G. | Deceptive marketing caused excessive opioid use. | 109 |
| H. | The False Narrative Enterprise coordinated the scheme through the Pain Care Forum. | 112 |
| I. | Defendants and the Manufacturers are members of the False Narrative Enterprise. | 115 |
| V. | THE FALSE NARRATIVE ENTERPRISE HARMED PLAINTIFF AND OTHER HOSPITALS. | 117 |
| VI. | THE OPIOID CRISIS IS NOT OVER. | 123 |
| A. | Continued Prescriptions and Overdoses | 123 |
| B. | Continued Activity of Front Groups and KOLs | 125 |
| VII. | CLASS ALLEGATIONS | 128 |
| VIII. | CAUSE OF ACTION | 131 |
|  | 1. | Structure of the False Narrative Enterprise | 131 |
|  | 2. | The Common Purpose and Scheme of the False Narrative Enterprise | 132 |
|  | 3. | Pattern of Racketeering Activity | 134 |

|  |  | 4. | Conspiracy | 138 |
|  |  | 5. | Consequences | 138 |
| IX. | PRAYER FOR RELIEF | | | 139 |
| X. | JURY DEMAND | | | 139 |

## COMPLAINT

Plaintiff San Miguel Hospital Corporation d/b/a Alta Vista Regional Hospital brings this Complaint against Defendants McKinsey & Company, Inc.; McKinsey Holdings, Inc.; McKinsey & Company, Inc. United States; McKinsey & Company, Inc. Washington D.C. (collectively "McKinsey" or "Defendants") under the Racketeering Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1961–1968) ("RICO"); seeking judgment against Defendants and in favor of Plaintiff; compensatory damages; treble damages; pre-judgment and post-judgment interest; cost of suit; and equitable relief, including injunctive relief, and allege as follows:

## I.    INTRODUCTION

1.    Opioids are powerful and highly addictive narcotics, and their use can result in serious medical complications, including opioid use disorder ("OUD") and fatal overdoses. This poses an ongoing crisis. According to the most recently available CDC data: "The number of people who died from a drug overdose in 2021 was over six times the number in 1999. The number of drug overdose deaths increased by nearly 16% from 2020 to 2021. Nearly 75% of the nearly 107,000 drug overdose deaths in 2021 involved an opioid." The rise in prescription opioid overdose deaths started in the 1990s. While that rise has plateaued, there has been an ongoing rise in synthetic opioid overdose deaths since 2013. These opioids include tramadol and fentanyl.[1]

2.    The use of opioids leads to physical dependency. If a physically dependent person stops taking opioids, the result is agonizing withdrawal.  Opioid use also leads to tolerance in which the brain physiologically adapts to the presence of opioids and then demands greater and greater doses over time to achieve the same effects.

---

[1]    *Understanding    the    Opioid    Epidemic*,    Ctrs.    for    Disease    Control    &    Prevention, https://www.cdc.gov/opioids/basics/epidemic.html (last reviewed Sept. 12, 2023).

3.    Obtaining opioids pursuant to a valid prescription and taking them as directed is no shield. The prevalence of opioid misuse following prescription of opioids for chronic pain is between 21% and 29%, and the prevalence of addiction is between 8% and 12%.[2] Indeed, it may even be higher as the CDC reports that as many as 1 in 4 people receiving prescription opioids long term in a primary-care setting struggles with addiction.[3]

4.    The link between the results and an initial opioid prescription is also clear. For example, between 2009 and 2018, 671 people in Massachusetts had filled a prescription for a Purdue opioid and later died of an opioid-related overdose.[4] Similarly, a study by United Health showed that hundreds of thousands of its policyholders had been prescribed opioids and subsequently diagnosed with OUD.[5]

5.    As their need for opioids becomes more acute, many individuals initially prescribed opioids seek prescriptions from multiple doctors, buy black-market prescription opioids, or turn to drugs like heroin and illicitly produced fentanyl. This progression is well documented; approximately 75% of heroin users report that their initial drug use was through prescription opioids.[6]

6.    The origins of the current crisis stretch back to the 1990s when Purdue released its blockbuster opioid, OxyContin. To ensure that OxyContin was widely adopted by the medical community, Purdue engaged in an extensive marketing campaign with a single message: opioids are safe and should be prescribed liberally for chronic pain.

---

[2] Kevin E. Vowles, *Rates of Opioid Misuse, Abuse, and Addiction in Chronic Pain: A Systematic Review and Data Synthesis*, 156 Pain 569 (2015), https://pubmed.ncbi.nlm.nih.gov/25785523/.

[3] *Prescription Opioids*, Ctrs. for Disease Control & Prevention (last rev. Aug. 29, 2017), https://www.cdc.gov/opioids/basics/prescribed.html; *see also* Anna Lembke, *Drug Dealer, MD: How Doctors Were Duped, Patients Got Hooked and Why It's So Hard to Stop* 22 (2016) (hereinafter, *Drug Dealer, MD*) ("[A]s many as 56 percent of patients receiving long-term prescription opioids for low back pain, for example, progress to addictive opioid use, including patients with no prior history of addiction.").

[4] *Empire of Pain, supra*, at 381.

[5] *Id.* at 419.

[6] Theodore J. Cicero, et al., *The Changing Face of Heroin Use in The United States: A Retrospective Analysis of The Past 50 Years*, 71 JAMA Psychiatry (2014), https://www.seattle.gov/documents/departments/cityAttorney/opioidLitigation/FN9-JAMAPsychiatry-ChangingFaceHeroinUse.%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.pdf.

7.      Purdue's marketing initiated a "paradigm shift" in attitudes towards prescribing opioids for chronic pain.[7] After witnessing OxyContin's blockbuster success, "other pharmaceutical firms rushed to develop and promote their *own* long-acting painkillers."[8] These Manufacturers did so with "rank indifference to the dangers they posed."[9]

8.      McKinsey's role was to devise strategies for Manufacturers (including Purdue, Endo, Janssen, and Noramco) that would result in increased sales of prescription opioids. After designing the strategies, McKinsey then turned around and worked hand-in-hand with these clients to implement these strategies.

9.      The Manufacturers and McKinsey thus formed the core of a racketeering enterprise—the False Narrative Enterprise, whose members cooperated to prescribe, sell, and dispense ever-increasing quantities of opioids. To create newfound demand for opioids, members of the False Narrative Enterprise used misleading marketing to convince both doctors and patients that opioids could safely be prescribed for common ailments that cause chronic pain. The goal was to sell more prescription opioids. The effect was to push out into the community opioids in quantities that could not possibly have been medically justified and in the face of clear evidence that opioids were being diverted for illegitimate uses. Much of this was done in violation of laws designed to control the market for the dangerous substances being sold.

10.     This organized campaign to increase the demand for opioids worked as planned. Opioid sales—less than $1 billion in 1992—ballooned to $8 billion in 2015.

11.     To further their scheme, members of the False Narrative Enterprise (including McKinsey) conspired to cause changes in the standard of care used by the medical profession

---

[7] Patrick Radden Keefe, *Empire of Pain* 367 (2021) (hereinafter *Empire of Pain*).
[8] *Id.* at 245.
[9] *Id.* at 419.

(especially hospitals) for treating pain. This new (and ultimately unattainable) goal of eradicating all pain drove a rapid and sustained increase in prescriptions for opioids.

12.      As demand rose, supply rose with it. The Drug Enforcement Administration ("DEA") sets quotas for the amount of controlled substances that can be manufactured (and hence distributed and dispensed) each year. Members of the False Narrative Enterprise engaged in a concerted campaign to convince regulators to raise these quotas to unprecedented heights, enabling the Enterprise to sell more and more opioids. At the same time, many members of the False Narrative Enterprise were also distributors of opioids. Distributors have an obligation to detect and refuse to ship suspicious orders in order to prevent controlled substances from being diverted out of legitimate channels. These distributors failed to develop sufficiently robust systems to detect suspicious orders, collaborated with their customers on ways to avoid triggering a review of orders as suspicious, and failed to halt shipment of potentially suspicious orders until the suspicion was dispelled.

13.      At the same time, national retail pharmacies that were members of the False Narrative Enterprise failed to fulfill their obligations under the CSA to only fill prescriptions written for a legitimate medical purpose by dispensing prescription opioids pursuant to such prescriptions that were not written for a legitimate medical purpose and by implementing policies and procedures that inhibited pharmacists' ability to detect and refuse to fill those prescriptions.

14.      The conduct of the members of the False Narrative Enterprise constituted repeated, related, and continuous acts of mail fraud, wire fraud, corruption of official proceedings, and violations of the Controlled Substances Act and its state analogs. As these acts were committed to further the purpose of the False Narrative Enterprise, they give rise to liability under the Racketeer Influenced and Corrupt Organizations Act.

15.      By misleading doctors and patients regarding the safety and efficacy of prescription opioids, by failing to take the steps required by law to prevent the diversion of controlled substances,

and by misleading authorities regarding all of this conduct, the False Narrative Enterprise caused a flood of opioids to be prescribed, distributed, and dispensed that was far in excess of what could possibly have been serving a legitimate medical need.

16.    Plaintiff operates a hospital that provides acute care, including treatment of opioid-dependent patients and patients suffering from opioid-related conditions.[10] These patients routinely seek services at Plaintiff's emergency room and occupy beds in Plaintiff's hospital. As a hospital operator, Plaintiff is legally and morally compelled to treat these patients, regardless of the cost of treatment.

17.    Plaintiff has directly paid the cost of the epidemic of utterly excessive opioid use that Defendants and the rest of the False Narrative Enterprise caused. Opioid-dependent patients are generally more complex to treat and consume more hospital resources of all kinds than do patients who are not opioid-dependent. Plaintiff must still provide all patients with complete care, but private and government insurance does not fully cover these increased costs for opioid-dependent patients. This financial impact proceeds directly from Defendants' misconduct in driving inflated demand for and supply of prescription opioids.

II.    **JURISDICTION AND VENUE**

18.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as Plaintiff's cause of action arises under the laws of the United States, specifically the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968.

---

[10] "Opioid-related conditions" include but are not limited to opioid use disorder and overdose; psychiatric and mental health treatment; neonatal abstinence syndrome ("NAS") or other opioid-related conditions of newborns; illnesses associated with opioid use, such as endocarditis, hepatitis C, and HIV; medical procedures made more complex and expensive due to a patient's opioid use or dependence; illnesses or other conditions claimed by a person with opioid use disorder in order to obtain an opioid prescription; and any other condition identified in Plaintiff's records as related to opioid use, misuse, or dependence.

19.     This Complaint is being directly filed in this Court for purposes of pretrial proceedings under Pretrial Order No. 7, *In re McKinsey & Co., Inc. Nat'l Prescription Opiate Litig.*, MDL No. 2996 (Nov. 30, 2021).

20.     The District of New Mexico has personal jurisdiction over Defendants because at all relevant times Defendants purposefully directed their actions towards New Mexico and have the requisite minimum contacts with New Mexico necessary to constitutionally permit the District of New Mexico to exercise jurisdiction.

21.     Venue is proper in the District of New Mexico pursuant to 28 U.S.C. § 1391 because Plaintiff was injured in that district and because Defendants and the other members of the False Narrative Enterprise directed their conduct towards persons in that district.

22.     Alternately, this Court has personal jurisdiction over Defendants because at all relevant times Defendants engaged in substantial business activities in California and purposefully directed their actions towards California, and have the requisite minimum contacts with California necessary to constitutionally permit this Court to exercise jurisdiction.

23.     Alternately, personal jurisdiction and venue are proper in the District of Delaware or the Southern District of New York as each Defendant is either a Delaware or a New York corporation with its principal place of business in New York, New York.

24.     Venue is proper in this Court for pretrial proceedings under *In re McKinsey & Co., Inc. Nat'l Prescription Opiate Litig.*, MDL No. 2996, 2021 WL 2351628 (J.P.M.L. June 7, 2021).

III.    **PARTIES**

A.    **Plaintiff**

25.     Plaintiff San Miguel Hospital Corporation d/b/a Alta Vista Regional Hospital is a corporation chartered in the State of New Mexico, domiciled and doing business at 104 Legion Drive, Las Vegas, New Mexico 87701.

**B.**    **Defendants**

26.    Defendant McKinsey & Company, Inc. is a corporation organized under the laws of the state of New York. McKinsey's principal place of business is located at 711 Third Avenue, New York, NY 10017.

27.    Defendant McKinsey Holdings, Inc. is a Delaware corporation with its principal place of business is located at 711 Third Avenue, New York, NY 10017.

28.    Defendant McKinsey & Company, Inc. United States is a Delaware corporation with its principal place of business is located at 711 Third Avenue, New York, NY 10017.

29.    Defendant McKinsey & Company, Inc. Washington D.C. is a Delaware corporation with its principal place of business is located at 711 Third Avenue, New York, NY 10017.

30.    Upon information and belief, McKinsey & Company, Inc. is the parent company of McKinsey & Company Holdings, Inc., which is itself the parent company of both McKinsey & Company, Inc. United States and McKinsey & Company, Inc. Washington D.C. Upon information and belief, each subsidiary corporation is wholly owned by its parent. Despite the corporate form, McKinsey began as a partnership and still refers to its senior employees as "partners." Those partners are the firm's shareholders. Collectively, these four Defendants are referenced throughout as "McKinsey."

31.    McKinsey is a global management consultancy with offices in over 130 cities in 65 countries, including the following United States cities: Atlanta, GA; Austin, TX; Houston, TX; Dallas, TX; San Francisco, CA; Los Angeles, CA; Redwood City, CA; Boston, MA; Charlotte, NC; Chicago, IL; Cleveland, OH; Denver, CO; Detroit, MI; Miami, FL; Miramar, FL; Tampa, FL; Minneapolis, MN; Summit, NJ; New York, NY; Philadelphia, PA; Pittsburgh, PA; Seattle, WA; St. Louis, MO; Stamford, CT; Waltham, MA; and Washington, D.C.

32.    McKinsey is registered to do business in all fifty states.

33.     While McKinsey does not itself manufacture, distribute, or dispense prescription opioids, its role in the False Narrative Enterprise was to advise other members in how to increase the sale and use of prescription opioids. McKinsey accordingly does not itself have obligations under the Controlled Substances Act or its state equivalents, but rather conspired with other members of the False Narrative Enterprise that did have such obligations.

### C.     Other Enterprise Members

#### 1.     Janssen

34.     Johnson & Johnson ("J&J") and Janssen Pharmaceuticals, Inc. (collectively, "Janssen") are or have been in the business of manufacturing, selling, promoting, and/or distributing opioids (including Duragesic (fentanyl), Nucynta (tapentadol), and Ultram (tramadol)) throughout the United States and in New Mexico.

35.     Duragesic was not discontinued until March 2020 for some formulations and July 2022 for others. On information and belief, the product continued to be distributed into New Mexico until at least those dates.

36.     Janssen continued to manufacture, market, and sell Ultram until at least 2021,[11] and, on information and belief, it continued to be distributed into New Mexico. Although tramadol, the active ingredient in Ultram, is an opioid and so inherently carries a risk of addiction, J&J was instrumental in having it approved by the FDA in 1995 as an unscheduled substance.

37.     J&J actively promoted tramadol as safer than other opioids. When evidence began to mount of significant problems with addiction and substance misuse related to tramadol, Janssen worked actively to prevent it from being added to the list of controlled substances. It was finally scheduled in 2014. Shortly after the drug was approved, problems with abuse and dependence began

---

[11]     *See Our Products*, Janssen, (as of Nov. 12, 2021), https://web.archive.org/web/20211112200717/https://www.janssen.com/us/our-products.

increasing rapidly. Instead of alerting the FDA of the need to schedule tramadol, J&J and Janssen, in the early 2000s, J formed a "Independent Steering Committee" ("ISC") associated with the so-called Scientific Advisory Board of the RADARS System (formed by Purdue and discussed elsewhere) in order to lobby regulators against scheduling the drug. The ISC was ostensibly formed to monitor abuse of tramadol. But the real objective of the ISC was to placate the FDA into approving tramadol as a Schedule IV drug (rather than a Schedule II drug). When it was formed, J&J executives even referred to the project as forming a sort of "SWAT Team," which made presentations across the country, to attempt to persuade various states not to put tramadol products in a more restrictive regulatory category. The SWAT Team was successful. Tramadol was not listed as a scheduled drug at all. The FDA would, in 2014, classify tramadol as a Schedule IV drug, rather than a Schedule II drug like most other narcotics. It remains, to this day, a Schedule IV drug.

38.     According to the most recently available ARCOS data, Janssen opioids were distributed into New Mexico from 2006 to 2019.[12]

39.     As described in this Complaint, Janssen has had multiple instances in which it has unlawfully distributed controlled substances and/or engaged in acts of mail or wire fraud in support of the False Narrative Enterprise. From this pattern of instances, it can be inferred that Janssen's policies, practices, and procedures have failed to adapt and change in order to prevent the excessive use, misuse, and diversion of prescription opioids. On that basis, Plaintiff alleges on information and belief that Janssen continues to operate in ways that enable the excessive use, misuse, and diversion of prescription opioids.

---

[12] The Automated Reports and Consolidated Ordering System (ARCOS) is "a data collection system in which manufacturers and distributors report their controlled substances transactions to the Drug Enforcement Administration (DEA)." This data is not ordinarily publicly available and has only become available as a result of the opioid litigation. The data is only available for the period from 2006 to 2019.

### 2. Noramco

42.     Noramco, Inc. made and continues to make active pharmaceutical ingredients ("APIs") for opioid painkillers.

43.     Noramco has maintained a wholesale drug distributor license in New Mexico since at least 2016. This license remains active with an expiration date of December 31, 2025. On information and belief, opioids containing Noramco's API continue to be distributed in New Mexico.

44.     As described in this Complaint, Normaco has had multiple instances in which it has unlawfully distributed controlled substances and/or engaged in acts of mail or wire fraud in support of the False Narrative Enterprise. From this pattern of instances, it can be inferred that Noramco's policies, practices, and procedures have failed to adapt and change in order to prevent the excessive use, misuse, and diversion of prescription opioids. On that basis, Plaintiff alleges on information and belief that Noramco continues to operate in ways that enable the excessive use, misuse, and diversion of prescription opioids.

### 3. Purdue

45.     Purdue Pharma, L.P.; Purdue Pharma, Inc.; and The Purdue Frederick Company (collectively, "Purdue") manufactured, promoted, advertised, distributed, and sold branded opioids, including opioids OxyContin (oxycodone), MS Contin (morphine), Butrans (buprenorphine), Hysingla ER (hydrocodone), Dilaudid (hydromorphone), Dilaudid-HP (hydromorphone), and Targiniq ER (oxycodone/naloxone).

### 4. Endo

46.     Endo Pharmaceuticals Inc. is a wholly owned subsidiary of Endo Health Solutions, Inc. (collectively, "Endo"). Endo manufactured, promoted, advertised, distributed, and sold branded—Percocet (oxycodone/paracetamol), Opana (oxymorphone), and Percodan (oxycodone/aspirin)—and generic opioids.

### 5.  Other Manufacturers

47.     Mallinckrodt LLC, Mallinckrodt plc, and SpecGx LLC (collectively, "Mallinckrodt") manufactured, promoted, advertised, distributed, and sold branded and generic opioids. Mallinckrodt manufactures four branded opioids: Exalgo (hydromorphone), Roxicodone (oxycodone), Xartemis XR (oxycodone/acetaminophen), and Methadose (methadone). Mallinckrodt is also one of the largest manufacturers of generic opioids.

48.     Watson Laboratories, Inc., Actavis Pharma, Inc., and Actavis LLC (collectively, "Actavis") and Allergan Finance, LLC, Allergan Sales, LLC, and Allergan USA, Inc. (collectively, "Allergan") have manufactured, promoted, marketed, advertised, and sold branded opioids nationwide and in New Mexico, including Kadian (morphine) and Norco (hydrocodone/acetaminophen).

49.     Abbott Laboratories and Abbott Laboratories, Inc. (collectively, "Abbott") and it successor, AbbVie, Inc. ("AbbVie"), manufactured, promoted, and sold the opioids Vicodin (hydrocodone/acetaminophen), Vicoprofen (hydrocodone/ibuprofen), and Dilaudid (hydromorphone).

50.     Teva Pharmaceutical Industries, Ltd. ("Teva Ltd."), Teva Pharmaceuticals USA, Inc., Cephalon, Inc. ("Cephalon") (collectively, "Teva") manufactured, promoted, advertised, distributed, and sold branded—Actiq (fentanyl) and Fentora (fentanyl)—and generic opioids in the United States and New Mexico.

51.     Grünenthal GmbH ("Grünenthal") concentrates on manufacturing, marketing, and selling prescription pain medications, including opioids. Grünenthal invented and developed tramadol, which it launched in 1981. J&J licensed the drug from Grünenthal and introduced into the U.S. market as Ultram, which continues to be distributed and dispensed in the United States. Grünenthal also invented and developed tapentadol, which it licensed to Janssen in 2003. Grünenthal then approved

Janssen's transfer for the license in 2015 to Depomed.[13] Dissatisfied with Depomed's inability to increase sales of the opioid, Grünenthal agreed in 2017 to transfer the license to Collegium in hopes of driving increased sales.[14] Collegium continues to market and sell Nucynta in the U.S. under the license from Grünenthal. Grünenthal also developed INTAC technology that purported to make pills more difficult to crush and then abuse by insufflation (snorting). It licensed this technology to Endo and Purdue. Opioids using this technology were distributed into and dispensed in New Mexico.

52.    Grünenthal GmbH controlled the activities of its U.S. subsidiaries and acted through them to engage in conduct within the United States as described in this Complaint. It has also independently engaged in conduct in the United States, including negotiating with and executing agreements with licensees for tramadol, tapentadol, and INTAC.[15] In the course of this conduct, both Grünenthal GmbH and the U.S. subsidiaries that it controlled engaged in predicate acts alleged in this Complaint and/or conspired with other members of the False Narrative Enterprise. It did so in part by using the mails and/or wires within the United States.

53.    Collectively, Janssen, Noramco, Grünenthal, Teva, AbbVie, Allergan, Mallinckrodt, Purdue, Noramco, and Endo are referred to as the "Manufacturers."

54.    All of the actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein and were authorized, ordered, and/or done by officers, agents, employees, or other representatives of members of the False Narrative Enterprise while actively

---

[13] Press Release, Grünenthal Grp., Grünenthal GmbH Granted Its Consent to Transfer the License Rights for Nucynta (tapentadol) in the U.S. from Janssen Pharmaceuticals, Inc. to Depomed, Inc. (Jan. 15, 2015).
[14] *New Partnership for the Commercialization of Nucynta in the U.S. Territory*, PR Newswire (Dec. 5, 2017), https://www.prnewswire.com/news-releases/new-partnership-for-the-commercialization-of-nucynta-in-the-us-territory-662000683.html.
[15] *See, e.g.*, 2nd Amendment to the Development, License and Supply Agreement entered on December 18, 2007, https://www.sec.gov/Archives/edgar/data/1100962/000144530514000793/ex101392grunenthal2ndamend.htm (showing Grünenthal GmbH contracting with Endo in "Malvern, PA 19355, USA"); Consent Agreement, https://www.sec.gov/Archives/edgar/data/1267565/000155837020005738/coll-20200331xex10d5.htm (showing Grünenthal GmbH contracting in 2020 with Assertio Therapeutics, Inc. of "Lake Forest, IL 60045, USA" and Collegium of "Stoughton, MA 02072").

engaged in the management of the affairs of the Enterprise members within the course and scope of their duties and employment, and/or with the Enterprise members' actual, apparent, and/or ostensible authority.

## IV.    THE FALSE NARRATIVE ENTERPRISE CREATED ILLEGITIMATE DEMAND FOR OPIOIDS.

### A.    McKinsey worked with other members of the False Narrative Enterprise to increase the sale of prescription opioids.

#### 1.  McKinsey devises strategies and directs their implementation.

55.    As a management consulting firm, McKinsey provides plans to managers, directors, and owners on how to run their companies or other enterprises, and helps implement those plans.

56.    Broadly speaking, there are two schools of management consulting. "Strategy" consulting provides big-picture advice to clients about how they approach their business: how the business is structured, which markets to compete in, potential new business lines, and mergers and acquisitions. The strategy consultant provides a plan to the client that the client may choose to adopt or not.

57.    If strategy consulting is providing advice to a client, "implementation" work is what happens once the client has adopted the consultant's plan. An implementation consultant remains in place with the client to actually do the necessary work and execute the plan.

58.    Although McKinsey has historically been regarded as a "strategy" consulting firm, by the time it was working with Purdue, implementation services were a core component of the suite of services that McKinsey provided.

59.    During the implementation phase, McKinsey essentially bonds with the client. Describing McKinsey's approach to implementation, one McKinsey consultant stated, "In some of

the most successful engagements I've seen, you can't even tell the difference between a McKinsey team member and one of our clients because we working that cohesively together."[16]

60.    Another McKinsey Senior Implementation Coach described McKinsey's approach: "We're in there interacting with every element of that organization, from the welders or mechanics on the front line, all the way up to the board of directors."[17]

61.    Eugene, a partner, further offered:

> The reason McKinsey's implementation works is because clients love it. The fact that we are staying longer with them, the fact that we're getting into the trenches, the fact that we are there to walk the emotional journey with them when they're going through the tough times and really changing their companies, is what makes McKinsey implementation truly distinctive.[18]

62.    McKinsey's business model is thus to partner with clients to pursue business objectives identified by McKinsey. Once an objective is identified, the client and McKinsey then engage in concerted action as a seamless and cohesive unit in order to implement the necessary means to achieve it.

63.    McKinsey helps numerous clients throughout the pharmaceutical industry, from manufacturers to distributors and pharmacies. It often does so contemporaneously. Thus, McKinsey can also help its clients by telling them what their competitors—who are also McKinsey clients—are doing. For example, McKinsey pitched its services to Purdue on the basis that it was able to "bring examples from other successful companies" and perform "detailed analytics."

64.    McKinsey has long maintained a Pharmaceuticals and Medical Products ("PMP") industry practice group dedicated to working with pharmaceutical companies. In 2004, when

---

[16] McKinsey on Implementation, YouTube (April 30, 2017), https://www.youtube.com/watch?v=rEQOGVpl9CY.
[17] Id.
[18] See "McKinsey Careers: what's behind McKinsey Implementation's logo and success?", October 22, 2018, https://web.archive.org/web/20200419140214/https://www.youtube.com/watch?v=3-Zx859VJtw.

McKinsey's relationship with Purdue began, the PMP group was led by Michael Pearson. Pearson stated: "At McKinsey pharmaceuticals was one of our biggest industry groups."[19]

65.    In 2012, the PMP group published a report entitled "Death of a Sales Model, or Not: Perspectives on the Evolution of Pharmaceutical Field Based Selling."[20] In it, McKinsey partner Laura Moran co-authored a segment called "The Few, The Proud, The Super-Productive: How a 'smart field force' can better drive sales." In the segment, Moran and her co-authors described various ways a pharmaceutical company could optimize its sales force. Moran worked on the Purdue account, where the strategies outlined in her article were incorporated into Project Turbocharge (described below) two years later.

66.    With respect to pharmaceutical marketing, the PMP group states, "We support clients in creating high-impact strategies that maximize value, using customized tools. We also have detailed market data for all major geographic regions."[21] PMP also works with pharmaceutical clients regarding their sales forces: "[W]e can help train and restructure sales forces, work directly in the field to provide coaching, maximize value from back-office services, develop strategies to accelerate short-term sales, and assist with company-wide commercial transformations."[22]

67.    Consistent with PMP's ambition that McKinsey be the dominant consultant in the pharmaceutical industry, McKinsey has blanketed the entire pharmaceutical supply chain with alumni. This includes Raj de Silva, who worked alongside Pearson in a leadership position at McKinsey before becoming Endo's CEO in March 2013, and Frank Solz, a McKinsey partner and PMP group leader until

---

[19] Michael Peltz, *Mike Pearson's New Prescription for the Pharmaceuticals Industry*, Institutional Investor, September 3, 2014, https://www.institutionalinvestor.com/article/b14zbjfm8nf1c4/mike-pearsons-new-prescription-for-the-pharmaceuticals-industry
[20] "Death of a Sales Model, or Not," Pharmaceutical and Medical Product Practice, McKinsey, https://www.mckinsey.com/~/media/mckinsey/dotcom/client_service/pharma%20and%20medical%20products/pmp%20new/pdfs/2012%20death%20of%20a%20sales%20model%20or%20not.pdf.
[21] *See* https://www.mckinsey.com/industries/pharmaceuticals-and-medical-products/how-we-help-clients/commercial.
[22] *Id.*

joining Mallinckrodt in 2013 to head Mallinckrodt's generics unit. McKinsey advised Endo and Mallinckrodt on their opioid businesses.

68.     McKinsey also has ties with Manufacturers, including Teva, Actavis, Allergan, and Abbott, as well as with pharmaceutical distributors such as Cardinal, McKesson, and AmerisourceBergen (now Cencora) as various high-level employees moved back and forth between McKinsey and these companies.

69.     Because of its client relationships, McKinsey was, quite literally, the sole repository on Earth of this collective knowledge of industry-wide tactics regarding the sales and marketing of opioids, and the outcomes thereof. This unique collection of knowledge and expertise made McKinsey a hub within the False Narrative Enterprise.

70.     McKinsey pursues a "transformational relationship" with its clients. This is a long-term relationship, not a mere one-off contract to solve a particular problem. "[O]nce McKinsey is inside a client, its consultants are adept at artfully creating a feedback loop through their work that purports to ease executive anxiety but actually creates more of it."[23] The long-term result can be "dependence" on the McKinsey consultants. "We insinuate ourselves," Ron Daniel, McKinsey's then-managing partner, told *Forbes* in 1987.

71.     Another aspect of the transformational relationship McKinsey develops with clients is the development and marketing of "leave-behind" products, such as software applications, that are sold to clients as tools that can be used by the business on an ongoing and recurring basis, separate and apart from McKinsey's project-based consulting work. For example, McKinsey sold Purdue a pharmaceutical sales and marketing workforce optimization tool called FieldGuide for the purpose of optimizing Purdue's OxyContin workforce.

---

[23] McDonald, *supra*, at 6.

### 2. McKinsey worked with Purdue.

#### a. McKinsey began working with Purdue in 2004.

72.   McKinsey's work with Purdue is a prime example of the transformational relationship in action.

73.   On March 1, 2004, McKinsey entered into a Master Consulting Agreement with Purdue. After a ruling that held patents on OxyContin unenforceable due to Purdue misleading the patent office, McKinsey stepped in to help Purdue.

74.   McKinsey actively worked with Purdue to increase OxyContin sales despite Purdue's 2007 guilty plea for misbranding OxyContin and continued to do so throughout the time period that Purdue and its advisors were bound by the terms of the Corporate Integrity Agreement entered into alongside the guilty plea. McKinsey's work with Purdue continued through at least 2018.

75.   McKinsey staffed at least forty known consultants to Purdue, from senior partners all the way down through engagement managers and entry-level associates.

76.   McKinsey partner Maria Gordian, in her March 26, 2009 "EY 2009 Impact Summary" internal report to McKinsey director Olivier Hamoir and McKinsey's Personnel Committee, recounted her accomplishments that year on the Purdue account. This document is an annual self-assessment produced by McKinsey partners. In it, Gordian described the state of the firm's relationship with Purdue: "[W]e continue to expand the depth and breadth of our relationships at Purdue. We look forward to deepening our relationships with the Sackler family[24] and serving them on key business development issues, and to expanding our relationship with [John] Stewart and other members of the senior management team." Gordian even described herself as a counselor to Richard Sackler in addition to being a "point of contact for the Board and Sackler family."

---

[24] The Sackler family privately owned Purdue.

77.    By 2014, both the breadth and depth of McKinsey's relationship with Purdue had expanded dramatically. During the 2009 to 2014 period, Purdue relied extensively on McKinsey to develop and implement its sales and marketing strategy for OxyContin. McKinsey's work with Purdue also included general and administrative consulting, review of product acquisition, evaluation of research and development, advising Purdue on the design of clinical studies, risk management, and interactions with regulators. As Purdue faced growing scrutiny for its aggressive promotion of OxyContin, McKinsey also helped the company protect its public image.

78.    McKinsey understood the Sacklers' goals for Purdue and the work it would need to perform to maintain and grow Purdue's opioid profits amidst a growing epidemic of opioid dependence and misuse. Part of McKinsey's work involved assessing the "underlying drivers" of OxyContin's (financial) performance. As described below, these drivers boil down to two things: (1) a widespread deceptive marketing campaign and (2) fueling an illicit market for non-medical use. Purdue entered into guilty pleas arising out of both types of conduct in 2007 and again in 2020. McKinsey delved into the "granular" aspects of Purdue's sales and promotion. And, throughout the two companies' long-term relationship, McKinsey understood Purdue's business "both in terms of content and culture," as its own renewed consulting agreement assured in 2013.

**b.  Purdue pleaded guilty to misbranding OxyContin.**

79.    In 2007, Purdue Frederick Company as well as three of Purdue's officers, pleaded guilty to the misbranding of OxyContin pursuant to various provisions of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301, *et seq.*

80.    Purdue admitted that "supervisors and employees, with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications." Part of this deceptive messaging included highlighting OxyContin as a long-acting ("LA") or extended-release ("ER") opioid

and suggesting that it reduced the risk of addiction compared to immediate-release or short-acting opioids because it had fewer "peak and trough" blood level effects or "did not cause a 'buzz' or euphoria" in the same manner as these other opioids.

81.    Concurrent with its guilty plea, Purdue entered into a Corporate Integrity Agreement, which ultimately terminated in January 2013. The agreement required Purdue to cease making misrepresentations regarding the safety and risk of abuse from its products, to reform its compensation for sales representatives to avoid motivating them to engage in misrepresentation, and to improve its processes regarding materials provided to doctors about Purdue's products. Notably, under the terms of Paragraph II.C.1(b) of the Corporate Integrity Agreement, McKinsey, as a contractor to Purdue performing sales and marketing functions for the company, was itself a "Covered Person" subject to the strictures of the Agreement.

### c.  Purdue hired McKinsey to evade the Corporate Integrity Agreement.

82.    Despite the agreement's constraints (i.e., do not lie about OxyContin), Purdue still intended to maximize OxyContin sales. Purdue intended to do so in order to maximize profits in the short term to enable the Sacklers to "cash out" of the business before further regulatory or enforcement actions would put them at risk.

83.    However, Purdue did not have the capabilities in-house to design and implement a sales strategy for OxyContin that would achieve this objective given the restrictions imposed by the Corporate Integrity Agreement. So, the company turned to McKinsey.

84.    In October 2008, Purdue retained McKinsey for broad strategy work after two board members "blessed" Purdue executive Craig Landau with doing "whatever he thinks is necessary to 'save the business'" after the 2007 criminal plea and introduction of generic competition to the older OxyContin.

85.     From as early as June 2009 and continuing at least through July 14, 2014, Purdue routinely relied upon McKinsey to orchestrate its sales and marketing strategy for OxyContin. The relationship was characterized by ongoing interactions between teams from McKinsey and Purdue regarding not only the *creation* of an OxyContin sales strategy but also its *implementation*. McKinsey was a real presence at Purdue. "A team of McKinsey analysts went in-house, camping out in a conference room at Purdue headquarters."[25]

86.     One critical aspect of Purdue's operations, given its status as a producer of controlled substances, was regulatory compliance. McKinsey guided Purdue through practically all of its interactions with regulators whose efforts to protect the public might pose threats to Purdue's business.

87.     In 2008, Purdue submitted a New Drug Application for a reformulation of OxyContin, ostensibly to make it more difficult to abuse by extracting the active ingredient from it or otherwise defeating the time-release mechanism in OxyContin tablets—i.e., another product Purdue would later deceptively promote as safer than and less prone to abuse than it was.

88.     Having advised Purdue on the design of tests of reformulated OxyContin as part of Purdue's FDA submission, McKinsey knew that reformulated OxyContin could still be abused. Purdue nonetheless touted its introduction of reformulated OxyContin and another ADF opioid as evidence of its good corporate citizenship and commitment to protecting the public.

89.     In September 2009, Purdue made a presentation to the FDA advisory committee considering its application for its reformulated OxyContin and stated that the OxyContin ADF would deter abuse. According to metadata, the PowerPoint presentation was prepared by McKinsey.

90.     The FDA approved the OxyContin ADF in April 2010.

---

[25] Keefe, *Empire of Pain*, *supra*, at 302.

91.     Having successfully navigated the approval process with McKinsey's chaperoning, Purdue then proceeded to market the ADF version of OxyContin as a solution to opioid abuse and as a reason that doctors could continue to safely prescribe Purdue's opioids.

92.     In 2020, two FDA advisory committees evaluating the impact of the reformulated OxyContin concluded that the OxyContin ADF did not, in fact, substantially reduce abuse.

93.     At the same time as it worked to rehabilitate Purdue's image with the FDA, McKinsey, in parallel, advised Purdue on how to limit FDA regulations aimed at mitigating the risks of opioid use. In 2008, shortly after Purdue's criminal plea, the FDA requested Purdue submit a proposed "Risk Evaluation and Mitigation Strategy" ("REMS") for OxyContin. McKinsey provided Purdue with drafts of the submission. Indeed, McKinsey was crucial in devising Purdue's response to the FDA's request for a REMS proposal from Purdue. Gordian informed Rosiello and Elling on October 23, 2008 that John Stewart, Purdue's CEO, "is aware of the critical role we are playing in pulling REMs together and is very appreciative."

94.     In 2009, the FDA expanded its scope to a class-wide ER/LA opioid REMS program.

95.     Seeking to avoid a requirement that prescribers undergo mandatory training on OxyContin's risks or management or obtain certification before prescribing OxyContin, which would limit the numbers of available prescribers, Purdue turned to McKinsey. McKinsey found the cost to Purdue of a system to verify completion of prescriber education before prescriptions could be filled would be $50 million—an estimate Purdue used to oppose efforts for more rigorous risk management strategies. Armed with McKinsey's analysis, Purdue's strategy on REMS was effective. The REMS program avoided verification and enrollment provisions that would harm Purdue's profits.

96.     In June 2009, McKinsey helped Purdue prepare for an FDA advisory committee meeting.

97.    McKinsey prepared for Purdue an "FDA Advisory Committee on Reformulated OxyContin: Question & Answer Book" in September 2009, with questions including "Why should we trust you?" In response, McKinsey recommended Purdue say "We acknowledge mistakes made in the past[;]" "We have x, y and z measures in place that did not exist before[;]" and "[a]t all levels, Purdue's focus is on maintaining the highest ethical standards and meeting the needs of patients[.]" These were misrepresentations of Purdue's true intentions and practices and were designed to delay an appropriate response to the epidemic of excessive prescription and misuse of Purdue's prescription opioids.

### d. McKinsey devised multiple strategies to increase OxyContin sales.

98.    McKinsey's analysis of Purdue's OxyContin sales efforts led to the implementation of a number of strategies to sell more pills.

99.    In June 2009, McKinsey discussed with Purdue's Craig Landau and his staff how best to "counter emotional messages from mothers with teenagers that overdosed in [sic] OxyContin."

100.    Months later, McKinsey advised Purdue to market OxyContin based on the false and misleading notion that the drug can provide "freedom" and "peace of mind" for its users, give patients "the best possible chance to live a full and active life," and concomitantly reduce stress and isolation. These marketing claims were tailored to avoid any pitfalls that the Corporate Integrity Agreement might hold. While false and misleading, these claims regarding "freedom" and "peace of mind" of OxyContin users were narrowly tailored in order to avoid representations regarding the topics specifically covered by the agreement.

101.    McKinsey informed Purdue that by highlighting the ability to "tailor the dose" and treat a "broad range of appropriate patients," the prescriber-takeaway would be that "physicians can help their patients function better and lead a fuller and more active life," even though this conclusion was not to be explicitly addressed (in order to comply with the letter—but not the spirit—of the Corporate Integrity Agreement).

102.    In November 2010, a McKinsey report instructed sales reps to maximize profits by "emphasizing [the] broad range of doses"—which meant pushing the doses that were highest and most profitable.

103.    Claims that OxyContin improved function and quality of life were not supported by substantial evidence and, in addition, failed to take into account risks of addiction.

104.    McKinsey urged Purdue to capitalize on OxyContin's extended-release characteristics in another way: marketing OxyContin's twelve-hour dosing as though users only need to take OxyContin twice a day, thus requiring fewer pills. OxyContin in fact was well known to wear off after eight to ten hours in many patients, however. What McKinsey called "convenient," would later be called "a [d]escription of Hell." Promotion of twelve-hour dosing, without disclosing its limitations, is misleading because it implies that the pain relief supplied by each dose lasts twelve hours. The result is patients taking their next dose early when the pain returns, which is "the perfect recipe for addiction."[26]

105.    McKinsey encouraged the tactic of "patient pushback," wherein McKinsey and Purdue would foment patients to directly lobby their doctors for OxyContin even when those physicians expressed reservations regarding the administration of Purdue's opioids. The idea was that McKinsey and Purdue could spread their own message through pain patients who would be perceived as more credible sources suggesting a need for an extended-release opioid—even though the team devising this strategy would have known that extended-release opioids did not substantially control pain or thwart addiction better than lower-dose, immediate-release opioids.

106.    McKinsey also coached Purdue on building "trust" (which from its vantage point, McKinsey knew was misplaced) in Purdue following its criminal conviction.

---

[26] Harriet Ryan, "'*You Want a Description of Hell?' OxyContin's 12-Hour Problem*," Los Angeles Times, May 5, 2016, http://www.latimes.com/projects/oxycontin-part1/.

107.    McKinsey identified historically large prescribers and advised Purdue to target those prescribers with a marketing blitz to encourage even more prescribing without any regard for, and indeed conscious disregard of, patient safety. Many of these prescribers had prescribed Purdue's OxyContin *before* the 2007 guilty plea and had already been subjected to Purdue's misrepresentations regarding OxyContin that were the subject of that guilty plea.

108.    More than three years after the initial introduction of this physician segmentation initiative, McKinsey requested, and Purdue provided, "prescriber-level milligram dosing data" so that McKinsey could further analyze the amounts of OxyContin prescribed by individual physicians. At the same time as it requested this data, McKinsey urged Purdue to strictly manage the target lists of each sales representative to ensure that the maximum amount of each sales representative's time was spent with the highest prescribers.

109.    On July 23, 2013, Purdue's board discussed concerns about "the decline in higher strengths" of Purdue's opioids as well as an observed decline is "tablets per Rx." In order to ensure that the threat to OxyContin sales growth be addressed, McKinsey was assigned "to actively monitor the number and size of opioid prescriptions written by individual doctors."

110.    In unveiling its 2013 plan to boost sales even further, McKinsey stated that the most prolific OxyContin prescribers wrote "25 times as many OxyContin scripts" as less prolific prescribers and urged Purdue and the Sacklers to "make a clear go-no go decision to 'Turbocharge the Sales Engine'" by devoting substantial capital toward McKinsey's plan.

111.    McKinsey also stated that increased visits by sales representatives to these prolific prescribers would increase the number of opioid prescriptions that they would write. This singular focus on increasing prescriptions was not coupled with colorable concern for the patient population.

112.    Not only did McKinsey identify which doctors prescribed the most of Purdue's opioids, but McKinsey also recommended segmenting prescribers into "types" and tailoring messages

and tactics to the different prescriber profiles. For prescribers dubbed "Early Adopting Experts" and "Proactive Teachers," defined by a willingness to use extended-release opioids, including in opioid-naïve patients (patients who were not already using opioids), McKinsey urged emphasizing that its seven tablet strengths provide flexibility to "tailor the dose" to customer needs. Upon information and belief, this message aimed to encourage prescribers to initiate and maintain patients on OxyContin long-term by reminding them they could increase the dose as patients became tolerant to long-term use (rather than discontinue use when the drug lost its effectiveness).

113.    McKinsey recommended a strategy to target those prescribers who did not regularly prescribe OxyContin by encouraging them to use OxyContin earlier in treatment, for a wider range of patients, and for longer periods of time.

114.    McKinsey advised Purdue to focus on selling higher-strength dosages of OxyContin, which would have the intended effect of increasing the sales of the highest (and most profitable) doses. Purdue implemented McKinsey's suggestions by adopting the marketing slogan "Individualize the Dose" and, by 2013, encouraged its sales representatives to "practice verbalizing the titration message" when promoting Purdue's opioids to prescribers.

115.    Claims that opioids could be taken in ever-increasing strengths to obtain pain relief, without disclosing that higher doses increased the risk of addiction and overdose, are deceptive and misleading. They were particularly important to promotional efforts, however, because patients on opioids for more than a brief period develop tolerance, requiring increasingly high doses to achieve pain relief. Marketers needed to generate a comfort level among doctors to ensure that the doctors maintained patients on the drugs even at the high doses that became necessary.

116.    The titration messaging worked. Nationwide, based on an analysis by the *Los Angeles Times*, more than 52% of patients taking OxyContin longer than three months are on doses greater

than sixty milligrams per day, which is a level that CDC guidelines urge prescribers to "avoid" or "carefully justify."

117.    McKinsey urged the use of quotas and bonus payments to motivate Purdue's sales force to sell as many OxyContin prescriptions as possible. This behavior was prohibited by the 2007 Corporate Integrity Agreement, which required Purdue to implement written policies regarding "compensation (including salaries and bonuses) for [sales representatives] engaged in promoting and selling Purdue's products that are designed to ensure that financial incentives do not inappropriately motivate such individuals to engage in the improper promotion or sales of Purdue's products."

118.    In its "Identifying Granular Growth Opportunities for OxyContin" presentation to the Purdue board in July 2013, McKinsey nonetheless urged Purdue, in addition to increasing the focus of the sales force on the top prescribers, to increase the overall quotas for sales visits for individual sales representatives from 1,400 to 1,700 annually.

119.    In 2013, McKinsey also recommended slashing *one-third* of the time that Purdue devoted to training its sales force. By eliminating one-third of the amount of time sales representatives were required to be in training, McKinsey projected that Purdue could squeeze an additional 5% of physical calls per day out of its newly less-trained sales force.

120.    McKinsey also developed a new incentive compensation structure for Purdue's sales representatives. McKinsey knew that, combined with higher quotas and less training, bonus/incentive compensation based on the number of OxyContin prescriptions a representative produced could be a powerful driver of increased OxyContin sales, without regard for patient safety.

### e.  Purdue implemented McKinsey's strategies.

121.    Purdue accepted and, with McKinsey's ongoing assistance, implemented McKinsey's strategies for selling and marketing OxyContin.

122.    For instance, in January 2010, Purdue was training its sales and marketing force on the new sales tactics based on a "physician segmentation" initiative that McKinsey urged. The initiative sought to identify the most prolific OxyContin prescribers and then devote significant resources towards convincing those high prescribers to continue to prescribe ever more OxyContin, in higher doses, for longer times, to ever more patients.

123.    During the time that McKinsey was working with Purdue, Purdue deliberately minimized the importance of the Corporate Integrity Agreement. Carol Panara, who joined the Purdue sales force from rival Novartis, stated that the 2007 guilty plea was deliberately minimized by the company in presentations to its sales staff: "They said, 'We were sued, they accused us of mis-marketing, but that wasn't really the case. In order to settle it and get it behind us we paid a fine.' You had the impression they were portraying it as a bit of a witch hunt."[27]

124.    Consistent with McKinsey's mandate, McKinsey devised methods for sales staff to sell OxyContin to doctors while at the same time maintaining technical compliance with the Corporate Integrity Agreement. Ms. Panara stated that, though she was told she could not flatly claim that OxyContin was better or safer than other opioids, "she was trained to talk about product in ways that implied that it was safer." She might tout OxyContin's twelve-hour formulation to a prescriber. "You could say that with a shorter-acting medication that wears off after six hours, there was a greater chance the patient was going to jump their dosing schedule and take an extra one a little earlier. We couldn't say [it was safer], but I remember we were told that doctors are smart people, they're not stupid, they'll understand, they can read between the lines."[28]

---

[27] David Crow, *How Purdue's 'one-two' punch fuelled the market for opioids*, Financial Times, September 9, 2018, https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c
[28] *Id.*

### f.  Project Turbocharge

125.    The Corporate Integrity Agreement expired in January 2013. With this restriction lifted, McKinsey devised additional marketing and sales strategies for Purdue to further increase OxyContin sales pursuant to a new consulting agreement entered into on May 14, 2013.

126.    The 2013 Agreement would lead to Project Turbocharge, McKinsey's successful bid to transform Purdue's sales and marketing efforts for OxyContin now that Purdue was no longer bound by the Corporate Integrity Agreement.

127.    In the summer of 2013, McKinsey made multiple recommendations (described above) to Purdue's board to increase OxyContin revenue and urged the Sacklers to "make a clear go-no-go decision to 'Turbocharge the Sales Engine."

128.    Eight days later, on August 23, 2013, McKinsey partners met with the Sackler family—not the Purdue board of directors—to pitch Project Turbocharge. Dr. Arnab Ghatak, one of the McKinsey partners leading the Purdue account, recounted the meeting to fellow McKinsey partner Martin Elling in an email exchange: "We went through exhibit by exhibit for about 2 hrs . . . . They were extremely supportive of the findings and our recommendations and wanted to strongly endorse getting going on our recommendations."

129.    Elling, a co-leader of the Purdue account, remarked in the same email correspondence that McKinsey's "findings were crystal clear to" the Sacklers and that the Sacklers "gave a ringing endorsement of 'moving forward fast.'"

130.    As a result of the Sackler family's endorsement of McKinsey's proposals, the following month Purdue implemented Project Turbocharge based on McKinsey's recommendations. In adopting "Project Turbocharge," Purdue acknowledged the improper connotations of the name, and re-christened the initiative the decidedly more anodyne "E2E: Evolve to Excellence." The entire E2E

initiative was overseen by McKinsey and some Purdue executives, who together comprised the E2E Executive Oversight Team and Project Management Office.

131. Evolve to Excellence called for a *doubling* of Purdue's sales budget. Under McKinsey's prior tutelage, Purdue's promotional spending had already skyrocketed. McKinsey's ongoing influence on Purdue's operations after the 2007 guilty plea is stark:



132. McKinsey and Purdue also worked together on an "implementation plan" for E2E, with McKinsey taking on the role of "executive oversight" of projects including the creation of target lists, internal dashboards to track progress, and changes to Purdue's incentive compensation plan consistent with E2E.

133. Project Turbocharge called for revising the existing process for targeting high-prescribing physicians. The core objective of McKinsey's initiative was to ensure that Purdue was "making calls on the highest potential customers with the right frequency to maximize prescribing

potential." McKinsey recognized that most of the highest volume prescribers, or "high writers" of prescriptions, were willing to entertain sales visits from sales representatives. McKinsey's analysis also found that the highest-volume prescribers were themselves most influenced by detail visits.

134.    McKinsey determined and advised Purdue that the top half of prescribing physicians "write on average 25 times more scripts per prescriber" than the lower half. McKinsey advised that Purdue would see a greater return on its sales investment by focusing on these targets, including on prescribers with alarming prescribing patterns that raised red flags they were writing "prescriptions" for non-medical use. McKinsey's plan aimed at boosting sales of OxyContin by targeting the highest volume opioid prescribers, without addressing whether the expanded sales would fuel an illicit market.

135.    Purdue moved quickly to do as McKinsey advised. All sales representatives received a memo on December 23, 2013, identifying how to select "SuperCore" prescribers, or the top ten targets, in their territory according to the E2E high prescribing principles and required that each SuperCore prescriber be visited at least twice a month.

136.    Under E2E, Purdue sales representatives visited numerous prescribers engaged in criminal conduct when prescribing opioids, including:

    a.    An Ohio doctor who pleaded guilty to criminal charges related to an opioid drug ring.

    b.    A family practitioner who was charged with involuntary manslaughter, Medicaid fraud, and drug trafficking.

    c.    A New Jersey doctor whose controlled substance license was suspended in 2018 and revoked in 2020 by the DEA because she prescribed opioids without a legitimate medical purpose and disregarded urine screens that indicated opioid misuse and diversion.

    d.    A New Jersey doctor who lost her license in 2018 for allegedly receiving kickbacks to prescribe the fentanyl drug Subsys to three patients, including one that died.

    e.    A Delaware doctor whose license was suspended in 2019 after prescribing controlled substances, including opioids, to undercover officers without performing any medical examinations.

30

      f.   A Delaware doctor whose license was suspended in 2017 for sharing drugs, including opioids, with her patients.

      g.   An Indiana doctor whose medical license was suspended in 2016 after he had prescribed over 2 million doses of oxycodone and seen 90 to 100 patients per day.

      h.   A Kentucky doctor who was sentenced to 100 months in prison in 2016 after pleading guilty to unlawful distribution or dispensing of controlled substances, health care fraud, conspiracy, and money laundering.

137.    Project Turbocharge also involved a granular analysis of Purdue's individual sales channels. In its August 8, 2013 report to the Purdue board, McKinsey also attributed the decline in OxyContin sales to safeguards to limit suspicious opioid sales.

138.    McKinsey's initiative included ways to circumvent these safeguards. McKinsey recommended that the sales force distribute vouchers and "starter kits" for patients who faced co-pays for OxyContin prescriptions. In particular, McKinsey recommended dispensing vouchers to outlets of a specific large national pharmacy chain where prescriptions and OxyContin inventories were down.

139.    At this time, enforcement by federal regulators was decreasing OxyContin dispensing through Walgreens. In order to counter this perceived problem, McKinsey suggested that Purdue's owners lobby Walgreens specifically to increase sales and circumvent the safeguarding sales limits. It also suggested the establishment of a direct-mail specialty pharmacy so that Purdue could circumvent Walgreens and sell directly to Walgreens's customers. Finally, McKinsey suggested the use of opioid savings cards distributed in neighborhoods with Walgreens locations to encourage the use of Purdue's opioids despite Walgreens's actions.

### g. McKinsey's efforts tripled Purdue's sales of OxyContin.

140.    McKinsey's contributions to Purdue's growth after 2007 are remarkable. OxyContin sales should have naturally declined as the Corporate Integrity Agreement, if properly followed, should have eliminated the illegitimate prescriptions that gave rise to the guilty plea.

141.    Under McKinsey's guidance, OxyContin sales would reach their all-time peak in 2013, the year McKinsey proposed, and Purdue adopted, Project Turbocharge. That OxyContin sales peaked in 2013 is especially notable, given that *overall* opioid prescriptions had *already peaked* three years earlier, in 2010. McKinsey's efforts added a final boost to OxyContin sales before the eventual unraveling, and Purdue's decision, in the end, to cease marketing the drug.

142.    McKinsey continued to help Purdue grow opioid sales even after Purdue reached a 2015 Assurance of Discontinuance with New York arising out of an investigation concerning Purdue's Abuse and Diversion Detection program and media coverage highlighted Purdue's lack of attention to diversion control. McKinsey's own work elsewhere identified "reducing prescribing" as among the efforts to combat the opioid epidemic and also showed that opioid prescribers were frequently writing prescriptions for patients with known risks of abuse. Still, McKinsey continued to work to help opioid manufacturers increase opioid sales, including through Purdue's deceptive marketing campaign.

### h. McKinsey advised Purdue to buy off health insurers.

143.    In December 2017, McKinsey proposed what was perhaps its most audacious gambit of the entire Purdue relationship: paying money—"rebates"—to health insurers whenever someone overdosed on Purdue's drug or developed OUD after using Purdue's drug. These payments for future OxyContin overdoses were christened "Event-Based contracts."

144.    McKinsey provided estimates for the future costs of these "events." According to McKinsey, a "meaningful" amount would be somewhere between 6 and 15 thousand dollars for each person.

145.    McKinsey's analysis also suggested that it could predict the number of people who would overdose or develop OUD from pills sold through Purdue's downstream customers. For instance, McKinsey "projected that in 2019, for example, 2,484 CVS customers would either have an overdose or develop an opioid use disorder."

146.    It is little surprise, then, that McKinsey was concerned with its legal liability for this work. Within months of making this recommendation to Purude, Martin Elling raised this concern with Arnab Ghatak and suggested corrective action: destroying evidence.

---

**Message**

| | |
|---|---|
| **From**: | Martin Elling [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=6B33C3264F744B04AF05FA59341271BE-MARTIN ELLI] |
| **Sent**: | 7/4/2018 12:10:13 PM |
| **To**: | A G [drarnabghatak@gmail.com] |
| **Subject**: | Re: [EXT]Re: Howdy |

```
Have a great fourth.  M

> On Jul 4, 2018, at 2:01 PM, A G <drarnabghatak@gmail.com> wrote:
>
> Thanks for the heads up.  Will do.
>
>> On Jul 4, 2018, at 7:57 AM, Martin Elling <martin_elling@mckinsey.com> wrote:
>>
>> Just saw in the FT that Judy Lewent is being sued by states attorneys general for her role on the
>> Purdue Board.  It probably makes sense to have a quick conversation with the risk committee to see if we
>> should be doing anything other that eliminating all our documents and emails.  Suspect not but as things
>> get tougher there someone might turn to us.  M
>>
>> +===================================================================+
>> This email is confidential and may be privileged. If you have received it
>> in error, please notify us immediately and then delete it.  Please do not
>> copy it, disclose its contents or use it for any purpose.
>> +===================================================================+
```

### i.    Purdue pleaded guilty again.

147.    On October 20, 2020, Purdue—McKinsey's co-conspirator—pleaded guilty to improper marketing of OxyContin and other opioids as part of a dual-object conspiracy to defraud the United States and to violate the Food, Drug, and Cosmetic Act and admitted to "using aggressive marketing tactics to convince doctors to unnecessarily prescribe opioids—frivolous prescriptions that experts say helped fuel a drug addiction crisis that has ravaged America for decades."

148.    Although the new plea agreement does not identify Purdue's co-conspirators and refers to McKinsey only as the "consulting company," the agreement concerns conduct that directly implicates McKinsey in the conspiracy. It is the same conduct described in this Complaint.

149.    Indeed, the plea agreement states bluntly: "Purdue, in collaboration with [McKinsey], implemented many of [McKinsey's] recommendations."

Further, Purdue admitted that E2E "was overseen by [McKinsey] and some of Purdue's top executives through the creation of the E2E Executive Oversight Team ('EOT') and Project Management Office ('PMO')."

### 3. McKinsey worked with other Manufacturers.

#### a. Endo

150.    While working for Purdue, McKinsey was also working for Endo. Multiple McKinsey partners worked on both accounts at the same time. McKinsey advised both companies on how to maximize the sales of their branded opioid products. The work McKinsey performed for each client was so similar that there was routinely confusion internally about whether a specific project or task to perform was for Endo or Purdue.

151.    McKinsey's relationship with Endo began as early as 2006, the same year that Endo launched Opana (oxymorphone). Over the course of the next decade, this relationship would expand to encompass all aspects of Endo's business, including corporate organization and resource allocation, the launch of a new branded buprenorphine product, and sales force optimization efforts for Endo's branded and generic opioid products.

152.    In some ways, McKinsey's relationship with Endo was even more tight-knit and companionable than with Purdue. For instance, no one at Purdue previously worked for McKinsey. In early 2013, Rajiv de Silva, previously a leader of McKinsey's PMP group, was appointed CEO of Endo. At Endo, McKinsey was now advising an old friend, one of its previous senior partners.

153.    Under de Silva, Endo relied more heavily on McKinsey than ever before. McKinsey consultants interacted directly and often *exclusively* with de Silva. McKinsey was so close to the Endo CEO that it could intervene in direct reporting from one of de Silva's deputies.

154.    McKinsey maintained weekly performance review meetings with de Silva and senior Endo management at which granular weekly sales data was reviewed for each of Endo's branded products.

155.    Within a few years of its introduction in the United States, abuse of Opana became widespread. Endo then sought to introduce a reformulated version of Opana that it could market as abuse-deterrent by introducing a tamper-resistant coating to the pill.

156.    In December 2011, Endo obtained FDA approval for an ADF of Opana ER. The following month, however, the FDA told Endo that it could not market Opana ER, even after the reformulation, as abuse-deterrent. The FDA found that such promotional claims "may provide a false sense of security since the product may be chewed and ground for subsequent abuse." In December 2011, Endo even admitted that "[i]t has not been established that this new formulation of Opana ER is less subject to misuse, abuse, diversion, overdose, or addiction."

157.    In 2013, an Endo training module directed KOLs to instruct prescribers that Opana ER with INTAC is the only oxymorphone designed to be "crush-resistant," and advised the KOLs to state during their speeches that "[t]he only way for your patients to receive oxymorphone ER in a formulation designed to be crush-resistant is to prescribe OPANA ER with INTAC."[216] The speakers were advised to stress that generic versions "are not designed to be crush-resistant."

158.    These abuse-deterrent attributes of the reformulation—the very characteristics McKinsey and Endo touted as a reason to prescribe Opana—were a sham. The reformulation was designed to prevent the pill from being crushed and snorted through the nose. It did not prevent intravenous use, however. The result was that many users already dependent on Opana began using

needles to inject the drug for the first time. The sharing of these needles resulted in outbreaks of HIV, hepatitis C, and thrombotic thrombocytopenic purpura.

159.    Endo was well aware of this trend even as it was encouraging KOLs to tout Opana ER as crush-resistant. In June 2013, McKinsey noted that the FDA had "raised concern over shift from intranasal to IV." Despite knowing that the problem was injection, McKinsey advised Endo to pursue a study of whether the reformulated Opana reduced the risk of insufflation, i.e., snorting, in hopes that the results might convince the FDA to allow Endo to market the reformulated Opana as reducing the risk of misuse.

160.    Endo and McKinsey were laser-focused on maximizing overall sales and decidedly *not* on concerns over their actual abuse potential or the appropriate *size* of the market for these products, given evident, longstanding, and ever-present concerns about their abuse. McKinsey regarded concerns about opioid abuse only as a means by which its clients could introduce *differentiated* products (i.e., those with purported abuse-deterrent or tamper-resistant features) to continually perpetuate opioid sales for their clients. In all instances, the parties desired for the size of that overall opioids market to grow in line with the introduction of "differentiated" products like a reformulated Opana.

161.    McKinsey also helped Endo market Belbuca, a buprenorphine product created with McKinsey's assistance to compete with Purdue's buprenorphine product, Butrans. On August 13, 2015, McKinsey's Craig MacKenzie circulated a discussion document to Endo and McKinsey staff entitled "Belbuca value proposition," which laid out McKinsey's thoughts on how to differentiate Belbuca from other opioids in the marketplace. Despite the fact that McKinsey was helping Purdue to market OxyContin, with Endo, McKinsey took the position that a point of differentiation was that OxyContin was commonly abused, while Belbuca would hopefully not be.

162.    By July 6, 2016, McKinsey and Endo were increasingly focused on converting short-acting opioid users to long-acting opioids. Notably, the goal was to increase *overall* buprenorphine

prescriptions, not only those of Belbuca. McKinsey provided a slide to Endo describing the way that

a narrative endorsing the transition from short- to long-acting opioids would first be *created* and then

exploited for market positioning:



163.    One aspect of the plan conceived by McKinsey would be that Belbuca (and

buprenorphine, generally) would convert short-acting opioid users to long-acting opioid users of

products *other than buprenorphine*. McKinsey and Endo instead conceived of Belbuca as an "*Initial* ATC

Opioid Therapy." It was to be positioned as "the *first* LAO for poorly controlled or dissatisfied chronic

pain patients transitioning from short-acting to long-acting opioids." Patients could eventually

transition from Belbuca to other LAOs, like Opana. However, McKinsey also knew that this same pathway of transitions also leads to opioid dependency.

164.    In 2015, a McKinsey team led by Arnab Ghatak proposed to Endo a sales transformation to invigorate Endo's product sales, including its opioids. At the suggestion of Ghatak, McKinsey used the Purdue Pharma Project Turbocharge model from the previous year as a template for the Endo proposal.[247] Even the PowerPoint presentations used to create the proposal to Endo were drafted off the Project Turbocharge slides. On June 28, 2015, Sherin Ijaz of McKinsey emailed Ghatak, Nicholas Mills, and Laura Moran to circulate a draft proposal for an "Endo sales force transformation" PowerPoint presentation. Ijaz explained, "Laura, I heavily leveraged what you send (sic) from Purdue as it was all applicable."[248] All three of the recipients of Ijaz's email regarding the Endo proposal had been working on the Purdue account for years.

165.    At McKinsey's suggestion, Endo began reallocating sales force resources to Opana from other Endo products.[254] Around the same time, Endo received a favorable initial ruling in patent litigation declaring that the generic versions of Opana violated Endo's patents, and enjoined their further sale. The ruling provided additional patent exclusivity for Opana, and Endo was keen to exploit its advantage.

166.    The following week, Harlow wrote to the McKinsey team working for Endo to focus their attention on Opana ER. "Now with our litigation victory from last week, plus our UHC opportunity, there is an increased need to increase FF support to drive Sep-Dec business ……. With this win, I am now willing to go broader with OER targeting."

167.    McKinsey and Endo proceeded to design and implement retargeting strategies to boost Opana sales in late 2015.

### b. **Janssen**

168.     As early as 2002, McKinsey was advising J&J regarding methods to boost sales of its opioids. For example, on March 14, 2002, McKinsey prepared a confidential report for Janssen regarding how to market Duragesic. Incredibly, one of the recommendations McKinsey provided was that Janssen concentrate its sales and marketing efforts on doctors that were *already* prescribing large amounts of OxyContin.

169.     McKinsey also advised Janssen to target Duragesic on "high abuse-risk patients (e.g., males under 40);" this targeting would take advantage of the marketing claim that Duragesic "was harder to abuse than other opioids on the market." At the same time, McKinsey also advised Janssen to target prescribers treating the elderly.

170.     McKinsey also worked with Janssen to maximize sales of Nucynta, using many of the same strategies it employed to increase sales at Purdue and Endo.

171.     McKinsey's efforts to turbocharge Nucynta sales resembled those it later deployed in a more robust form at Purdue. For example, "physician prescribing habits" and "switching behavior," were external factors McKinsey identified as key issues "impacting future Nucynta growth." Understanding these issues at a granular level would be crucial, including "What is physician/market awareness of Nucynta ER? By physician segment?"

172.     On July 6, 2011, Ghatak attended an internal McKinsey call with the consultants working on the J&J account to discuss the "J&J Nucynta sales force disruption." The same day, Laura Moran, who like Ghatak worked both the Purdue and Endo accounts, also provided internal advice regarding Nucynta to her McKinsey partner Gerti Pellumbi, who was leading Nucynta sales efforts, and engagement manager Bryan Reinholt, who was with Pellumbi on the J&J account. [262] Martin Elling, one of the lead McKinsey partners on the Purdue account alongside Ghatak, attended internal McKinsey calls on March 25, 2010, and again on May 27, 2011 to discuss McKinsey's work for

Nucynta. Then, on December 13, 2011, Elling attended a meeting with J&J personnel regarding "acceleration opportunities." Aamir Malik attended the meeting with Elling, and, naturally, also worked on the Endo account.[266] Malik and Ghatak had had an internal McKinsey meeting amongst themselves regarding the "Nucynta Kickoff" Janssen six months prior, on June 3, 2011.

173.    McKinsey was also intimately involved in the sale of Nucynta to Depomed in 2015.

### c.  Noramco

174.    J&J and Janssen also served the purposes of the False Narrative Enterprise by producing active pharmaceutical ingredients for prescription opioids manufactured by themselves and by other members of the Enterprise. Janssen did this through two subsidiaries: Tasmanian Alkaloids PTY, LTD ("Tasmanian Alkaloids") and Noramco, Inc. ("Noramco").

175.    In the early 1990s, Noramco began discussions with Purdue Pharmaceuticals regarding the anticipated future demand for opioid painkillers, including those opioid painkillers with oxycodone as the primary active ingredient.[29]

176.    In or around 1994, Tasmanian Alkaloids began a research project with the purpose of creating a poppy plant with enhanced thebaine content; thebaine is a precursor from which oxycodone and hydrocodone can be produced. The purpose of the project was to meet the "anticipated demand" for oxycodone-based opioids, including OxyContin. The new poppy, called the "Norman", allowed a dramatic increase in the production of oxycodone, which in turn allowed a dramatic increase in the production, marketing, and sale of oxycodone-based products.[30]

177.    In or around 1996, Tasmanian Alkaloids began a program to entice Tasmanian farmers to grow the new poppy, including with prizes like a Mercedes, Jaguar, and BMW. Tasmanian Alkaloids

---

[29] Peter Whoriskey, *How Johnson & Johnson Companies Used a 'Super Poppy' to Make Narcotics for America's Most Abused Opioid Pills* (Mar. 26, 2020), https://www.washingtonpost.com/graphics/2020/business/opioid-crisis-johnson-and-johnson-tasmania-poppy/ (hereinafter *Super Poppy*).
[30] *Id.*

bought the poppies from farmers and then shipped concentrated poppy products to the United States where Noramco processed the raw materials into oxycodone, hydrocodone, and other opioid APIs.[31]

178.    Tasmanian Alkaloids and Noramco, together, became world leaders in the supply of oxycodone and other thebaine-based products. As of 2015, roughly 65% of all oxycodone consumed in the United States was distributed by Noramco.[32]

179.    As a condition of supplying oxycodone, Noramco requested assurances from Purdue that the latter would be able to manufacture and sell significant quantities of oxycodone-based products. Ultimately, Purdue relied largely on Noramco's thebaine for its production of OxyContin.[33]

180.    Noramco continued to develop "improved" versions of the poppy. In 2009, it created a new variety that produced an even higher amount of thebaine than the Norman poppy.

181.    The poppy was farmed in abundance.

182.    At all relevant times, J&J and Noramco had reason to know that their stockpiles of the Tasmanian poppy were dangerous and subject to diversion. The International Narcotics Control Board specifically discouraged J&J and Noramco from holding big stockpiles of the poppy due to potential diversion into the production of heroin, whose market was (as of 2014) more than four times the size of the opiate painkillers market. Until its sale, J&J and Noramco continued to create excess stockpiles for shipment to the United States, without sufficient regard for the heroin market and with sole focus on the lucrative opioid market in the United States.

183.    Noramco and J&J successfully lobbied DEA to exclude the thebaine that Noramco and J&J were importing into the United States from coverage under certain treaties. They did so by representing that the risk posed by large quantities of thebaine was low because it was not a substance

---

[31] *Id.*
[32] *Id.*
[33] *Id.*

that could be abused in its raw form, ignoring the fact that all the thebaine being imported would be turned into prescription opioid medications that could be and were misused.[34]

184.    On August 19, 2009, McKinsey sent Noramco and J&J a slide deck containing a "[r]evised list of strategic options," which included "divest[ing] the business to a strategic buyer . . . or to a financial buyer." J&J ultimately followed this advice.

185.    In 2015, J&J prepared a marketing brochure for the sale of Noramco representing that:

    a.    The purchaser had the opportunity to "[a]cquire the #1 supplier of Narcotic AOSs in the United States" and "[b]ecome a key supplier to the world's largest multi-source generics";

    b.    The Noramco portfolio of products, (with net trade sales in 2014), included Oxycodone ($94 million); hydrocodone ($52 million); buprenorphine ($20 million); morphine ($20 million); codeine ($18 million); and other products, for a global 2014 sales of $258 million;

    c.    Noramco's U.S. market share of these products in 2014 was as follows: oxycodone (65%); hydrocodone (54%); codeine (60%); and morphine (60%);

    d.    "Tasmanian Alkaloids produces over 40% of the world's supply of Narcotic Raw Materials";

    e.    "Tasmanian Alkaloids has the highest content poppies for key alkaloids"; and

    f.    Noramco and Tasmanian Alkaloids, located in four countries around the world (Wilmington, Delaware; Athens, Georgia; Tasmania, Australia; and Schaffhausen, Switzerland) had 483 full-time equivalent employees, including 28 employees shared with J&J.[35]

186.    This brochure also represented that "Noramco has long-term agreements and/or majority controlled substance share with all 7 of the top US generic companies." The marketing materials represented, as to "typical supply terms:"

    a.    Agreements cover multiple controlled substance products (4 or more);

    b.    Agreements are for more than 80% of customer's volume; and

---

[34] *See id.*
[35] *Noramco World Wide Narcotics Franchise* (Oct. 2015).

c.   Terms are for 3 to 5 years minimum with rolling renewals.[36]

187.    J&J sold Noramco and Tasmanian Alkaloids in or around 2016.[37]

188.    McKinsey benefitted from its work with Noramco because the perspective McKinsey gained of the overall opioid market from advising the principal upstream supplier to the entire industry was invaluable to its own work with its other Manufacturer clients.

### 4.  McKinsey worked with the FDA.

189.    As described above, McKinsey assisted Purdue and others in confronting FDA regulations that posed threats to their clients' ability to maximize revenues from their opioid products. McKinsey's role in shepherding its clients through regulatory interactions takes on a different hew when considered in light of one of McKinsey's other clients: the Food and Drug Administration itself.

190.    A significant portion of that work is related to the FDA's Center for Drug Evaluation and Research ("CDER"). The CDER is the principal division tasked with approving, among other classes of drugs, opioids. Since 2008, McKinsey has been awarded at least 17 contracts worth at least $48 million for CDER work.[38] Under one contract, McKinsey developed a roadmap and implemented plans to modernize CDER's new drug regulatory program. Under another, McKinsey developed a framework to increase information technology project delivery across CDER.[39]

191.    The REMS protocols, discussed above, that McKinsey assisted Purdue and others in surmounting beginning in 2008 and culminating in 2012, were overseen by CDER.[40]

192.    In 2007, Congress passed the Food and Drug Administration Amendments Act ("FDAAA"), which required the Secretary of Health and Human Services "to develop standards and

---

[36] *Id.*

[37] *Super Poppy*, *supra*.

[38] Letter to Dr. Janet Woodcock from Senator Margaret Hassan et al, August 23, 2021, https://www.hassan.senate.gov/imo/media/doc/fda-mckinsey_letter-final-210823.pdf ("Hassan Letter").

[39] Letter to Senator Chuck Grassley from Andrew Tantillo (Oct. 22, 2021), https://www.grassley.senate.gov/imo/media/doc/fda_to_grassley_-_mckinsey_conflicts_of_interest.pdf.

[40] Hassan Letter, *supra*.

identify and validate effective technologies for the purpose of securing the drug supply chain against counterfeit, diverted, subpotent, substandard, adulterated, misbranded, or expired drugs."[41]

193.    In 2010 and 2011, under the FDAAA, the FDA awarded McKinsey contracts to design a "track and trace" system to monitor prescription drugs, including opioids, throughout the supply chain and to streamline the drug approval process. The track and trace system had the greatest effect on drug distributors, including McKinsey clients McKesson, AmerisourceBergen, and Cardinal Health.[42]

194.    Under these contracts, McKinsey was required to consult with "supply chain stakeholders," which likely included these three McKinsey clients as well as pharmaceutical manufacturers.[43]

195.    In 2011, McKinsey also won a $1.8 million contract with CDER's Office of Surveillance and Epidemiology ("OSE"), which monitors and evaluates the safety profiles of drugs available to American consumers. OSE "evaluates more than 2 million adverse event reports submitted every year to FDA's MedWatch program" and provides "risk management expertise on development and implementation of programs and initiatives to support [CDER's] policies related to [REMS] authorities.[44]

196.    The OSE contract tasked McKinsey with a widespread mission of understanding how OSE functions within the context of a broader system of drug safety in CDER and ultimately developing and implementing a new operating model. In other words, McKinsey helped to restructure a key body that has oversight over the opioid supply chain.

---

[41] 21 U.S.C. § 355e(a).
[42] Hassan Letter, *supra*.
[43] *Id.*
[44] https://www.fda.gov/about-fda/center-drug-evaluation-and-research-cder/cder-office-surveillance-and- epidemiology.

197.     The 2012 Food and Drug Administration Safety and Innovation Act required the FDA to modernize Sentinel, a system meant to monitor the safety of drugs once they are on the market. According to the FDA, "Sentinel generates real-world evidence to support regulatory actions aimed at protecting the public's health," which in turn "inform[s] healthcare provider decision-making for patients."[45]

198.     A 2014 contract with the FDA charged McKinsey with assessing the "strengths, limitations and appropriate use" of Sentinel. Like the track and trace contract, the Sentinel project required McKinsey to interview "external stakeholders," including "industry organizations" and "drug and device industry leaders."[46] McKinsey also evaluated how the FDA employees used Sentinel to inform regulatory decision making.[47]

199.     McKinsey performed similar work for the FDA as recently as 2019,[48] when it signed a contract extension with the agency for work relating to the FDA's efforts to modernize the process by which it regulates new drugs.[49]

200.     The FDA's drug tracking programs have been panned as failures.[50]

201.     A theme was emerging: as new legislation and regulatory systems were enacted that could have hampered the opioid supply chain, McKinsey stepped in as a key consultant for the FDA. Each time, the new system failed to reign in the out-of-control opioid market. While the FDA was not solely responsible for regulating the opioid industry and McKinsey was not wholly responsible for

---

[45] https://www.fda.gov/files/about%20fda/published/Sentinel-System-Overview—-Presentation.pdf; https://www.healthaffairs.org/do/10.1377/hpb20150604.936915/full/.

[46] Ian MacDougall, *McKinsey Never Told the FDA It Was Working for Opioid Makers While Also Working for the Agency*, ProPublica (Oct. 4, 2021), https://www.propublica.org/article/mckinsey-never-told-the-fda-it-was-working-for-opioid-makers-while-also-working-for-the-agency.

[47] Letter to Bob Sternfels from Representative Carolyn B. Maloney (Nov. 5, 2021), https://oversight.house.gov/sites/democrats.oversight          house.gov/files/2021-11-05.CBM%20to%20Sternfels-McKinsey%20re%20Document%20and%20Information%20Request%20%28001%29.pdf.

[48] MacDougall, *supra*.

[49] Maloney Letter, *supra*.

[50] Sabrina Tavernise, *F.D.A. Faulted for Problems With Drug Tracking*, N.Y. Times (Jan. 14, 2016), https://www.nytimes.com/2016/01/15/health/fda-faulted-for-problems-with-drug-tracking.html; https://www.gao.gov/assets/gao-16-192.pdf.

the FDA's inaction, tools like Sentinel and track and trace could have been implemented in a way to provide new information to combat the country's growing opioid crisis.

202.    At the same time as it was consulting for the FDA, McKinsey was working with its opioid industry clients on how to skirt the FDA's regulatory systems.

203.    For example, McKinsey advised Purdue on how to soften the FDA's proposed REMS and on coordinating with other opioid manufacturers to advocate against strict oversight. The finalized REMS for opioid products was largely devoid of the restrictions that FDA had initially proposed.[51]

204.    McKinsey's work with the FDA was a key factor in why pharmaceutical industry clients tapped McKinsey for FDA-related work. For example, in endorsing McKinsey's proposed strategy of banding together with other opioid manufacturers, Purdue CEO John Stewart suggested that the consultant itself facilitate the pharmaceutical group's approach to FDA. He wrote: "Perhaps a consultant such as McKinsey who did similar work in the industry and FDA on some aspects of clinical trials or a healthcare-related group that would be interested in playing an active role in the program's development and delivery would be a good choice."

205.    McKinsey performed work for the FDA without disclosing its potential conflicts of interest to the FDA in violation of the contracts between the company and the agency.

206.    The FDA typically includes conflict of interest clauses in its contracts and relies on contractors to assess and report any conflicts. McKinsey's contracts with the FDA related to CDER processes contained such provisions. One contract required McKinsey to "make an immediate and full disclosure, in writing, . . . of any potential or actual organizational conflict of interest or the existence of any facts that may cause a reasonably prudent person to question the contractor's impartiality because of the appearance or existence of bias."[52]

---

[51] Hassan Letter, *supra*; Maloney Letter, *supra*.
[52] MacDougall, *supra*.

207.    But McKinsey never disclosed its work on behalf of opioid supply clients to the FDA despite having a hand in developing some of the FDA's most important regulatory processes.[53]

208.    Disclosing its conflicts might have turned off the lucrative tap to not only FDA contracts but also to pharmaceutical industry clients, given the clear value such clients placed on McKinsey's work for the FDA.

### 5.  McKinsey worked to increase the overall size of the opioid market.

209.    In order to benefit all its clients, McKinsey engaged in efforts to grow the entire opioid market, not only each individual client's share of it. For example, Purdue incentivized its sales staff "to increase not just sales of OxyContin but also generic versions of extended release oxycodone." Typically, one would not wish to encourage the sales of generic competitors that offer a similar product to one's own. If, however, the goal is to position a company so as to look like an attractive acquisition target, the growth of the overall opioid market is just as important as one's own market share: "Whereas pharma salespeople are usually compensated based on their ability to grow sales of a particular medicine, part of the bonus for Purdue's staff was calculated in relation to the size of the overall market."[54] In other words, "Purdue's marketing force was indirectly supporting sales of millions of pills marketed by rival companies."[55] McKinsey designed that plan.

### 6.  McKinsey's hedge fund created a conflict of interest.

210.    On February 4, 2021, forty-nine state attorneys general announced a multistate settlement with McKinsey related to its work for opioid manufacturers.

211.    Three days after the settlement, it came to light that McKinsey appears to have benefitted from its work promoting opioids not only through the fees paid to McKinsey by its clients,

---

[53] *Id.*; Letter to Senator Chuck Grassley from Andrew Tantillo (Oct. 22, 2021), https://www.grassley.senate.gov/imo/media/doc/fda_to_grassley_-_mckinsey_conflicts_of_interest.pdf.
[54] *See* David Crow, *How Purdue's 'one-two' punch fuelled the market for opioids*, Fin. Times (Sept. 9, 2018), https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c.
[55] *Id.*

but also through investments in opioid-related businesses made by McKinsey's own hedge fund, the McKinsey Investment Office ("MIO").

212.    Through MIO, McKinsey was heavily invested in the opioid industry and stood to gain financially from the continuation of the opioid crisis. It even invested in opioid addiction treatment businesses—a growing industry, as McKinsey knew.

213.    In short, "during the years McKinsey was helping opioid makers propel sales of the drugs, MIO Partners held stakes in companies that profited from increased usage."[56]

214.    MIO is run for the benefit of McKinsey's partners and, to a separate extent, McKinsey's employees. Those individuals (and, crucially, former McKinsey partners) invest their own money in MIO, and their access to those investment opportunities constitutes a meaningful and important component of those individuals' compensation. MIO has, "at a minimum, the ability to view the individual securities that account for approximately 40 to 50 percent." This is approximately $6 billion dollars of invested capital. What is more, MIO *directly invests* approximately 10% of its assets. That is $1.5 billion MIO directly invests in securities without the use of any outside money manager. These numbers exclude leverage.

215.    From a conflicts perspective, the fact that *former* partners may participate in MIO investments merits consideration. Former McKinsey partners went on to become, for instance, officers of Endo, Teva, Mallinckrodt, and McKesson and so were positioned to take actions that would increase the value of those companies to the benefit of themselves and their former colleagues at McKinsey. This increased value, of course, came from increased sales of prescription opioids.

---

[56] Gretchen Morgenson, *Consulting giant McKinsey allegedly fed the opioid crisis. Now an affiliate may profit from treating addicts*, NBC News (Feb. 8, 2021), https://www.nbcnews.com/news/us-news/consulting-giant-mckinsey-allegedly-fed-opioid-crisis-now-affiliate-may-n1256969.

B.      **Members of the False Narrative Enterprise set out to change the best practices for the use of opioids.**

216.    Members of the False Narrative Enterprise were aware that opioids pose significant risks and that the long-term safety and efficacy of opioids for chronic pain has never been established in medical literature. Nevertheless, in a deliberate plot to counter legitimate fears, Enterprise members intentionally and unlawfully engaged in a misinformation campaign about the risks and effects of opioid use.  They did so to convince prescribers and the public that opioids are appropriate—and even necessary—to treat common chronic conditions, such as back pain and headaches.

217.    The consensus in the medical community—prior to the Enterprise's concerted campaign of deception—was that opioids were not safe for long-term use or for the treatment of chronic pain. Opioids were reserved for specialized uses, such as treatment of cancer pain or palliative care at the end of life. But members of the False Narrative Enterprise realized that they could profit if they could convince providers to prescribe opioids for common ailments.

218.    The result of Enterprise members' push to normalize the treatment of chronic, noncancer pain with prescription opioids is clearly described by the Department of Veterans Affairs and the Department of Defense:

> Prior to the 1980s, O[pioid] T[herapy] was rarely used outside of severe acute injury or post-surgical pain, primarily due to concern for tolerance, physical dependence, and addiction. As the hospice and palliative care movement began defining end-of-life care in the U.S. during the 1980s and emphasizing the importance of pain relief, OT increasingly became a mainstay for cancer and end-of-life pain. Efforts to destigmatize the use of prescription opioids for chronic non-terminal pain encompassed primary care providers and the public. The efforts led to an unprecedented increase in opioid prescribing for chronic non-terminal pain. <u>Chronic pain management became synonymous with L[ong-term] OT in the 1990s and the first decade of the 2000s with significant numbers of patients in pain clinics receiving LOT. Despite the absence of long-term safety or efficacy data, OT for chronic non-terminal pain became a mainstay of therapy.</u>[57]

---

[57] The Opioid Therapy for Chronic Pain Work Group, U.S. Dep't of Veterans Affairs & U.S. Dep't of Defense, *VA/DoD Clinical Practice Guideline for Opioid Therapy for Chronic Pain* (3d ed. 2017),

219.     This tentative expansion of opioid use for palliative care and cancer pain provided an opportunity that members of the False Narrative Enterprise exploited directly through their characterization of the appropriate use and risk-benefit profile of their own products and indirectly through financing and influencing organizations that promoted increasing the use of opioids to treat an ever-wider variety of chronic conditions. With little to no evidentiary support, Enterprise members claimed that opioids posed little, if any, risk of addiction when used by patients in pain.

220.     Much of the early work in changing the approach to pain management was made possible through grants by the Robert Wood Johnson Foundation ("RWJF"), which funded initiatives to expand the use of prescription opioids to treat both end-of-life and cancer pain <u>as well as</u> chronic, nonmalignant pain. A primary grantee was the University of Wisconsin Pain & Policy Study Group ("UW-PPSG") that initially promoted opioid use for end-of-life and cancer care before expanding its advocacy to the use of opioids for other chronic conditions.

221.     One of the primary ways in which members of the False Narrative Enterprise achieved their objective was by manipulating, funding, and, in some cases, founding ostensibly independent organizations to advocate for the wider use of opioids to treat all forms of chronic, noncancer pain, particularly through treatment guidelines.

222.     Such guidelines play a role in establishing best practices for clinicians. Recognizing this fact of modern medical practice, members of the False Narrative Enterprise set their sights on three targets to change prescribing practices and the culture surrounding pain treatment: (1) the Joint Commission of the Accreditation of Healthcare Organizations ("JCAHO"), which established standards that hospitals had to follow to remain accredited; (2) the Federation of State Medical Boards

---

https://www.va.gov/HOMELESS/nchav/resources/docs/mental-health/substance-abuse/VA_DoD-CLINICAL-PRACTICE-GUIDELINE-FOR-OPIOID-THERAPY-FOR-CHRONIC-PAIN-508.pdf (emphasis added) (hereinafter *VA/DoD 2017 Opioid Guidelines*).

("FSMB"), which established model standards for doctor discipline; and (3) the Veterans Administration ("VA"), which directly ran a great number of hospitals and clinics. The goal was to convince these organizations to issue treatment guidelines encouraging the regular evaluation of pain and its treatment with prescription opioids.

223.    In this members of the False Narrative Enterprise were successful. The VA and FSMB guidelines supporting the assessment of pain and its treatment via prescription opioids were issued in 1998. JCAHO and the opioid industry (through another front group, the National Pharmaceutical Council) issued joint guidelines in 1999. The changes in these guidelines were so significant from the then-current best practices that hospitals were given two years—until 2001—to implement them.

224.    The slogan, "pain is the fifth vital sign," illustrates just how radical this change was. The addition of pain, a subjective and effectively unquantifiable metric, to the list of vital signs essentially required doctors to treat pain as equivalently important to blood pressure or respiration rate because patients should always receive treatment to bring their vital signs back into a normal range. In the context of an overburdened health care system, doctors of necessity turned to the fastest-acting tool at their disposal to reduce pain to an acceptable level: prescription opioids.

225.    In the interval before the JCAHO guidelines went into effect, UW-PPSG (funded by the RWJF and the drug industry) led a media campaign directed at doctors, hospitals, and patients to persuade them to adopt these novel practices. According to one expert:

> The funding is really what made it possible for the Pain & Policy Study Group to roll out this new paradigm around pain treatment . . . . Also, the Joint Commission was involved in that process, and they actually received content that was created by Purdue Pharma. That was disseminated to hospitals who were trying to make Joint Commission accreditation. They used videos produced by Purdue. They used documents created by Purdue in order to change the paradigm around opioid prescribing, including promoting opioid[s]—including promoting pain as the fifth vital sign.

226.    As a result of the paradigm shift in the approach to treating chronic pain orchestrated by the False Narrative Enterprise through the Front Groups, "[d]octors were taught that prescribing opioids for chronic pain was evidence-based medicine even though there was no evidence to support it." Simply put, "these different factions manipulated and misrepresented, deliberately or otherwise, medical science to serve their own agendas."[58] This change affected nearly every aspect of medical practice:

a.    Articles were published in the media describing pain as the fifth vital sign, the assessment of pain as a required practice in hospitals and clinics around the country, and the elimination of pain as a patient right.

b.    Pain scores emphasized the absence of pain as a patient right and documented pain in patient records. Those records became the basis for enforcement activities resulting from JCAHO accreditation audits and effectively forced doctors to treat pain with opioids.

c.    The 1998 FSMB guidelines spurred prescriptions by removing the threat of discipline for doctors who prescribed opioids in violation of what had been accepted best practices prior to the interventions of the members of the False Narrative Enterprise. Reasonable physicians could conclude that failing to prescribe opioids would expose them to discipline.

d.    Medical schools began teaching pain as the fifth vital sign and the assessment and treatment of pain as part of the core curriculum.

e.    Continuing Medical Education (CME) programs led by the opioid industry, their Front Groups, and KOLs regularly characterized the use of prescription opioids as best practices even to the exclusion of other recognized and less dangerous treatment modalities.

f.    Once a greater number of patients with chronic, noncancer pain were receiving opioid "therapy," best practices had to evolve to treat the consequences: titration to higher doses for patients presenting with the industry-promoted concept of "pseudoaddiction" as well as higher doses and longer use of opioids when patients presented with withdrawal-like symptoms.

g.    The concept of blaming the patient for drug-seeking behavior took root. Patients moved to illicit heroin and other drugs to address their withdrawal cravings after states and regulatory authorities took steps to reduce opioid prescriptions and prosecute doctors running pill mills.

---

[58] *Drug Dealer, MD, supra*, at 57.

C.     **The False Narrative Enterprise spread falsehoods about the risks and benefits of prescription opioids.**

227.     Members of the False Narrative Enterprise were aware that opioids pose significant risks and that the long-term safety and efficacy of opioids for chronic pain has never been established in medical literature. Nevertheless, members of the False Narrative Enterprise intentionally and unlawfully engaged in a misinformation campaign to convince prescribers, legislators, and the public that opioids are appropriate—and even necessary—to treat chronic pain.

228.     The intended effect (which was, in fact, achieved) was to increase opioid prescriptions, thereby increasing Enterprise members' profit from manufacturing, distributing, and dispensing their opioids.

### 1. Falsehood #1: The risk of addiction to opioids is low.

229.     Members of the False Narrative Enterprise were aware that opioids are highly addictive, that tolerance and physical dependency develop rapidly, and that prescription opioids confer an increased risk of addiction and overdose even in patients who take their medication as prescribed. By the mid-1990s, a number of studies had already demonstrated a high incidence of OUD among chronic pain patients.

230.     Each Manufacturer claimed that the potential for addiction from its opioids was relatively small or non-existent, even though there was no scientific evidence to support that claim. None of them have acknowledged, retracted, or corrected their false statements.

231.     A common method, used by various Manufacturers, was to point to a one-paragraph letter to the editor published in the *New England Journal of Medicine* ("*NEJM*") in 1980.[59]

---

[59] Jane Porter & Hershel Jick, *Addiction Rare in Patients Treated with Narcotics*, 302 New Eng. J. Med. 123 (1980), https://www.nejm.org/doi/pdf/10.1056/NEJM198001103020221.

**ADDICTION RARE IN PATIENTS TREATED
WITH NARCOTICS**

*To the Editor:* Recently, we examined our current files to determine the incidence of narcotic addiction in 39,946 hospitalized medical patients[1] who were monitored consecutively. Although there were 11,882 patients who received at least one narcotic preparation, there were only four cases of reasonably well documented addiction in patients who had no history of addiction. The addiction was considered major in only one instance. The drugs implicated were meperidine in two patients,[2] Percodan in one, and hydromorphone in one. We conclude that despite widespread use of narcotic drugs in hospitals, the development of addiction is rare in medical patients with no history of addiction.

JANE PORTER
HERSHEL JICK, M.D.
Boston Collaborative Drug
Surveillance Program
Boston University Medical Center

Waltham, MA 02154

1. Jick H, Miettinen OS, Shapiro S, Lewis GP, Siskind Y, Slone D. Comprehensive drug surveillance. JAMA. 1970; 213:1455-60.
2. Miller RR, Jick H. Clinical effects of meperidine in hospitalized medical patients. J Clin Pharmacol. 1978; 18:180-8.

---

232.     While first Purdue and then other Manufacturers used it to assert that their opioids were not addictive, according to Dr. Jick, "that's not in any shape or form what we suggested in our letter."[60]

233.     The enormous impact of Manufacturers' misleading amplification of the Porter & Jick Letter was well documented in another letter published in the *NEJM* on June 1, 2017:

> [W]e found that a five-sentence letter published in the *Journal* in 1980 was heavily and uncritically cited as evidence that addiction was rare with long-term opioid therapy. We believe that this citation pattern contributed to the North American opioid crisis by helping to shape a narrative that allayed prescribers' concerns about the risk of addiction associated with long-term opioid therapy.[61]

234.     The picture painted by the Porter & Jick Letter regarding short-term therapy in a hospital setting is not consistent with the evidence about long-term opioid therapy for chronic pain.

---

[60] Taylor Haney & Andrea Hsu, *Doctor Who Wrote 1980 Letter on Painkillers Regrets that It Fed Opioid Crisis*, NPR (June 16, 2017), https://www.npr.org/sections/health-shots/2017/06/16/533060031/doctor-who-wrote-1980-letter-on-painkillers-regrets-that-it-fed-the-opioid-crisi.

[61] Pamela T.M. Leung, et al., *A 1980 Letter on the Risk of Opioid Addiction*, 376 N. Engl J. Med. 2194 (June 1, 2017), https://www.nejm.org/doi/full/10.1056/NEJMc1700150#t=article.

A 2015 systematic review found that the prevalence of misuse following opioid prescriptions for chronic pain was between 21% and 29%, with a prevalence of addiction between 8% and 12%.[62]

### 2. Falsehood #2: It is easy to identify people at high risk for addiction.

235.    Members of the False Narrative Enterprise asserted that even if <u>some</u> patients are at risk of opioid addiction, doctors can effectively identify those patients using screening tools or questionnaires and then manage the risk of addiction by imposing heightened monitoring on patients deemed "at risk."

236.    Members of the False Narrative Enterprise created and disseminated these tools to perpetuate the myth that only patients with easily identifiable traits are at risk for addiction and that, by implication, opioids are safe for everyone else.

237.    There is no reliable scientific evidence that doctors can depend on the screening tools currently available to materially limit the risk of OUD, that high-risk patients identified through screening can take opioids over the long term without triggering OUD, even with enhanced monitoring, or that patients who are not identified through such screening can take opioids over the long term without significant danger of OUD.

238.    By ostensibly identifying patients likely to develop OUD, the tool gave doctors false confidence in their ability to safely prescribe opioids long-term.

### 3. Falsehood #3: Signs of addictive behavior are "pseudoaddiction" requiring more opioids.

239.    Members of the False Narrative Enterprise claimed that the signs of opioid addiction were merely symptoms of "pseudoaddiction," meaning "behaviors (that mimic addictive behaviors) exhibited by patients with inadequately treated pain." Moreover, Enterprise members claimed that pseudoaddiction should be treated by giving patients higher doses of opioids. The message was that

---

[62] Vowles, et al., *supra*.

patients exhibiting classic signs of opioid misuse—for example, asking for more and higher doses of opioids, self-escalating their doses, or claiming to have lost prescriptions in order to get more opioids—did not have or were not developing OUD, but rather simply suffering from under-treatment of their pain.

240.    In reality, such behaviors are frequently, if not usually, indications of OUD.  Members of the False Narrative Enterprise knew there was no legitimate evidence to support their claim that doctors should treat signs of addiction as "pseudoaddiction."  As late as 2015, an investigative review of medical studies concluded that empirical evidence supporting pseudoaddiction as a diagnosis distinct from addiction had still not emerged.[63]

241.    Material supporting the concept of pseudoaddiction includes:

    a.  APF's *A Reporter's Guide: Covering Pain and Its Management*

    b.  AAPM's CME *The Truth About Pain Management*[64]

    c.  FSMB's *Responsible Opioid Prescribing*

    d.  *A Clinical Guide to Opioid Analgesia*, written by Drs. Fine and Portenoy and supported by Endo[65]

    e.  NIPC's *Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia*, sponsored by Endo[66]

    f.  *Opioid Analgesia: Practical Treatment of the Patient with Chronic Pain*, supported by Endo[67]

---

[63] Marion S. Greene & R. Andrew Chambers, *Pseudoaddiction: Fact or Fiction? An Investigation of the Medical Literature* 2 Curr. Addiction Rep. 310 (2015), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4628053/pdf/40429_2015_Article_74.pdf.

[64] *The Truth About Pain Management: The Interface of Pain and Addiction*, Am. Acad. Pain Med., https://web.archive.org/web/20080517184137/http://aapm.confex.com/aapm/2007am/techprogram/S1237.HTM (last accessed Aug. 23, 2025 as of May 17, 2008) (hereinafter, *The Truth*).

[65] Perry G. Fine & Russell K. Portenoy, *A Clinical Guide to Opioid Analgesia* 20, 34 (2004).

[66] Perry Fine, Nat'l Inst. on Pain Control, *Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia* (2009).

[67] Bill H. McCarber, *Opioid Analgesia: Practical Treatment of the Patient with Chronic Pain*, MedScape, https://www.medscape.org/viewarticle/469428

    g.   *Advances in Opioid Analgesia: Maximizing Benefit While Minimizing Risk*, supported by Endo[68]

    h.   Janssen's *Let's Talk Pain* website[69]

    i.   Purdue's *Clinical Issues in Opioid Prescribing* pamphlet posed on *PartnersAgainstPain.com*

    j.   The FAQ on *pain-topics.org*, funded by Mallinckrodt

    k.   Cephalon's brochure, *Making Pain Talk Painless: A Guide to Help You Talk with Your Doctor About Pain Management*[70]

    l.   Dr. Lynn Webster's *Avoiding Opioid Abuse While Managing Pain*, distributed by Endo

### 4.  Falsehood #4: Addicted patients are "untrustworthy" "abusers".

242.    As it became apparent that individuals were, in fact, misusing opioids that they had been prescribed, members of the False Narrative Enterprise began to blame addiction, overdose, and death on "abuse," in effect blaming patients for their OUD—rather than accurately identifying the culprit as the marketing and resulting excessive prescription of dangerous opioids.

243.    As early as 2001, Richard Sackler, Purdue's president, wrote in a confidential email exculpating Purdue's marketing of OxyContin: "we have to hammer on the abusers in every way possible. They are the culprits and the problem. They are reckless criminals."[71] He chose to stigmatize

---

[68]  B. Eliot Cole, *Advances in Opioid Analgesia: Maximizing Benefit While Minimizing Risk*, MedScape, https://www.medscape.org/viewarticle/552190_2.

[69]  *Understanding Addiction*, Let's Talk Pain, https://web.archive.org/web/20120322234928/http://www.letstalkpain.org/real_story/addictions.html (last accessed Aug. 25, 2023 as of Mar. 22, 2012).

[70]  *Making Pain Talk Painless: A Guide to Help You Talk with Your Doctor* (July 2006). This brochure was introduced into evidence in the February 20, 2019 deposition of John Hassler in the opioid litigation brought by the State of Oklahoma available at https://nick-mail.net/marginalia/opioid-cases/oklahoma-opioids-trial/1042898736-20190403-143708-.pdf.

[71]  Joanna Walters, *House of Pain: Who are the Sacklers Under Fire in Lawsuits Over Opioids* (July 26, 2019), https://www.theguardian.com/us-news/2019/jul/26/sacklers-opioids-purdue-pharma-oxycontin-opioids.

people who were hurt by Purdue's opioids, calling them "junkies."[72] Similarly, in December 2011, John Stewart, Purdue's CEO from 2007 to 2013, gave a speech titled *Providing Relief, Preventing Abuse*, which deceptively blamed addiction, overdose, and death on "abuse."

244.    Purdue and other members of the False Narrative Enterprise knew that the tactic of blaming addiction on untrustworthy patients was a lie. The truth is that the real risk of OUD is not so limited. Purdue internally admitted: "This can happen to anyone—from a 50-year-old woman with chronic lower back pain to an 18-year-old boy with a sports injury, from the very wealthy to the very poor."

245.    While there are patients who obtain opioids for the express purpose of misusing them, such patients are a small minority. For example, patients who "doctor-shop"—i.e., visit multiple prescribers to obtain opioid prescriptions—are responsible for only about 2% of opioid prescriptions.[73] The opioid use and misuse that has harmed hospitals such as Plaintiff is overwhelmingly a problem of false marketing and unconstrained distribution and dispensing of the drugs—not problem patients.

### 5.  Falsehood #5: Opioid withdrawal can be avoided by tapering.

246.    Most patients who have been taking opioids regularly will, upon stopping treatment, experience physically and psychologically painful withdrawal. Members of the False Narrative Enterprise deceptively represented that withdrawal is easily managed by tapering a patient's dose of opioids and failed to disclose that withdrawal would be more severe and tapering less effective in patients who had used opioids for a prolonged period.

---

[72] *Id.*
[73] *Although Relatively Few, "Doctor Shoppers" Skew Opioid Prescribing*, Nat'l Inst. on Drug Abuse (May 27, 2014), https://web.archive.org/web/20230209135632/https://archives.drugabuse.gov/news-events/nida-notes/2014/05/although-relatively-few-doctor-shoppers-skew-opioid-prescribing.

6. **Falsehood #6: Opioid doses can be increased without limit or increased risk.**

247.    Members of the False Narrative Enterprise misleadingly claimed there was no ceiling on the amount of opioids that can be taken safely. With higher doses, and particularly with the addition of short-acting or immediate-release opioids, the risk of fatal overdose and other adverse effects grows.

248.    These misrepresentations were integral to the Manufacturers' promotion of prescription opioids, and they were directed, in key part, toward prescribers, including those working in hospitals. Because patients develop a tolerance to opioids' analgesic effects, achieving long-term pain relief requires constantly increasing the dose. Not only are stronger doses more expensive, but patients who take larger doses or who escalate to larger doses faster are much more likely to remain on opioids for a longer time. The increased revenue that results comes at the cost of increased adverse effects.[74]

249.    The Manufacturers' sales representatives aggressively pushed doctors to prescribe stronger doses of opioids. One common technique was to visit doctors regularly, gradually, and dangerously raising their comfort level with prescribing ever-higher doses of opioids. For example, one Purdue sales representative wrote about how his regional manager would drill the sales team on their upselling tactics:

> It went something like this. "Doctor, what is the highest dose of OxyContin you have ever prescribed?" "20mg Q12h." "Doctor, if the patient tells you their pain score is still high you can increase the dose 100% to 40mg Q12h, will you do that?" "Okay." "Doctor, what if that patient then came back and said their pain score was still high, did you know that you could increase the OxyContin dose to 80mg Q12h, would you do that?" "I don't know, maybe." "Doctor, but you do agree that you would at least Rx the 40mg dose, right?" "Yes."

---

[74] *See* Heidi N. Overton, et al., *Opioid-Prescribing Guidelines for Common Surgical Procedures: An Expert Panel Consensus*, 227 J. Am. Coll. Surgeons 411 (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6353661/pdf/nihms-989596.pdf.

The next week the representative would see that same doctor and go through the same discussion with the goal of selling higher and higher doses of OxyContin.

250.     Manufacturers were aware of the greater dangers high-dose opioids posed. In 2013, the FDA acknowledged "that the available data do suggest a relationship between increasing opioid dose and risk of certain adverse events" and that studies "appear to credibly suggest a positive association between high-dose opioid use and the risk of overdose and/or overdose mortality."[75]

### 7.  Falsehood #7: Long-term opioid use improves functioning.

251.     Members of the False Narrative Enterprise represented to patients and prescribers that long-term opioid use can improve the quality of life of patients suffering from chronic conditions.

252.     Members of the False Narrative Enterprise knew that these claims were incorrect because they knew that there were no controlled long-term studies establishing that opioids improve the quality of life in chronic pain patients—or even that they are effective in improving patients' chronic pain over the long term.[76] FDA warning letters to manufacturers have pointed out this lack of evidence.[77] These claims are based on what the CDC has characterized as "insufficient evidence."[78]

253.     What evidence there is shows not only that opioids are ineffective for the treatment of chronic pain but also that they worsen patients' health. For example, a 2006 review found that

---

[75] Letter from Janet Woodcock, Dir. of Ctr. for Drug Evaluation & Research, to Andrew Kolodny, President, Physicians for Responsible Opioid Prescribing (Sept. 10, 2013), https://paindr.com/wp-content/uploads/2013/09/FDA_CDER_Response_to_Physicians_for_Responsible_Opioid_Prescribing_Partial_Petition_Approval_and_Denial.pdf (responding to citizen petition regarding opioid prescribing) (hereinafter "Woodcock-Kolodny Letter").

[76] *Promoting Safer and More Effective Pain Management*, Ctrs. for Disease Control, https://www.cdc.gov/drugoverdose/pdf/guidelines_factsheet-patients-a.pdf; *2016 CDC Guideline*, *supra*, at 20.

[77] *See also* Warning Letter from Thomas Abrams, Dir., Div. of Mktg., Adver., & Commc'ns, U.S. Food & Drug Admin., to Doug Boothe, CEO, Actavis US (Feb. 18, 2010), https://www.fdanews.com/ext/resources/files/archives/a/ActavisElizabethLLC.pdf (rejecting claims that Actavis' opioid, Kadian, had an "overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life."); Warning Letter from Thomas Abrams, Dir., Div. of Mktg., Adver., & Commc'ns, U.S. Food & Drug Admin., to Brian A. Markison, Chairman, President and Chief Executive Officer, King Pharmaceuticals, Inc. (March 24, 2008) (finding the claim that "patients who are treated with [Avinza (morphine sulfate ER)] experience an improvement in their overall function, social function, and ability to perform daily activities . . . has not been demonstrated by substantial evidence or substantial clinical experience."). The FDA's warning letters were available to Defendants on the FDA website.

[78] *2016 CDC Guideline*, *supra*, at 20.

opioids as a class did not demonstrate an improvement in functional outcomes over other non-addictive treatments.[79] The few longer-term studies of opioid use had "consistently poor results," and "several studies have showed that opioids for chronic pain may actually worsen pain and functioning . . . ."[80]

254.    In addition, members of the False Narrative Enterprise knew that patients using opioids for chronic pain were at heightened risk of developing OUD and that long-term opioid use can cause debilitating deterioration in a patient's quality of life. As one pain specialist observed, "opioids may work acceptably well for a while, but over the long term, function generally declines, as does general health, mental health, and social functioning. Over time, even high doses of potent opioids often fail to control pain, and these patients are unable to function normally."[81]

### 8.    Falsehood #8: Opioids are safer than other pain medications.

255.    Members of the False Narrative Enterprise misleadingly claimed that opioids are safer than traditional painkillers like acetaminophen and nonsteroidal anti-inflammatory drugs ("NSAIDs") by exaggerating the risks of NSAIDs and trivializing, or simply omitting, the risks of opioids.

256.    These risks, which are not shared or are of much less concern with acetaminophen and NSAIDs, include hyperalgesia;[82] hormonal dysfunction;[83] decline in immune function; mental clouding, confusion, and dizziness; increased falls and fractures in the elderly;[84] neonatal abstinence syndrome; and potentially fatal interactions with alcohol.[85]

---

[79] Andrea D. Furlan, et al., *Opioids for Chronic Noncancer Pain: A Meta-Analysis of Effectiveness and Side Effects*, 174 Can. Med. Ass'n J. 1589 (2006), https://www.cmaj.ca/content/cmaj/174/11/1589.full.pdf.

[80] Thomas Frieden & Debra Houry, *Reducing the Risks of Relief – The CDC Opioid-Prescribing Guideline*, 374 New Eng. J. Med. 1503 (2016), https://www.nejm.org/doi/full/10.1056/NEJMp1515917 (hereinafter "*Reducing the Risks of Relief*").

[81] Andrea Rubinstein, *Are We Making Pain Patients Worse?*, 60 Sonoma Med. (Fall 2009).

[82] Woodcock-Kolodny Letter, *supra*.

[83] Harry W. Daniell, *Hypogonadism in Men Consuming Sustained-Action Oral Opioids*, 3 J. Pain 377 (2001), https://www.jpain.org/article/S1526-5900(02)00032-9/fulltext.

[84] *See* Bernhard M. Kuschel, et al., *The Risk of Fall Injury in Relation to Commonly Prescribed Medications Among Older People – A Swedish Case-control Study*, 25 Eur. J. Pub. Health 527 (2014), https://www.ncbi.nlm.nih.gov/pubmed/25085470.

[85] Karen H. Seal, et al., *Association of Mental Health Disorders with Prescription Opioids and High-Risk Opioids in US Veterans of Iraq and Afghanistan*, 307 J. Am. Med. Ass'n 940 (2012), https://jamanetwork.com/journals/jama/fullarticle/1105046.

257.    As a result of this false claim, opioid prescriptions increased even as the percentage of patients visiting a doctor for pain remained constant. A study of 7.8 million doctor visits between 2000 and 2010 found that opioid prescriptions increased from 11.3% to 19.6% of visits, while NSAID and acetaminophen prescriptions fell from 38% to 29%.[86]

258.    In April 2007, Endo sponsored an article aimed at prescribers, which emphasized the risks of NSAIDs as an alternative to opioids. The article included a case study that focused on the danger of extended use of NSAIDs. The article did not provide the same detail concerning the serious side effects associated with opioids.[87]

### 9.  Falsehood #9: Ostensibly "abuse-deterrent" formulations are safer.

259.    As the opioid crisis intensified, members of the False Narrative Enterprise capitalized on the problem they had created—the widespread diversion and misuse of opioids—by delaying and marketing purportedly "abuse-deterrent formulations" ("ADFs") that make pills harder to crush, snort, or dissolve and inject.

260.    Websites and message boards reported a variety of ways to tamper with ADFs to release their opioids immediately, thereby defeating the effectiveness of ADFs.

261.    The CDC Guidelines confirm that "[n]o studies" support the notion that "abuse-deterrent technologies [are] a risk mitigation strategy for deterring or preventing abuse."[88]

---

[86] Matthew Daubresse, et al., *Ambulatory Diagnosis and Treatment of Nonmalignant Pain in the United States, 2000-2010*, 51 Med. Care, 870 (2013), https://insights.ovid.com/pubmed?pmid=24025657 ("For back pain alone, the percentage of patients prescribed opioids increased from 19% to 29% between 1999 and 2010, even as the use of NSAIDs or acetaminophen declined from 39.9% to 24.5% of these visits; and referrals to physical therapy remained steady."); *see also* John N. Mafi, et al., *Worsening Trends in the Management and Treatment of Back Pain*, 173 J. Am Med. Ass'n Internal Med. 1573, 1573 (2013), https://www.ncbi.nlm.nih.gov/pubmed/23896698.

[87] Charles E. Argoff, *Case Challenges in Pain Management: Opioid Therapy for Chronic Pain*, Pain Med. News(Apr. 2007), https://www.painmedicinenews.com/download/BtoB_Opana_WM.pdf.

[88] Ctrs. for Disease Control & Prevention, *CDC Guideline for Prescribing Opioids for Chronic Pain, 2016*, Morbidity & Mortality Weekly Rep. (Mar. 18, 2016), https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm (hereinafter, "*2016 CDC Guidelines*").

262.    Members of the False Narrative Enterprise also knew that these formulations did nothing to reduce the likelihood that a patient taking a pill orally for medical use would develop OUD.

263.    Grünenthal played a key role in this process. It developed INTAC technology, which made pills manufactured using the technology more difficult to crush and therefore, ostensibly, more difficult to abuse by insufflating the resulting powder. At the time of the technology's announcement, Grünenthal asserted that Intac would "foil[] the key step in most forms of opioid abuse,"[89] a misleading statement that ignores the fact that the vast majority of opioid misuse occurs by oral ingestion, something that INTACT does nothing to address. Grünenthal also asserted that "tablets produced by the INTAC process form a gel in aqueous solutions that cannot be readily injected," a statement that subsequent events would prove to be tragically incorrect.[90]

264.    Purdue licensed the technology to produce an ADF version of OxyContin in 2010.

265.    Endo licensed this technology for the 2012 reformulation of Opana ER, which had originally been released without INTAC in 2006. This reformulation was a ploy designed to allow Endo to claim that the newly available generic versions of Opana without INTAC were unsafe because they could be more readily abused and to market the reformulated Opana ER as "abuse deterrent". What actually happened is that the FDA refused to allow Endo to claim that the reformulation was "abuse deterrent," Endo released the reformulated drug anyway, there was a "significant shift in the route of abuse [of Opana] from nasal to injection," sharing of needles led to outbreaks of HIV and hepatitis C, and the FDA ultimately had to request that Opana be removed from the market.[91]

---

[89] Press Release, Grunenthal Group, INTAC – Grunenthal Group Presents Data Demonstrating the Strength of Its Tamper Resistant Technology at the American Association of Pharmaceutical Science Annual Meeting and Exposition (Oct. 16, 2012), https://www.prnewswire.com/news-releases/intac---grunenthal-group-presents-data-demonstrating-the-strength-of-its-tamper-resistant-technology-at-the-american-association-of-pharmaceutical-science-annual-meeting-and-exposition-174383771.html.

[90] Id.

[91] Press Release, Food & Drug Admin., FDA Requests Removal of Opana ER for Risks Related to Abuse (June 8, 2017), https://www.fda.gov/news-events/press-announcements/fda-requests-removal-opana-er-risks-related-abuse.

Meanwhile, Grünenthal continued to insist in face of the contrary evidence that "the properties of Intac add significant[ly] to prescription drugs."[92]

### 10. Falsehood #10: Short-acting opioids should be used to treat chronic, noncancer "breakthrough" pain.

266.    Members of the False Narrative Enterprise disseminated the idea that short-acting or immediate-release opioids should be taken in conjunction with long-acting or extended-release opioids to treat "breakthrough pain" for a variety of common chronic conditions. While breakthrough pain is recognized in cancer patients, Enterprise members broadened the definition to include a transitory flare of moderate-to-severe pain that occurs in any patient with otherwise persistent pain.

267.    Some short-acting opioids used to treat breakthrough cancer pain contain fentanyl. Fentanyl treatments for breakthrough pain are deadly for people who are not already tolerant of opioids. They have never been accepted as a safe treatment for non-cancer chronic pain.

268.    As part of their campaign to expand the market for their opioid products, Enterprise members marketed high-risk fentanyl-based opioids to fill that "need" in patients taking opioids for chronic conditions, even though Enterprise members knew that the safety of such use had never been established and that fentanyl-based opioids come with heightened risk.

### 11. Falsehood #11: Despite heightened risk factors, the elderly and veterans can safely use opioids.

269.    Members of the False Narrative Enterprise aggressively marketed opioids as safe and effective for high-risk groups. For example, they marketed opioids to veterans, even though opioids can cause fatal interactions with benzodiazepines, a common treatment for PTSD. Members of the False Narrative Enterprise did so without addressing these risks.

---

[92] Michael Gibney, *Grunenthal Insists Crush-Proof Tablet Works After Endo Pulls Opana sNDA*, Fierce Pharma (Aug. 30, 2016), https://www.fiercepharma.com/drug-delivery/grunenthal-insists-crush-proof-tablet-works-after-endo-pulls-opana-snda.

270.    For instance, in 2009 the American Pain Foundation published *Exit Wounds: A Survival Guide to Pain Management for Veterans and their Families*; this publication was sponsored by Purdue, among others.[93] *Exit Wounds* described opioids as the "gold standard" of pain medications, as "often underused," and as drugs that can "increase [your] level of functioning." The publication further stated, "[l]ong experience with opioids shows that people who are not predisposed to addiction are unlikely to become addicted to opioid pain medications." *Exit Wounds* did not address the significant dangers of taking benzodiazepines with opioids. The book encouraged veterans that they "may need to push" doctors "hard" to get their preferred pain treatment. The publication further suggested that patients should plan for a "recurrence of pain" by "having a supply of a pain medication on hand."[94]

271.    Janssen and Purdue both paid for APF to distribute *Exit Wounds.*

272.    Members of the False Narrative Enterprise also aggressively marketed opioids to elderly patients, even though the elderly suffer the same risk of dependence and tolerance that other opioid users experience. In fact, opioid use by older adults comes with additional risks, such as mental confusion and falls. Older adults also often take multiple medications, which can lead to dangerous interactions between opioids and other drugs. And, as people age, medications affect them more strongly and leave their system more slowly.

273.    Elderly patients frequently suffer from osteoarthritis, but opioids are not approved to treat that condition. Purdue conducted a single study on osteoarthritis for its Butrans opioid, and it failed.[95] Nevertheless, to meet its business goals, Purdue trained its representatives to mislead doctors by promoting opioids for osteoarthritis without disclosing the failed trial.

---

[93] Derek McGinnis, *Exit Wounds: A Survival Guide to Pain Management for Veterans and Their Families* (2009).
[94] *Id.*
[95]    *Efficacy    and    Safety    Evaluated    in    Opioid-Experienced    Patients*,    Butrans, https://web.archive.org/web/20230329233134/https://butrans.com/clinical-data/trial-results.html (last visited Aug. 25, 2023 as of Mar. 29, 2023).

274.    A non-credit educational program sponsored by Endo, *Persistent Pain in the Older Adult*, misleadingly claimed that withdrawal symptoms, which make it difficult for patients to stop using opioids, could be avoided by simply tapering a patient's opioid dose over ten days and that chronic opioid therapy has been "shown to reduce pain and improve depressive symptoms and cognitive functioning."

275.    Janssen co-sponsored an APF publication that sought to normalize opioid treatment for the elderly.[96]

\* \* \* \* \* \* \*

276.    In sum, each of these misrepresentations regarding the use of opioids to treat chronic pain was either not supported by or was contrary to the scientific evidence. Through these and other misrepresentations, members of the False Narrative Enterprise misinformed and continue to misinform the medical community and the public about the risks of opioid use.

**D.    The False Narrative Enterprise used a campaign of misinformation to publicize these falsehoods and convince prescribers, legislators, and the public of their truth.**

277.    Members of the False Narrative Enterprise did not merely spread their misinformation through their own employees and publications. They recognized that their message would more strongly influence prescribers if it appeared to come from purportedly independent sources. Enterprise members, therefore, used multiple, mutually reinforcing channels to spread their deceptive claims, including: (1) direct, targeted communications with prescribers by sales representatives or "detailers"; (2) Front Groups with the appearance of independence from the Manufacturers; (3) independent organizations that were captured by members of the False Narrative Enterprise; (4) Key Opinion Leaders ("KOLs"), that is, doctors paid by the Manufacturers to promote their pro-opioid message; (5) mechanisms of disseminating their misleading messages through reputable organizations;

---

[96] Am. Pain Found., *Special Considerations: Pain in Specific Populations* (Nov. 2008).

(6) CME programs controlled and/or funded by the Manufacturers; (7) branded advertising; (8) unbranded advertising; (9) publications; and (10) speakers' bureaus and programs.

278.    As explained in a Purdue sales presentation, the purpose of these "public relations initiatives" was to "make the whole pie bigger, not only for us but for our competition as well."

### 1. Members of the False Narrative Enterprise used "detailers" to disseminate their misrepresentations directly to prescribers.

279.    The Manufacturers employed numerous sales representatives (also called "detailers") to call and visit healthcare providers and deliver deceptive messages about opioids. These in-person sales calls are called "detailing."

280.    The Manufacturers identified and targeted susceptible prescribers by, for example, focusing on primary care doctors, who were more likely to prescribe drugs to chronic pain patients, but less likely to be educated about treating pain; such doctors were more likely to accept the Manufacturers misrepresentations. One of McKinsey's primary tasks was to assist the Manufacturers in identifying these prescribers and to encourage the Manufacturers to detail them more frequently and aggressively.

281.    Manufacturers trained these representatives to evade prescribers' questions regarding opioids' addictiveness and to misrepresent and conceal facts relating to opioid safety.

282.    Manufacturers prepared brochures, videos, and other marketing materials containing misrepresentations for sales representatives to distribute to providers during in-person visits.

283.    The Manufacturers devoted and continue to devote massive resources to direct sales contacts with doctors. In 2014 alone, the Manufacturers spent $166 million to detail branded opioids to doctors. This amount is twice as much as the Manufacturers spent on detailing in 2000. The amount included $108 million spent by Purdue, $34 million by Janssen, $13 million by Teva, and $10 million by Endo. These companies would not have spent so lavishly had detailing not been effective at increasing the prescribing rates.

284.    For example, former Purdue sales representative Steven May explained that he and his coworkers were trained to "refocus" doctors on "legitimate" pain patients and to represent that "legitimate" patients would not become addicted. In addition, they were trained to say that 12-hour dosing made the extended-release opioids less "habit-forming" than painkillers that need to be taken every four hours.[97]

285.    Janssen detailers took advantage of Ultram's unscheduled status to leave free samples with doctors to encourage the patients to begin to use (and continue to use the drug). There were numerous reports of physicians developing OUD from the use of these free samples. During their presentations to doctors, Janssen's detailers frequently touted Ultram's supposed low or nonexistent potential for abuse and inaccurately compared its risks to those of NSAIDs.

286.    Janssen employed sales representatives to promote its opioids in New Mexico, including Erik Zimmer and Danny Montford. Sales representatives like them deliberately targeted doctors to promote the use of Nucynta. These doctors included Dr. Jain, whose medical license was suspended in 2012 and who in 2014 was indicted for unlawfully dispensing controlled substances.[98] The sales representative assigned to Dr. Jain was given the highest target goal of new prescriptions of Nucynta to be written by Dr. Jain in the upcoming quarter.

287.    Detailing had the intent and effect of making the detailed prescriber more willing to prescribe not only the detailing manufacturer's opioids, but also opioids as a class of drugs.

---

[97] David Remnick, *How OxyContin Was Sold to the Masses* (Steven May interview with Patrick Radden Keefe), New Yorker (Oct. 27, 2017), https://www.newyorker.com/podcast/the-new-yorker-radio-hour/how-oxycontin-was-sold-to-the-masses.

[98] *Pawankumar Jain Pleads Guilty to Unlawfully Dispensing Prescription Painkillers and Health Care Fraud*, U.S. Dep't of Justice (Feb. 11, 2016), https://www.justice.gov/usao-nm/pr/pawankumar-jain-pleads-guilty-unlawfully-dispensing-prescription-painkillers-and-health.

### 2. Members of the False Narrative Enterprise used Front Groups to promote greater opioid use.

288.    Members of the False Narrative Enterprise, led by the Manufacturers, spread misinformation through front groups that were created to appear to be independent, neutral, third parties (the "Front Groups") but were in fact funded and influenced by Enterprise members.

289.    Members of the False Narrative Enterprise viewed this funding as a *quid pro quo*. For instance, Purdue's Robin Hogen stated, "[i]f [these Front Groups] want our bucks (and they honestly can't survive without industry support) they are going to have to learn to live with 'industry' reps on their board. I don't think they can expect huge grants without some say in governance." Hogen's language regarding the expectations of "industry" implies that Hogen's views were shared by Manufacturers other than Purdue.

290.    Some of the Front Groups were professional associations whose independence was compromised by their reliance on funding from members of the False Narrative Enterprise and their use of that funding to engage in activities that promoted the greater use of prescription opioids. Examples of these sorts of Front Groups include the American Pain Society, the American Geriatrics Society, and the American Academy of Pain Medicine.

291.    Other Front Groups appeared to be patient advocacy groups, but were, in fact funded and supported almost entirely by members of the False Narrative Enterprise and other manufacturers and marketers of prescription opioids and existed to promote the wider use of prescription opioids. Examples of these included the American Pain Foundation and the C.A.R.E.S. Alliance.

292.    These Front Groups released patient education materials, treatment guidelines, and CMEs that, despite the absence of evidence, overstated the benefits and understated the risks of using

opioids to treat chronic pain.[99] Members of the False Narrative Enterprise then used, referenced, and distributed these ostensibly neutral materials to support their marketing claims.

293.    Treatment guidelines released by Front Groups are especially influential with primary care physicians and family doctors whose lack of specialized training in pain management made them more reliant on and less able to evaluate these guidelines.

294.    Members of the False Narrative Enterprise funded these Front Groups in order to ensure supportive messages from seemingly neutral and credible third parties, and this funding did, in fact, ensure such supportive messaging.

295.    A 2017 U.S. Senate investigation found that the Manufacturers made millions of dollars' worth of contributions to various Front Groups.[100] The Front Groups "amplified or issued messages that reinforce[d] industry efforts to promote opioid prescription and use, including guidelines and policies minimizing the risk of addiction and promoting opioids for chronic pain."[101] The report also found that these groups "lobbied to change laws directed at curbing opioid use, strongly criticized landmark CDC guidelines on opioid prescribing, and challenged legal efforts to hold physicians and industry executives responsible for over prescription and misbranding."[102]

296.    For example, in 2004, J&J established the National Pain Education Council to develop and promote continuing medical education programs and materials to educate physicians on the treatment of chronic pain with opioids. After a bench trial, an Oklahoma court found that CME materials sponsored by the NPEC "disseminated false and misleading statements regarding opioids and pain management."[103]

---

[99] U.S. Senate Homeland Sec. & Governmental Affairs Comm., Ranking Members' Office, *Fueling an Epidemic, Report Two: Exposing the Financial Ties Between Opioid Manufacturers and Third Party Advocacy Groups* 2 (Feb. 12, 2018), https://www.hsdl.org/?abstract&did=808171 (hereinafter *Fueling an Epidemic Part Two*).
[100] *Id.* at 3.
[101] *Id.* at 12–15.
[102] *Id.* at 12.
[103] While this decision was overturned by the Oklahoma Supreme Court, that court overturned the ruling on purely legal grounds and did not challenge this factual conclusion by the trial court.

### a. American Pain Foundation

297.    The most prominent of the Front Groups was the American Pain Foundation ("APF").

298.    Although APF held itself out as an independent patient advocacy organization, it was funded almost entirely by the pharmaceutical industry. For instance, it received 88% of its funding in 2010 from drug manufacturers, including Janssen and Cephalon. In all, APF received more than $10 million in funding from opioid manufacturers from 2007 until it closed its doors in May 2012. By 2011, APF was entirely dependent on incoming grants from Purdue, Cephalon, Endo, and others to avoid using its line of credit.

299.    This funding was not disinterested. As Purdue told APF in 2001, the basis of a grant to the organization was Purdue's desire to invest in nonprofits that shared its business interests. As a result, APF submitted grant proposals seeking to fund activities and publications suggested by members of the False Narrative Enterprises and assisting in their marketing projects.

300.    In 2003, APF participated in a luncheon with Cephalon, Purdue, and other pharmaceutical companies, the purpose of which, according to Cephalon's Scott Melville (who was coordinating with Purdue's Burt Rosen), was to "build a formal or informal coalition on these issues" related to pain.

301.    Later that year, APF held a "Corporate Roundtable" attended by Cephalon, Janssen, and Purdue. The notes from this roundtable reflect discussions of "how to exploit decade of pain," "collaboration," "collaboration w/focus," "collab – need to coalesce a key msg," "time is now to define roles of orgs what can we each do," "industry = problem solvers," and "APF has staff – take leadership."

302.    This alignment of interests was expressed most forcefully in the fact that Purdue hired APF to provide consulting services on its marketing initiatives. A "Master Consulting Services"

Agreement executed on September 14, 2011, gave Purdue substantial rights to control APF's work related to a specific promotional project. The agreement also gave Purdue—but not APF—the right to end the project (and, thus, APF's funding) for any reason.

303.    APF's Board of Directors was largely comprised of doctors who were on the Manufacturers payrolls, either as consultants or as speakers for medical events.

304.    APF also developed materials and initiatives intended to influence prescribers and patients through the media. For example, APF published *A Reporter's Guide: Covering Pain and Its Management*, which claimed that "the potential for addiction is low for the vast majority of patients using opioids for the long-term management of chronic pain." The guide argued that under-treatment of pain is a greater concern than addiction and asserted that, "[u]nless a patient has a past or current history of substance abuse, the potential for addiction is low." It warned reporters that "misunderstandings" about physical dependence and tolerance "reinforce the stigma surrounding legitimate medical use of these medicines" and "fuel fears of addiction" that "may impinge on patient access to these medications."

305.    APF published a guide sponsored by Cephalon and Purdue, *Treatment Options: A Guide for People Living with Pain*, and distributed 17,200 copies of this guide in 2007 alone. This guide contains multiple misrepresentations regarding opioid use, including that opioids are an appropriate first-line therapy for chronic pain.[104]

306.    *Treatment Options* also represented the risk of death as a reason to avoid NSAIDs and warned that risks of NSAIDs increase if "taken for more than a period of months," with no corresponding warning about opioids. Under a heading asking "[s]hould I take these pain medicines?", the publication claimed that "NSAIDs can cause life-threatening side effects in some persons" and

---

[104]    Am. Pain Found., *Treatment Options: A Guide for People Living with Pain*, https://web.archive.org/web/20220812235117/https://ce4less.com/Tests/Materials/E019Materials.pdf (last visited Aug. 25, 2023 as of Aug. 12, 2022) (hereinafter *Treatment Options*).

that "[t]here are 10,000 to 20,000 deaths each year because of the side effects of this class of medicines,"[105] when the actual figure is closer to 3,200.[106] In contrast, *Treatment Options* posed no such question about the appropriateness of opioids. Rather, the publication stated that opioids could be "increased over time" and that there was "no ceiling dose as there is with the NSAIDs."[107] This comparison is deceptive because opioids also pose severe and life-threatening effects, particularly at higher doses, and more people die each year from opioid use than from NSAID use.

307.    *Treatment Options* ignored the fact that whatever the dangers of NSAIDs, they are available over the counter because they have no real risk of causing anyone to develop a substance use disorder. Opioids are controlled substances precisely because they carry that risk.

308.    The publication dismissed the concern that an "average person" could become addicted to opioids and blamed this concern for doctors' hesitation to write opioid prescriptions and for the fact that opioids were "under-used." It also claimed that withdrawal can be prevented by slowly reducing the dose, without addressing that many people have an extremely difficult time weaning themselves off opioids once they become physically dependent.[108]

309.    Cephalon supported another APF publication called *Target Chronic Pain Notebook*.[109] This publication was cited in later KOL materials, such as "Consensus Panel Recommendations" regarding breakthrough pain (which were themselves based on a meeting that was also supported by Cephalon), which promoted the idea of using immediate-release opioids to treat "breakthrough" pain in patients without cancer.

---

[105] *Id.*

[106] Robert E. Tarone, et al., *Nonselective Nonaspirin Nonsteroidal Anti-Inflammatory Drugs and Gastrointestinal Bleeding: Relative and Absolute Risk Estimates from Recent Epidemiologic Studies*, 11 Am. J. Therapeutics 17 (2004), https://pubmed.ncbi.nlm.nih.gov/14704592/.

[107] *Treatment Options, supra.*

[108] *Id.*

[109] Am. Pain Found., *Target Chronic Pain Notebook* (rev. ed. Mar. 2008), https://nebula.wsimg.com/392ead060392f7d4fe593c5417233921?AccessKeyId=BFACF0D24D833A99FAF8&disposition=0&alloworigin=1.

310.     APF also developed the National Initiative on Pain Control (the "NIPC"), which ran a facially unaffiliated website, *painknowledge.org*. NIPC promoted itself as an education initiative led by its expert leadership team, including purported experts in the pain management field. NIPC published unaccredited[110] prescriber education programs, including a series of "dinner dialogues." But it was Endo that substantially controlled NIPC by funding NIPC projects; developing, specifying, and reviewing the programs' content; and distributing NIPC materials. Endo's control of NIPC was such that Endo listed it as one of its "professional education initiative[s]" in a plan submitted to the FDA. Yet, Endo's involvement in NIPC was nowhere disclosed on the website pages describing NIPC or on *painknowledge.org*. Endo estimated it would reach 60,000 prescribers through NIPC.[111]

311.     This website proclaimed that "[p]eople who take opioids as prescribed usually do not become addicted" and that opioid dosages should be raised until "you are on the right dose of medication for your pain," without addressing the dangers that high doses of opioids present to patients. The website listed certain adverse effects of opioids but omitted the severe adverse effects of hyperalgesia, immune system and hormone dysfunction, cognitive impairment, tolerance, dependence, addiction, and death. *Painknowledge.org* represented that, with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse."[112] The grant request that Endo approved for this project specifically indicated NIPC's intent to make claims of functional improvement.

---

[110] Accredited programs are reviewed by a third party and must meet certain requirements of independence from pharmaceutical companies.
[111] Endo Pharmaceuticals, *Risk Minimization Action Plan for OPANA ER (Oxymorphone Hydrochloride) Extended-Release Tablets* (June 2007) (hereinafter, *Opana REMS*).
[112]          *Pain:          Opioid          Therapy*,          painknowledge.org, https://web.archive.org/web/20101007083722/http://painknowledge.org/patiented/pdf/B697_%20Patient%20Hand out_FINAL.pdf (last accessed July 13, 2021 as of Jan. 19, 2012).

312.    *Pain: Opioid Facts*, a brochure available on *Painknowledge.org*, stated that "people who have no history of drug abuse, including tobacco, and use their opioid medication as directed will probably not become addicted."[113]

313.    APF was often called upon to provide "patient representatives" for the Manufacturers' promotional activities, including for Janssen's *Let's Talk Pain*.

314.    Endo utilized APF to spread its message by supporting the publication of *Reading This Could Help Ease Your Pain: Pain Action Guide*, which included misrepresentations such as "Pain medications rarely cause addiction. . . . Unless you have a history of substance abuse, there is little risk of addiction when these medications are properly prescribed by a doctor and taken as directed."[114]

315.    Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which taught that "[s]ymptoms of physical dependence can often be ameliorated by gradually decreasing the dose of medication during discontinuation," but did not disclose the significant hardships that often accompany cessation of use. This publication also claimed that "multiple clinical studies" have shown that opioids are effective in improving daily function, psychological health, and health-related quality of life for chronic pain patients. But the article cited as support stated the contrary, noting the absence of long-term studies and concluding, "For functional outcomes, the other analgesics were significantly more effective than were opioids."

### b. American Academy of Pain Medicine and the American Pain Society

316.    The American Academy of Pain Medicine ("AAPM") and the American Pain Society ("APS") are professional medical societies that received substantial and regular funding from members of the False Narrative Enterprise who were thus able to wield influence over them.

---

[113] *Pain: Opioid Facts*, painknowledge.org, https://web.archive.org/web/20120112051109/http://www.painknowledge.org/patiented/pdf/Patient%20Education%20b380_b385%20%20pf%20opiod.pdf (last accessed July 14, 2021 as of Jan. 19, 2012).
[114] Am. Pain Found., *Reading This Could Help Ease Your Pain: Pain Action Guide* (2000).

317.     Through 2019, AAPM received lavish funding totaling nearly $10 million from opioid manufacturers. Purdue paid $2,798,769; J&J paid $570,174; Janssen paid $562,674; Insys paid $52,725; and Teva and Cephalon contributed over $1 million. In 2011 alone, AAPM received $1.3 million from pharmaceutical companies.

318.     As to APS, Purdue paid $3,418,210; J&J paid $1,793,906; Endo paid $5,208,065; and Janssen paid $60,000. Altogether, opioid manufacturers contributed over $12 million through 2019.[115]

319.     AAPM's past presidents include Drs. J. David Haddox, Scott Fishman, Perry G. Fine, and Lynn Webster, all of whom have well-documented connections to opioid manufacturers. In this way, members of the False Narrative Enterprise were able to influence AAPM.

320.     In 1997, AAPM and APS jointly issued a consensus statement, *The Use of Opioids for the Treatment of Chronic Pain*, which endorsed opioids to treat chronic pain and claimed that the risk of addiction to opioids was low.[116] Employees or paid advocates of the Manufacturers participated in the drafting of this statement; these included David Haddox, David Joransson, Robert Angarola (a J&J attorney), David Carr, Richard Payne, and Russell Portenoy. The Manufacturers financial contributions to APS, AAPM, and the drafters were not disclosed. The consensus statement remained on AAPM's website until 2011.

321.     The AAPM offered a CME on *The Truth About Pain Management* in conjunction with a 2007 annual meeting where the chief lecturer had financial ties to Cephalon and Purdue.[117]

322.     AAPM and APS issued their own guidelines in 2009 (the "2009 Guidelines") with assistance, prompting, involvement, and funding from the members of the False Narrative Enterprise. The 2009 Guidelines recommended the use of opioids to treat chronic pain and the use of screening

---

[115] Sen. Chuck Grassley & Sen. Ron Wyden, Senate Fin. Comm., *Findings from the Investigation of Opioid Manufacturers' Financial Relationships with Patient Advocacy Groups and Other Tax-Exempt Entities* 19–37 (Dec. 16, 2020) (hereinafter *December 2020 Senate Bipartisan Opioids Report*).
[116] Am. Acad. of Pain Med. & Am. Pain Soc'y, *The Use of Opioids for the Treatment of Chronic Pain* (1997).
[117] *The Truth, supra.*

tools to identify patients at a purportedly high risk of addiction. The panel made these recommendations even though *none* of its recommendations were "supported by high quality evidence," and only four of its 25 recommendations were supported "by even moderate quality evidence."[118]

323.    Attesting to the Manufactuers' influence, 14 of the 21 panel members, including KOLs Drs. Fine and Portenoy, received support from the Manufacturers: six from Purdue, eight from Teva, nine from Janssen, and nine from Endo.[119]

324.    The Manufacturers widely cited and promoted the 2009 Guidelines without disclosing the lack of supporting evidence, the Manufacturers' involvement, or their financial backing of the guidelines' authors. For example, a 2009 speaker presentation prepared by Endo, *The Role of Opana ER in the Management of Moderate to Severe Chronic Pain*, used the 2009 Guidelines while omitting their disclaimer about the lack of evidence for recommending the use of opioids for chronic pain.

325.    Cephalon promoted the 2009 Guidelines for the use of opioids for noncancer patients.

### c.  The University of Wisconsin Pain and Policy Study Group

326.    The Pain and Policy Study Group ("PPSG") at the University of Wisconsin was instrumental in providing purportedly scientific and academic rationale for the increased use of prescription opioids. Led by two non-physicians: Aaron Gilson (who holds a PhD in social welfare) and David Joranson (who holds a master's in social work), the PPSG relentlessly advocated for the removal of restrictions designed to monitor and keep careful controls over the use of dangerous prescription opioids. The group's goal was to increase the use of prescription opioids by downplaying

---

[118] Roger Chou, et al., Am. Pain Soc'y & Am. Acad. of Pain Med. Opioids Guidelines Panel, *Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Noncancer Pain*, 10 J. Pain 113 (2009), https://www.jpain.org/action/showPdf?pii=S1526-5900%2808%2900831-6.

[119] *Id.*

consequences associated with the widespread availability of prescription opioids, including misuse and substance use disorder.

327.    All the while, the UW-PPSG was accepting millions of dollars from opioid manufacturers, including Purdue and the Robert Wood Johnson Foundation, closely affiliated with and receiving financial support from J&J and its stock.

328.    UW-PPSG used resources, particularly from the RWJF, to pressure the Joint Commission to change its standards for treating pain. UW-PPSG also pressured FSMB to change its model regulations on pain treatment. Both of these changes were designed to and had the effect not merely of increasing attention to pain, but of requiring its treatment with prescription opioids.

### d.  Alliance for Patient Access

329.    Founded in 2006, the Alliance for Patient Access ("AfPA") styles itself as "a national network of physicians dedicated to ensuring patient access to approved therapies and appropriate clinical care."[120] It is run by Woodberry Associates LLC, a lobbying firm that was also established in 2006.[121] As of June 2017, the AfPA listed 30 "Associate Members and Financial Supporters," including J&J, Endo, Mallinckrodt, Purdue, and Cephalon.

330.    AfPA's board members have also received substantial funding from pharmaceutical companies.[122] For instance, board vice president Dr. Srinivas Nalamachu ("Nalamachu") received more than $800,000 from 2013 through 2015 from pharmaceutical companies—nearly all of it from manufacturers of opioids or drugs that treat opioids' side effects, including from Endo, Purdue,

---

[120] Anne Marie Hummel, *New Treatments Provide Hope for Respiratory Patients*, Am. Ass'n for Respiratory Care (May 19, 2021), https://www.aarc.org/an21-new-treatments-provide-hope-for-respiratory-patients/; *see also About AfPA*, Alliance for Patient Access, https://allianceforpatientaccess.org/about (last visited Aug. 25, 2023). References herein to AfPA include two affiliated groups: the Global Alliance for Patient Access and the Institute for Patient Access.

[121] Mary Chris Jaklevic, *Non-profit Alliance for Patient Access Uses Journalists and Politicians to Push Big Pharma's Agenda*, Health News Rev. (Oct. 2, 2017), https://www.healthnewsreview.org/2017/10/non-profit-alliance-patient-access-uses-journalists-politicians-push-big-pharmas-agenda/.

[122] All information concerning pharmaceutical company payments to doctors in this paragraph is from ProPublica's Dollars for Docs database, https://projects.propublica.org/docdollars/.

Cephalon, and Insys. Nalamachu's clinic was raided by FBI agents in connection with an investigation of Insys and its payment of kickbacks to physicians who prescribed an Insys opioid.[123] Other board members have included Dr. Robert A. Yapundich, who received $215,000 from 2013 through 2015 from pharmaceutical companies, including payments by Cephalon and Mallinckrodt; Dr. Jack D. Schim, who received more than $240,000 between 2013 and 2015 from pharmaceutical companies, including Endo, Mallinckrodt, and Cephalon; Dr. Howard Hoffberg, who received $153,000 between 2013 and 2015 from pharmaceutical companies, including Endo, Purdue, Mallinckrodt, and Cephalon; and Dr. Robin K. Dore, who received $700,000 between 2013 and 2015 from pharmaceutical companies.

331.    Among its activities, AfPA issued a white paper, *Prescription Pain Medication: Preserving Patient Access While Curbing Abuse.*[124] The white paper criticizes prescription monitoring programs, which are vital tools in reducing diversion and opioid misuse.

### e.  American Geriatrics Society

332.    The American Geriatrics Society ("AGS") was another Front Group with systematic connections to the Manufacturers, who used the AGS to target the elderly by advocating for increased treatment of the elderly with opioids.

333.    AGS was a large recipient of contributions from the Manufacturers, including Endo, Purdue, and Janssen. Between 1997 and 2012, Purdue contributed a total of $443,548, and J&J contributed $565,626.[125] Purdue paid an additional $11,785 from 2012 to 2017[126] and provided $40,000

---

[123] Andy Marso, *FBI Seizes Records of Overland Park Pain Doctor Tied to Insys*, Kan. City Star (July 19, 2017), https://www.kansascity.com/news/business/health-care/article162569383.html.
[124] Inst. for Patient Access, *Prescription Pain Medication: Preserving Patient Access While Curbing Abuse*, (Oct. 2013), http://alliancebpm.wpengine.com/wp-content/uploads/2016/05/2014-11-13-pt-white-paper-final-1-1-pdf.pdf.
[125] *December 2020 Senate Bipartisan Opioids Report*, *supra*, at 22–23.
[126] *Fueling an Epidemic Part Two*, *supra*, at 4.

in "corporate roundtable dues" to AGS's Health in Aging Foundation, an affiliated 501(c)(3) organization between 2012 and 2015.[127]

334.    AGS contracted with Purdue, Endo, and Janssen to disseminate guidelines regarding the use of opioids for chronic pain in 2002 called *The Management of Persistent Pain in Older Persons* ("2002 AGS Guidelines"),[128] and again in 2009, this time called *Pharmacological Management of Persistent Pain in Older Persons* ("2009 AGS Guidelines").[129] Purdue, Janssen, and Endo also participated in the production of these guidelines, whose authors included a number of paid consultants to Endo, Janssen, Purdue, and Cephalon. Purdue sponsored CMEs based on these guidelines.

335.    Notably, it was only after funding to AGS began—Purdue and Janssen began funding around 1997—that AGS developed guidelines that recommended the expansive use of opioids and argued that addiction risks from opioids were very low.

336.    The 2009 AGS Guidelines recommended that "[a]ll patients with moderate to severe pain . . . should be considered for opioid therapy." The panel made "strong recommendations" in this regard despite "low quality of evidence" and concluded that the risk of addiction is manageable even in patients with a prior history of drug abuse.[130] These Guidelines further advised that "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse." These recommendations are not supported by any study or other reliable scientific evidence.

337.    AGS's common purpose with the Manufacturers is evidenced by the fact that AGS's internal discussions in August 2009 reveal that it did not want to receive up-front funding from drug

---

[127] Letter from Nancy E. Lundebjerg, CEO, Am. Geriatrics Soc'y, to Sen. Claire McCaskill (Oct. 11, 2017).
[128] AGS Panel on Persistent Pain in Older Persons, *The Management of Persistent Pain in Older Persons*, 50 J. Am. Geriatrics Soc'y S205 (2002), https://pubmed.ncbi.nlm.nih.gov/12067390/.
[129] AGS Panel on Pharmacological Management of Persistent Pain in Older Persons, *The Pharmacological Management of Persistent Pain in Older Persons*, 57 J. Am. Geriatrics Soc'y 1331 (2009), https://www.ncbi.nlm.nih.gov/pubmed/19573219 (hereinafter *2009 AGS Guidelines*).
[130] *Id.* at 1342.

companies as that would suggest drug company influence. Instead, AGS opted to accept commercial support to disseminate pro-opioid publications.

338.    Members of the AGS Board of Directors were doctors who were on the Manufacturers' payrolls, either as consultants or as speakers for medical events.

339.    AGS, along with AAPM, served as a "partner" in a 2009 Janssen-sponsored publication, *Finding Relief: Pain Management for Older Adults*, which was distributed by Janssen's sales force.[131]

340.    *Finding Relief* described the addictive qualities of opioids as a myth and mischaracterized dose limitations as "disadvantages" of alternative pain management medications without discussing the risks associated with increasing opioid dosages. *Finding Relief* described the advantages and disadvantages of NSAIDs on one page, and the "myths/facts" of opioids on the facing page. The disadvantages of NSAIDs are described as involving "stomach upset or bleeding," "kidney or liver damage if taken at high doses or for a long time," "adverse reactions in people with asthma," and "increase[d] risk of heart attack and stroke." The only adverse effects of opioids listed are constipation and "upset stomach or sleepiness," which the brochure claims will go away.[132]

### f.  American Chronic Pain Association

341.    After the American Chronic Pain Association ("ACPA") was founded in 1980, it became influenced by the opioid industry. The organization received funding from opioid makers, medical device manufacturers, and companies that market opioid therapies for opioid-related conditions. These payments funded materials that "appear to help sell products sold by opioid manufacturers, discussed opioid therapy while sidestepping the addictive nature of drugs, and attributed responsibility for overdoses for people who misuse opioids."[133]

---

[131] Am. Acad. of Pain Med., *Finding Relief: Pain Management for Older Adults* (2009) (hereinafter *Finding Relief*).
[132] *Id.*
[133] *December 2020 Senate Bipartisan Opioids Report*, *supra*, at 10–12 (and authorities cited therein).

342.    Between 2012 and 2018, contributions to ACPA totaled $3,193,795 and included the following amounts from the Manufacturers: Teva ($1,005,975); Endo ($399,250); Purdue ($386,470); J&J ($120,000); Mallinckrodt ($55,775); Janssen ($25,000); and Cephalon ($10,000).[134]

343.    Between 2013 and 2016, 10 members of ACPA's Advisory Board received more than $140,000 from opioid manufacturers.

### g.  C.A.R.E.S. Alliance

344.    In 2010, Mallinckrodt created the C.A.R.E.S. (Collaborating and Acting Responsibly to Ensure Safety) Alliance, which it describes as a "patient safety initiative which provides education and tools to healthcare professionals and patients to support responsible opioid prescribing and safe use."[135] Materials distributed by the C.A.R.E.S. Alliance include unbranded publications promoting the use of opioids to treat noncancer chronic pain that do not disclose the link to Mallinckrodt. For example, by 2012 the C.A.R.E.S. Alliance was promoting the book *Defeat Chronic Pain Now!* to doctors and patients.[136]

345.    False claims and misrepresentations in *Defeat Chronic Pain Now!* include:

a.  "Only rarely does opioid medication cause a true addiction when prescribed appropriately to a chronic pain patient who does not have a prior history of addiction."

b.  "It is currently recommended that every chronic pain patient suffering from moderate to severe pain be viewed as a potential candidate for opioid therapy." "When chronic pain patients take opioids to treat their pain, they rarely develop a true addiction and drug craving."

c.  "Only a minority of chronic pain patients who are taking long-term opioids develop tolerance."

d.  "Only rarely does opioid medication cause a true addiction when prescribed appropriately to a chronic pain patient who does not have a prior history of addiction."

---

[134] *Id.* at 31.
[135]    C.A.R.E.S.    All.,    *Fact    Sheet*    (Feb.    2011),    https://www.justice.gov/sites/default/files/usao-ndga/legacy/2011/03/02/C.A.R.E.S.%20Alliance%20Fact%20Sheets.pdf.
[136] C.A.R.E.S. All., *C.A.R.E.S. Alliance Tools: Catalog and Order Form* 13 (n.d.) (hereinafter *C.A.R.E.S. Alliance Tools*).

e. "Studies have shown that many chronic pain patients can experience significant pain relief with tolerable side effects from opioid narcotic medication when taken daily and no addiction."[137]

346.    Dr. Fishman published a glowing review of *Defeat Chronic Pain Now!*.[138]

347.    The C.A.R.E.S. Alliance worked closely with other front groups. For example, the Alliance offered to send doctors free copies of *Clinical Guidelines for the Use of Opioid Therapy in Chronic Noncancerous Pain*, written by APS and the AAPM.[139] In addition, a portion of the sales of *Defeat Chronic Pain Now!* were donated to APF.[140]

* * * * * * *

348.    The Front Groups succeeded in spreading misinformation about opioids. Their publications and messages were widely available, caused inappropriate opioid prescribing, and encouraged widespread acceptance inside and outside the profession of extensive opioid use. Many of the Manufacturers' false messages promulgated via the Front Groups remain available today.

### 3. Members of the False Narrative Enterprise captured independent organizations.

349.    Members of the False Narrative Enterprise also captured otherwise independent organizations and co-opted them as mouthpieces for their pro-opioid messages.

### a. Federation of State Medical Boards

350.    The Federation of State Medical Boards ("FSMB") is a trade organization representing the various state medical boards in the United States. These boards have the power to license doctors, investigate complaints, and discipline physicians.

---

[137] Charles Argoff & Bradley Galer, *Defeat Chronic Pain Now!: Groundbreaking Strategies for Eliminating the Pain of Arthritis, Back and Neck Conditions, Migraines, Diabetic Neuropathy, and Chronic Illness* (2010).
[138] *Defeat Chronic Pain Now Website, supra.*
[139] C.A.R.E.S. All., *C.A.R.E.S. Alliance Tools: Catalog and Order Form* 6 (n.d.).
[140] *Defeat Chronic Pain Now*, http://www.defeatchronicpainnow.com/ (last visited Aug. 25, 2023) (hereinafter *Defeat Chronic Pain Now Website*).

351.    The FSMB finances opioid- and pain-specific programs through grants from members of the False Narrative Enterprise For instance, the FSMB sponsored an online CME available for credit entitled *Extended Release and Long Acting Opioids: Assessing Risks, Safe Prescribing* that included some of the misrepresentations described above.[141]

352.    Starting in 1998, several of the Manufacturers' Front Groups, as well as the Janssen-funded Robert Wood Johnson Foundation ("RWJF"), partnered to author the new standards of practice that would drive opioid prescribing. RWJF provided the funding, and the Front Groups, including AAPM, APS, and PPSG, "developed" the model guidelines "for state medical boards . . . for use in regulating the prescribing of controlled substances, such as opioids, in the management of chronic cancer and non-cancer pain." Critically, the FSMB, as well as each of the Front Groups that drafted the model guidelines, were all members of the Pain Care Forum.

353.    Not surprisingly, therefore, the *Model Guidelines for the Use of Controlled Substances for the Treatment of Pain* (the "1998 Guidelines")[142] echoed the Manufacturers' common message, emphasizing the treatment of pain and trivializing addiction. They taught that opioids are "essential" for treating chronic pain, including as a first-line therapy.[143] A 2004 iteration of the 1998 Guidelines made the same claims.[144]

354.    The 1998 Guidelines also assured doctors that they "should not fear disciplinary action" for "prescribing, dispensing or administering controlled substances, including opioid analgesics, for a legitimate medical purpose." The guidelines did not identify any pharmaceutical company as an author. The PPSG touted that it "played a central role" in revising the guidelines.

---

[141] Opioid CME, CME List, https://www.cmelist.com/opioid-cme/ (last visited Aug. 25, 2023).
[142] *Model Guidelines for the Use of Controlled Substances for the Treatment of Pain*, Fed. St. Med. Bds. (May 1998), https://web.archive.org/web/19990202032433/http://www.fsmb.org/pain.htm (last accessed July 13, 2021 as of Feb. 2, 1999) (hereinafter *1998 FSMB Guidelines*).
[143] *1998 FSMB Guidelines.*
[144] *Model Guidelines for the Use of Controlled Substances for the Treatment of Pain*, Fed. St. Med. Bds. (May 2004), https://web.archive.org/web/20050103015118/http://www.fsmb.org/ (click "Pain Policy Research Center"; then click "Model Policy") (last accessed July 13, 2021 as of Jan. 3, 2005).

355.    The Manufacturers heavily promoted these guidelines, citing the 1998 Guidelines and 2004 Model Policy thousands of times. Starting in 2007, Cephalon, Purdue, Endo, and Mallinckrodt provided funding to the FSMB to distribute pro-opioid materials nationwide.[145]

356.    FSMB's 2007 publication, *Responsible Opioid Prescribing*, was backed largely by drug manufacturers, including Purdue, Endo, Cephalon, and Abbott. This publication was also supported by APF and AAPM; Dr. Fishman wrote the text[146] and Dr. Fine served on the Board of Advisors.[147] *Responsible Opioid Prescribing* made claims similar to those in the 1998 Guidelines. This publication inaccurately claimed that "[m]ultiple clinical studies" showed that opioids improved daily function, psychological health, and overall quality of life for those suffering from chronic pain.[148]

357.    The FSMB website described *Responsible Opioid Prescribing* as the "leading continuing medical education (CME) activity for prescribers of opioid medications."[149] Endo sales representatives distributed copies of *Responsible Opioid Prescribing* with a special introductory letter from Dr. Fishman. Evidencing its influence, 163,131 copies of *Responsible Opioid Prescribing* were distributed by state medical boards.[150] Copies were also given away for free by Mallinckrodt's C.A.R.E.S. Alliance.[151]

358.    A 2012 update to *Responsible Opioid Prescribing* still assured physicians that "[o]pioid therapy to relieve pain and improve function is legitimate medical practice for acute and chronic pain of both cancer and non-cancer origins."[152]

---

[145] John Fauber, *Follow the Money: Pain, Policy, and Profit*, MedPage Today (Feb. 19, 2012), https://www.medpagetoday.com/neurology/painmanagement/31256.

[146] In the same year as this publication appeared, Dr. Fishman received funding from Abbott.

[147] *Project Sponsors*, Fed'n St. Med. Bds., https://web.archive.org/web/20071112193505/http://www.fsmb.org/RE/PAIN/projectsponsors.html (last accessed July 13, 2021 as of Nov. 12, 2007).

[148] Scott M. Fishman, *Responsible Opioid Prescribing: A Physician's Guide* (2007) (hereinafter, *Responsible Opioid Prescribing*).

[149] *Responsible Opioid Prescribing: A Clinician's Guide*, Fed'n St. Med. Bds., https://web.archive.org/web/20130115014329/http://www.fsmb.org/book/ (last accessed July 13, 2021 as of Jan. 15, 2013).

[150] Email from Dr. Scott Fishman to Charles Ornstein (Dec. 15, 2011), https://assets.documentcloud.org/documents/279033/fishman-responses-to-propublica.pdf.

[151] *C.A.R.E.S. Alliance Tools*, *supra*, at 8.

[152] *Id.*

359.    The Manufacturers made additional contributions to the FSMB to further their misleading advertising. For example, Purdue paid FSMB $822,400.06 over 8 years.[153] Cephalon paid FSMB a total of $180,000 in 2007, 2008, and 2011.[154] Endo paid FSMB $371,620 over a 5-year period.[155] Mallinckrodt paid FSMB $100,000 in 2011.[156]

### b.   The Joint Commission

360.    The Joint Commission f/k/a the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO" prior to 2007 and "Joint Commission" thereafter) is the oldest and largest healthcare standards-setting and performance-improvement organization in the United States.

361.    Hospitals view losing Joint Commission accreditation as a disaster because the loss of accreditation means losing an automatic right to participate in Medicare and Medicaid and can also cause private insurers to refuse to pay for hospital care.[157]

362.    Members of the False Narrative Enterprise made it their primary goal in the late 1990s to influence JCAHO to enact standards making pain the "fifth vital sign," thereby encouraging (and in some cases all but requiring) the use of opioids to treat hospital patients' pain.

363.    The Manufacturers advanced their campaign of deception to influence JCAHO to enact favorable pain standards through Front Groups such as APF, APS, and UW-PPSG, whose efforts to advocate for the assessment and treatment of pain and to minimize the risks of addiction from opioids were financed primarily by the Robert Wood Johnson Foundation, an organization that still holds a significant amount of J&J stock.

---

[153] Letter from Humayun J. Chaudhry, President and CEO, FSMB, to the Hon. Max Baucus and Hon. Charles Grassley, U.S. Senate (June 8, 2012), https://s3.documentcloud.org/documents/3109089/FSMB-Response-Letter-to-US-Senate.pdf.
[154] *Id.*
[155] *Id.*
[156] *Id.*
[157] Terry Richards, *Consultant: Loss of Hospital Accreditation Can Be Catastrophic* (Sept. 27, 2018), https://www.valdostadailytimes.com/news/local_news/consultant-loss-of-hospital-accreditation-can-be-catastrophic/article_169da87d-3eb5-5aca-a4ee-f32409481b07.html.

364.    Dr. June Dahl at the PPSG played a key role in developing the standards. Although in 1998 JCAHO declined to include Dahl's proposed content that pain must be assessed in every new hospital patient, one year later, Dr. Dahl approached a "differently composed committee," and these standards were adopted.

365.    Supported by these entities and the efforts of the Manufacturers, JCAHO enacted Pain Standards in 1999. Because the JCAHO Standards totally transformed the standard of care for treating pain in hospitals and other healthcare organizations, their effective date was delayed until 2001. In the interim, JCAHO, the Manufacturers, and Front Groups and KOLs supported by the Manufacturers engaged in a well-financed effort to persuade hospitals, prescribers, and even consumers to adopt the messages embodied in the new standards: opioids should be used to treat pain and were not addictive when so used.

366.    The Manufacturers provided additional financial support to JCAHO while it was developing a pain care guide and other materials to be distributed to hospitals and pain care providers that reflected the JCAHO Standards. Purdue reported paying over $2.1 million directly to JCAHO from 2000 to 2002, including $560,000 in 2000; $981,359 in 2001; and $582,649 in 2002. J&J contributed $14,919 in 2001 and $498,791 in 2011.

367.    In 2000, as part of the plan discussed above to "make the whole pie bigger," Purdue discussed developing "materials for the Joint Commission on Accreditation for Healthcare Organiations (JCAHO)" that "will be distributed to hospitals across the country in our partnership with the American Pain Society."

368.    That same year, Purdue sponsored a JCAHO book that falsely claimed that "there is no evidence that addiction is a significant issue when persons are given opioids for pain control."[158] It also misleadingly called doctors' concerns about addiction side effects "inaccurate and exaggerated."[159]

369.    In October 2001, Purdue paid $58,272 to fund a JCAHO publication, *Pain Assessment and Management: An Organizational Approach*. In August 2000, Purdue also paid $85,000 to fund two JCAHO videos for "Pain Management in Special Populations: Geriatric and Disease Related Pain."[160]

370.    In 2001, Janssen provided $66,000 in funding to JCAHO for the "Pain Management: An Overview for Clinicians" audioconference.[161]

371.    The National Pharmaceutical Counsel ("NPC") paid $155,104 between 2001 and 2002 for JCAHO to develop "a monograph designed as a reference for clinicians, quality professionals, researchers and others involved in performance assessment, improvement, education, and policy decisions related to pain management within healthcare organizations."[162] This monograph, *Pain: Current Understanding of Assessment, Management and Treatments*, was published in December 2001 and required assessment of pain in all patients.[163]

372.    Abbott provided support for JCAHO and instructed its sales force to leverage the new pain guidelines, which had been made part of the accreditation requirements for hospitals, by reminding doctors and hospitals that if they did not treat pain, they could risk the hospital's accreditation.

---

[158]    Sonia Moghe, *Opioid History: From 'Wonder Drug' to Abuse Epidemic*, CNN (Oct. 13, 2016), https://www.cnn.com/2016/05/12/health/opioid-addiction-history/ (hereinafter *Wonder Drug*).
[159]    *Id.*
[160]    *December 2020 Senate Bipartisan Opioids Report, supra*, at 6.
[161]    *Id.*
[162]    *Id.* (quoting letter from Mark Chassin, President, The Joint Commission, to Sen. Baucus & Sen. Grassley (June 2012)).
[163]    Nat'l Pharm. Council & Joint Comm'n on Accreditation of Healthcare Orgs., *Pain: Current Understanding of Assessment, Management, and Treatments* (Dec. 1999), https://www.npcnow.org/sites/default/files/media/Pain-Current-Understanding-of-Assessment-Management-and-Treatments.pdf.

373.    The result of the change that the JCAHO standards prompted by the activities of the Manufacturers and their Front Groups was to increase opioid prescribing and administration within hospitals, which were effectively forced to comply with these new standards.

### 4. Members of the Opioid Promotion Enterprise paid Key Opinion Leaders to deceptively promote opioid use.

374.    The Manufacturers also spread misinformation through purported medical experts, known as Key Opinion Leaders ("KOLs"), whom the Manufacturers paid to deliver deceptive messages because of their ability to influence their peer prescribers. Although funded by the Manufacturers, the KOLs were used to present the appearance that unbiased and reliable medical research supporting the broad use of opioid therapy for chronic pain had been conducted and was being reported on by independent medical professionals. This use of KOLs was designed to lend legitimacy to their opinions, making doctors and their patients more likely to accept their claims.

375.    The Manufacturers not only paid for the speakers to deliver their messages, they also controlled the content of those messages. For instance, paid speakers were routinely handed slide decks and presentation materials from the Manufacturers that the presenters were expected to deliver without modification.

### a. Dr. Russell Portenoy

376.    Dr. Portenoy promoted the use of opioids and minimized their risks as a spokesperson for Purdue and other Manufacturers. A respected leader in the field of pain treatment, Dr. Portenoy was highly influential. Dr. Andrew Kolodny, co-founder of Physicians for Responsible Opioid Prescribing, described him "lecturing around the country as a religious-like figure. The megaphone for Portenoy is Purdue, which flies in people to resorts to hear him speak. It was a compelling message: 'Docs have been letting patients suffer; nobody really gets addicted; it's been studied.'"[164]

---

[164] Sam Quinones, *Dreamland: The True Tale of America's Opiate Epidemic* 134 (2015).

377.    As one organizer of CME seminars who worked with Portenoy and Purdue pointed out, "had Portenoy not had Purdue's money behind him, he would have published some papers, made some speeches, and his influence would have been minor. With Purdue's millions behind him, his message, which dovetailed with their marketing plans, was hugely magnified."[165]

378.    Dr. Portenoy has now admitted that he minimized the risks of opioids[166] and that he "gave innumerable lectures in the late 1980s and '90s about addiction that weren't true."[167]

379.    A Purdue email from 2004 noted that National Pain Education Council ("NPEC"), an organization also supported by Janssen, used "the same speakers [who] spoke for us at regional and national meetings."[168] Dr. Portenoy was co-chair of the NPEC,[169] which, according to an internal Janssen document, was used to assist in marketing Duragesic.[170]

380.    A 2007 fundraising prospectus from Dr. Portenoy's program shows that his program received millions of dollars over the preceding decade in funding from Endo, Abbott, Cephalon, Purdue, and J&J.

381.    Janssen worked with other Manufacturers to use common KOLs. In an internal Purdue email, an executive reported on a conversation with Dr. Portenoy in 2001: "Russ [Portenoy] said that Janssen called and has called others to try to help deal with this media blitz and protect the pain movement."[171]

---

[165] *Id.* at 136.

[166] Celine Gounder, *Who Is Responsible for the Pain-Pill Epidemic?*, New Yorker (Nov. 8, 2013), https://www.newyorker.com/business/currency/who-is-responsible-for-the-pain-pill-epidemic.

[167] Thomas Catan & Evan Perez, *A Pain-Drug Champion Has Second Thoughts*, Wall Street J. (Dec. 17, 2012), https://www.wsj.com/articles/SB10001424127887324478304578173342657044604.

[168] Email from Harry Lazarus to Joseph DaBronzo, et al. (Mar. 24, 2004, 9:12 AM).

[169] *About NPEC*, Nat'l Pain Educ. Council, https://web.archive.org/web/20080517231127/http://www.npecweb.org/aboutnpec.asp?id=15&selMenu=2,0 (last visited Aug. 25, 2023 as of May 17, 2008).

[170] *Duragesic (Fentanyl Transdermal System) CII: 2003 Business Plan Summary* 10, 13 (n.d.).

[171] Email from Paul Goldenheim to Howard Udell, et al. (Mar. 1, 2001).

### b. Dr. Lynn Webster

382.    Dr. Lynn Webster was president of AAPM in 2013 and was a Senior Advising Editor of *Pain Medicine*, the AAPM's journal.[172] Dr. Webster was the author of numerous CMEs sponsored by Cephalon, Endo, and Purdue. At the same time, he received significant funding from Manufacturers (including nearly $2 million from Cephalon).

383.    Dr. Webster created and promoted the *Opioid Risk Tool*, a five-question, one-minute screening tool relying on patient self-reports that purportedly allows doctors to manage the risk that their patients will misuse opioids or develop OUD.[173] Versions of this tool appear on, or are linked to, websites run by Endo, Janssen, and Purdue.

384.    In 2011, Dr. Webster presented a webinar sponsored by Purdue titled *Managing Patients' Opioid Use: Balancing the Need and the Risk*. This webinar misleadingly taught that risk screening tools, urine testing, and patient agreements will prevent "overuse of prescriptions" and "overdose deaths."

385.    Dr. Lynn Webster served on the Mallinckrodt's Advisory Board and performed a study of Mallinckrodt's drugs that the company relied on in its marketing materials.

### c. Dr. Perry Fine

386.    Dr. Fine's ties to the Manufacturers are well documented. He has authored articles, testified in court cases and before state and federal committees, and argued against legislation restricting the prescription of high doses of opioids to noncancer patients. He has served on Purdue's advisory board, consulted for Janssen, and participated in CME activities for Endo; he has served in similar capacities for several other drug companies. He co-chaired the APS-AAPM Opioid Guideline

---

[172] *CRI Lifetree Chief Medical Director Dr. Lynn Webster Named President of the American Academy of Pain Medicine (AAPM)*, Scorr Marketing (Apr. 23, 2013), https://www.scorrmarketing.com/news/cri-lifetree-chief-medical-director-dr-lynn-webster-named-president-of-the-american-academy-of-pain-medicine-aapm/; Elaine Silvestrini, *Profiting from Pain*, Drug Watch, https://www.drugwatch.com/featured/opioid-crisis-big-pharma/ (last modified June 29, 2021).

[173] Lynn Webster & Rebecca Webster, *Predicting Aberrant Behaviors in Opioid-Treated Patients: Preliminary Validation of the Opioid Risk Tool*, 6 Pain Med. 432 (2005).

Panel, served as treasurer of AAPM from 2007 to 2010 and as president of that group from 2011 to 2013, and sat on the board of directors of APF.[174]

387.    Drs. Fine and Portenoy co-wrote the Endo-supported *A Clinical Guide to Opioid Analgesia*, which downplayed risks such as respiratory depression and addiction. This publication also promoted the myth that "long-term opioid therapy of an older population with no history of substance abuse is rarely associated with de novo development of abuse or addiction."[175]

### d.  Dr. Scott Fishman

388.    Dr. Fishman's ties to the opioid drug industry are multitudinous. He has served as an APF board member and as AAPM president and has participated yearly in numerous CME activities for which he received "market rate honoraria." He has authored publications, including seminal guides on opioid prescribing, which were funded by the Manufacturers. He has also worked to oppose legislation requiring doctors and others to consult pain specialists before prescribing high doses of opioids to noncancer patients. He has himself acknowledged his failure to disclose all potential conflicts of interest.[176]

389.    He received funding from Janssen, Endo, Cephalon, and Purdue.

390.    In one guide, Dr. Fishman downplayed the risk of addiction and defended the concept of pseudoaddiction: "I draw a distinction between a 'chemical coper' and an addict."[177]

---

[174] Scott M. Fishman, *Incomplete Financial Disclosures in a Letter on Reducing Opioid Abuse and Diversion*, 306 J. Am. Med. Ass'n 1445 (2011), https://jamanetwork.com/journals/jama/article-abstract/1104464 (hereinafter *Incomplete Financial Disclosures*).

[175] Perry G. Fine & Russell K. Portenoy, *A Clinical Guide to Opioid Analgesia* 20, 34 (2004).

[176] *Incomplete Financial Disclosures, supra*; Tracy Weber & Charles Ornstein, *Two Leaders in Pain Treatment Have Long Ties to Drug Industry*, ProPublica (Dec. 23, 2011), https://www.propublica.org/article/two-leaders-in-pain-treatment-have-long-ties-to-drug-industry.

[177] Scott M. Fishman, *Listening to Pain: A Physician's Guide to Improving Pain Management Through Better Communication* 45 (2012).

### 5. Members of the False Narrative Enterprise disseminated their misrepresentations through Continuing Medical Education programs.

391.    One way the Manufacturers aggressively distributed their false message to the medical community was through countless continuing medical education ("CME") programs. In some cases, Manufacturers created educational organizations to develop the CMEs; in other cases, Manufacturers supported Front Groups and KOLs to develop and provide CMEs. Manufacturers controlled the content of these presentations. CMEs spread Manufacturers' false messages to doctors under the guise of neutral educational programs.  Manufacturers deliberately maintained this illusion of neutrality.

392.    Endo and Purdue sponsored *Overview of Management Options*, a CME issued by the AMA in 2003, 2007, 2010, and 2013. The 2013 version remains available for CME credit. The CME taught that NSAIDs and other drugs, but not opioids, are unsafe at high doses.

393.    CMEs directly supported by Endo included *Opioid Analgesia: Practical Treatment of the Patient with Chronic Pain*,[178] and *Advances in Opioid Analgesia:  Maximizing Benefit While Minimizing Risk.*[179] The programs promoted the use of opioids for pain from osteoarthritis, neuropathy, and back pain. Endo listed "[d]ifferentiation among states of physical dependence, tolerance, pseudoaddiction, and addiction" as an element to be considered when awarding grants to CME providers.[180]

394.    Abbott financially supported the development and hosting of AAPM CMEs entitled *Opioid Therapy for Chronic Pain: Safe and Effective Prescribing* (2007) and *Essentials of Pain Medicine* (2008).

### 6. Members of the False Narrative Enterprise promoted specific opioid products to doctors and consumers.

395.    The Manufacturers engaged in widespread advertising campaigns touting the benefits of their branded drugs. The Manufacturers published print advertisements in a broad array of medical journals. The Manufacturers collectively spent more than $14 million on medical journal advertising

---

[178] McCarber, *supra.*
[179] Cole, *supra.*
[180] *Opana REMS*, *supra.*

of opioids in 2011, nearly triple what they had spent in 2001. The 2011 total includes $8.3 million by Purdue, $4.9 million by Janssen, and $1.1 million by Endo.

396.    The Manufacturers' advertising also targeted consumers. The Manufacturers knew that physicians were more likely to prescribe a drug if a patient specifically requested it.[181] Endo's research, for example, found that direct-to-consumer advertising resulted in greater patient "brand loyalty," with longer durations of Opana ER therapy and fewer discontinuations. The Manufacturers thus increasingly took their campaigns directly to consumers, including through patient-focused "education and support" materials in the form of pamphlets, videos, or other publications that patients could view in their physicians' offices.

397.    At most (if not all) pertinent times in the past 30 years, hydrocodone/acetaminophen (e.g., Vicodin, Norco, Lortab) has been the most prescribed painkiller of any kind. One reason for the brisk sales was that, until 2014, it was a Schedule III drug (rather than Schedule II, as it is today). As such, prescriptions could be refilled by patients without additional written prescriptions. In fact, Knoll (now AbbVie) made this part of the basis for its promotion of Vicodin in the 1980s and 1990s. Knoll marketed Vicodin as "The Highest Potency Pain Relief You Can Still Phone In." Knoll used such advertising on trinkets and toys.

398.    A Kadian prescriber guide deceptively represented that Kadian is more difficult to misuse and less addictive than other opioids. The guide included the following misleading statements: (1) "unique pharmaceutical formulation of KADIAN may offer some protection from extraction of morphine sulfate for intravenous use by illicit users"; and (2) "KADIAN may be less likely to be abused by health care providers and illicit users" because of "Slow onset of action"; (4) "Lower peak

---

[181] In one study, for example, nearly 20% of sciatica patients requesting oxycodone received a prescription for it compared with 1% of those making no specific request. John B. McKinlay, et al., *Effects of Patient Medication Requests on Physician Prescribing Behavior*, 52 Med. Care 294 (2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4151257/.

plasma morphine levels than equivalent doses of other formulations of morphine"; (5) "Long duration of action"; (6) and "Minimal fluctuations in peak to trough plasma levels of morphine at steady state."

399.    In a 2010 training manual for the Kadian sales force, Allergan trained sales representatives to tell providers that opioid patients have a low risk of addiction, many opioid patients are merely experiencing pseudoaddiction, and opioid withdrawal is a minor concern.[182] The manual also trained the representatives that, for most patients, chronic opioid therapy "markedly improved" functioning, a claim that is unsubstantiated.

400.    Allergan misleadingly told patients whose bodies became "tolerant" at their current dose that "[t]his is not addiction," but rather indicated that a "dose adjustment" was required.[183]

401.    Allergan received a warning letter from the FDA for circulating a Kadian Co-Pay Assistance Program Brochure to patients. The FDA found that the brochure contained unsubstantiated claims of effectiveness.[184] In this warning letter, FDA observed that the promotional materials "impl[ied] that Kadian is appropriate for use in a broader range of patients than it is approved to treat." The FDA found this "particularly concerning considering the serious and potentially fatal risks associated with the drug."[185]

402.    Starting in the mid-1990s, Janssen's promotion of Duragesic shifted from a focus on cancer pain to chronic pain generally. As of May 1994, there was a "[s]hift away from limiting consideration to only malignant patients" to "[p]romotion of around-the-clock control highlights benefits of 72 hour efficacy in limiting breakthrough pain associated with oral medications." From April 1995 to September 1995, Janssen's "Core Campaign Journal Ad" for Duragesic used the headline

---

[182] *See* Actavis Elizabeth, *Kadian Learning System* (July 1, 2010).

[183] *Learn More About Customized Pain Control with Kadian* (cited in Statement of Charges and Notice of Hearing, *In re Teva Pharm. Indus., Ltd.*, No. 2020-0032-C (N.Y. Dep't Fin. Servs. Aug. 17, 2020)).

[184] *See* Letter from Thomas Abrams, Dir., Div. of Drug Mtkg., Advertising, and Commc'ns, to Doug Boothe, CEO, Actavis US (Feb. 18, 2010) (hereinafter "Kadian Warning Letter").

[185] *Id.*

"Why Interrupt These Moments With Oral Opioid Dosing?" and the tagline "Chronic Pain Control That Goes On."[186]

403.    In a 1998 letter, the FDA declared as "false and misleading" Janssen's claim that Duragesic "stops the pain. Not the patient." The FDA stated, "Janssen's statement implies that the use of Duragesic is not associated with any impairment of mental or physical abilities. Janssen has not submitted data to substantiate such a claim."[187]

404.    A Duragesic Business Plan for 2001 stated that Duragesic's "vision" was to be the "first choice of chronic pain patients for around-the clock-therapy." The Plan noted that "[n]on-malignant market is the growth opportunity," but it also stated just below this point that "DURAGESIC data is non-existent." Another analysis in the same document stated that "opioid acceptance for non-malignant pain" was an opportunity for Duragesic, but that "limited clinical data" was a weakness. Elsewhere in the same plan is the statement "need non-malignant pain data (lower back, OA [osteoarthritis]/RA [rheumatoid arthritis])."[188]

405.    A 2001 patient booklet for Duragesic confidently but misleadingly declared: "Addiction is relatively rare when patients take opioids appropriately."[189]

406.    In or about 2002, Janssen developed another ad campaign promoting Duragesic as improving patients' functioning and work productivity that included misrepresentations that Duragesic was "[c]hronic pain relief that supports functionality" and "[i]mprove[s] . . . physical and social functioning." Photos on the four ads depicted the following:

    a.  a man (presumably the father of the bride) laughing with the bride with the caption: "This day will be a lifelong memory. I'm glad chronic pain won't be a part of it."

    b.  two hands kneading a loaf of bread with the caption: "1,360 loaves . . . and counting. Work, uninterrupted."

---

[186] *Duragesic: Positioning Evolution Overview* 7, 11 (June 1, 2002) (hereinafter *Positioning Evolution*).
[187] *Id.*
[188] *Duragesic 2001 Business Plan* (Aug. 2000).
[189] *Patient Booklet: Your Questions and Answers* 22.

    c.   the torso of a "blue-collar" man holding a bowling ball with the caption: "506 strikes . . . and counting. Game, uninterrupted."

    d.   a man holding a packing box with the caption: "Work. Plan. Stand. Sit. Bend. Stretch. Move. Carry."[190]

407.    In a 2004 warning letter, the FDA found this ad campaign to be "misleading."

408.    In 2009, the FDA sent J&J a warning letter for disseminating a misleading 7-minute promotional video that downplayed the risks of Ultram (tramadol) and overstating benefits. The letter indicated that a failure to present any risk information during the first six minutes of a seven-minute video was insufficient. Further, presenting risk information in a rapidly scrolling telescript "lacks comparable prominence to the benefit claims contained in the testimonial portion of the webcast" and failed to include certain contraindications. The FDA found that J&J violated the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 352(a) & (n); 321(n).

409.    In Janssen's Nucynta and Nucynta ER 2012 Business Plan, an aspect of the marketing strategies associated with "differentiation" was to "Generate data to support lower abuse potential."[191] Such data was never obtained.

410.    AbbVie's predecessor, Knoll, was admonished by FDA for promotional materials for Vicoprofen that conveyed an inaccurate impression that the drug could be used to treat chronic pain on a long-term basis and to treat conditions such as osteoarthritis.

411.    Abbott advertised Vicodin to be used to treat chronic pain such as osteoarthritis pain and low back pain in brochures intended for providers.

---

[190] *Positioning Evolution*, *supra*.
[191] *Nucynta & Nucynta ER 2012 Business Plan* (Dec. 12, 2012).

### 7. Members of the False Narrative Enterprise used unbranded advertising to promote opioid use.

412.    The Manufacturers also aggressively promoted opioids through "unbranded advertising" that generally touted the benefits of opioids without specifically naming a particular brand-name drug. In doing so, they were able to evade FDA scrutiny of their promotion.

413.    Because unbranded advertising is not required to provide balanced disclosures about a product's limits and risks, it was an effective tool to expand the overall acceptance of and demand for chronic opioid therapy. By expanding the market for opioids generally, unbranded advertising benefited manufacturers of both generic and branded opioids.

414.    Purdue's pain-management website, *inthefaceofpain.com* contained testimonials from several dozen "advocates," including healthcare providers, urging more pain treatment. The website presented the advocates as neutral and unbiased, but an investigation by the New York Attorney General later revealed that Purdue had paid them hundreds of thousands of dollars.[192]

415.    Janssen funded, edited, participated in the development of, and controlled the content of misleading materials published by front groups, including the unbranded APF initiative "Let's Talk Pain." The "Let's Talk Pain" website included misinformation about opioids, such as that "the stigma of drug addiction and abuse" associated with the use of opioids stemmed from a "lack of understanding addiction." The website also featured a video interview, edited by Janssen personnel, which claimed that opioids were what allowed a patient to "continue to function," falsely implying that her experience would be representative.[193] This website was accessible online until at least 2012.

---

[192] Assurance of Discontinuance under Executive Law Section 63, Subdivision 15, No. 15-151, *Purdue Pharma, L.P.*. (N.Y. Att'y Gen. Aug. 19, 2015), https://ag.ny.gov/pdfs/Purdue-AOD-Executed.pdf.

[193]    *The    Let's    Talk    Pain    Show*,    Let's    Talk    Pain, https://web.archive.org/web/20120324220752/http://www.letstalkpain.org/talkshow/ (last accessed July 13, 2021 as of Mar. 24, 2012).

416.    Purdue's unbranded website, *PartnersAgainstPain.com*,[194] lied about the risks of addiction from the treatment of chronic pain with opioids by stating as a "Fact" that "Fears about psychological dependence are exaggerated when treating appropriate pain patients with opioids."

417.    As early as 2001, CVS worked with Purdue and its unbranded marketing arm, Partners Against Pain ("PAP"), to challenge these (later proven) allegations that Purdue's OxyContin was being misused at alarming rates. Purdue and its partners, including CVS, used Purdue's PAP website to claim that the risk of addiction associated with OxyContin was very small.

418.    On an unbranded website, *www.painaction.com*, Endo misleadingly represented that "[m]ost chronic pain patients do not become addicted to the opioid medications that are prescribed for them," downplaying the significant risk of addiction that opioids present.

419.    One Endo-sponsored brochure, *Understanding Your Pain: Taking Oral Opioid Analgesics*, stated that "[t]aking opioids as prescribed for pain relief is not addiction" and "[a]ddiction to an opioid would mean that your pain has gone away but you still take the medicine regularly when you don't need it for pain, maybe just to escape from your problems." In the same publication, Endo stated that the following test should guide patients in determining whether they are addicted to opioids: "Ask yourself: would I want to take this medicine if my pain went away? If you answer no, you are taking opioids for the right reasons – to relieve pain and improve your function. You are not addicted."  The same brochure promoted the concept that "you may also need to take a short-acting opioid in between" doses of a long-acting opioid "for any increase in pain." In the Q&A Section, the pamphlet indicated that, if a patient develops "tolerance" to opioids, "it does not mean you will 'run out' of pain relief," because "[y]our dose can be adjusted, or another medicine can be prescribed." The same section posed a similar question: "If I take the opioid now, will it work later when I really need it?"

---

[194] *Partners Against Pain* consisted of both a website, styled as an "advocacy community" for better pain care, and a set of medical education resources distributed to prescribers by sales representatives. It existed until at least 2015 and was a vehicle for Purdue to downplay the risks of addiction from long-term opioid use.

The response: "The dose can be increased . . . You won't 'run out' of pain relief." In recommending increasing opioid dosage as a response to tolerance, Endo did not address the risks that accompany high-dose opioid use.[195]

420.    In this same pamphlet, Endo answered the hypothetical patient question, "What should I know about opioids and addiction?" by creating a false dichotomy between addiction ("a chronic brain disease") and opioid therapy ("Taking opioids for pain relief"). It explains that "[a]ddicts take opioids for other reasons, such as unbearable emotional problems. Taking opioids as prescribed for pain relief is not addiction." This publication was edited by Dr. Portenoy.[196]

421.    In another pamphlet for patients, *Taking a Long-Acting Opioid: What Does It Mean to Me?*, Endo misrepresented the distinctions between physical dependence, tolerance, and addiction to downplay the risk that patients would become addicted to opioids.[197]

422.    A Janssen unbranded website, *PrescribeResponsibly.com*, stated that concerns about opioid addiction are "overestimated" and that "true addiction occurs only in a small percentage of patients."[198] The website further stated that the risk of opioid addiction "can usually be managed" through tools such as opioid agreements between patients and doctors.[199] The website recommends four-to-fourteen question screeners that purportedly help physicians identify and address possible opioid misuse.[200]

---

[195] Margo McCaffery & Chris Pasero, *Understanding Your Pain: Taking Oral Opioid Analgesics* (Russell K. Portenoy ed., 2004).
[196] *Id.*
[197] Endo Pharmaceuticals, *Taking a Long-Acting Opioid: What Does It Mean to Me?* (2008).
[198] Keith Candiotti, *Use of Opioid Analgesics in Pain Management*, Prescribe Responsibly, https://web.archive.org/web/20181119235909/http://www.prescriberesponsibly.com:80/articles/opioid-pain-management (last accessed July 13, 2021 as of Nov. 19, 2018).
[199] Howard A. Heit & Douglas L. Gourlay, *What a Prescriber Should Know Before Writing the First Prescription*, Prescribe Responsibly, https://web.archive.org/web/20171003105720/http://www.prescriberesponsibly.com/articles/before-prescribing-opioids (last accessed July 13, 2021 as of Jan. 6, 2019).
[200] Kenneth L. Kirsh & Steven D. Passik, *Assessing Patients with Pain Using Evaluation Tools*, Prescribe Responsibly, https://web.archive.org/web/20190120012152/http://www.prescriberesponsibly.com/articles/patient-pain-assessment (last accessed July 13, 2021 as of Jan. 20, 2019).

423.    Allergan distributed a brochure that stated that the risk of opioid addiction was "less likely if you never had an addiction problem," misleadingly implying that the risk of addiction was low and that individuals at higher risk of addiction could be easily identified.

### 8.    Members of the False Narrative Enterprise funded, edited, and distributed publications that supported their misrepresentations.

424.    The Manufacturers created a body of false, misleading, and unsupported medical and popular literature about opioids that (a) understated the risks and overstated the benefits of long-term use; (b) appeared to be the result of independent, objective research; and (c) was calculated to shape the perceptions of prescribers, patients, and payors. This literature served marketing goals, rather than scientific standards, and was intended to persuade prescribers and consumers that the benefits of long-term opioid use outweighed the risks.

425.    To accomplish their goal, the Manufacturers—sometimes through third-party consultants and/or Front Groups—commissioned, edited, and arranged for the placement in academic journals of favorable but deceptive review articles, letters to the editor, commentaries, case-study reports, and newsletters aimed at discrediting or suppressing negative information that contradicted their claims or raised concerns about chronic opioid therapy. The Manufacturers also frequently relied on unpublished data or posters, neither of which were subject to peer review, but were presented as valid scientific evidence.

426.    Janssen funded studies and placed them in medical journals to support its marketing efforts. Janssen also used external studies in ways that were misleading.

427.    One of the studies was "Evaluation of Long-term Efficacy and Safety of Transdermal Fentanyl in the Treatment of Chronic Noncancer Pain" by Milligan et al.[201] Janssen advised its sales

---

[201] Kenneth Milligan, et al., *Evaluation of Long-Term Efficacy and Safety of Transdermal Fentanyl in the Treatment of Chronic Noncancer Pain*, 2 J. Pain 197 (2001), https://pubmed.ncbi.nlm.nih.gov/14622817/.

force that the study's authors stated that Duragesic provided "sustained, long-term pain control" even though the study had found that one-third of its subjects did not respond to Duragesic.

428.    Canadian health authorities had previously commented to Janssen that the studies it submitted in support of the use of Duragesic for chronic pain, including the Milligan study, involved only patients who were already taking potent opioids before entering the studies. The Canadian authorities further noted that "the treatment of opioid-naive patients with transdermal fentanyl for postoperative pain has resulted in deaths due to respiratory depression in the past." In its reply, Janssen stated, "We acknowledge that the experience in opioid naive non-cancer patients is limited." No such acknowledgment was made in Janssen's bulletin to its sales force about the Milligan study.

429.    Janssen also did not advise its sales force in the bulletin that the stability of pain control achieved in the study came at the cost of nearly doubling the mean dose of Duragesic over 12 months.[202] A Janssen scientist raised concerns with the Milligan study, sending an email stating she wanted to "reiterate" concerns that had been raised regarding using the Milligan study "to make an argument for efficacy." She noted that "these studies not [sic] the appropriate design neither the end points to make a case for efficacy." Janssen did not disclose these concerns to its sales force. Nor did Janssen disclose that the Milligan study was supported by a grant from the Janssen Research Foundation and that the lead author had received financial support from Janssen.

430.    Janssen also provided its sales force with a 1997 study by Simpson et al. entitled "Transdermal Fentanyl as Treatment for Chronic Low Back Pain."[203] Janssen advised its sales force that the study results suggested "that patients on Duragesic treated for chronic low back pain report greater improvement in pain relief and disability than those who received oral opioids" and that "use of Duragesic may be associated with less disability caused by chronic lower back pain." In professional

---

[202] Memo to 275 Sales Force, et al., from Medical Services, Sales Training, Duragesic Brand Team (Sept. 21, 2001).
[203] Richard K. Simpson Jr., et al., *Transdermal Fentanyl as Treatment for Chronic Low Back Pain*, 14 J. Pain Symptom Mgmt. 218 (1997), https://pubmed.ncbi.nlm.nih.gov/9379069/.

file cards and other materials used by sales representatives, Janssen likewise cited the Simpson study for its claim that Duragesic "[d]emonstrated effectiveness in chronic back pain with additional patient benefits" and claimed that "[a]ll patients who experienced overall benefit from Duragesic would recommend it to others with chronic low back pain."[204]

431.    In its September 2004 warning letter to Janssen, the FDA found that the Simpson study was "inadequate to support th[ese] claim[s], because it was an open-label, single-arm trial with no control group" and further stated, "We are not aware of substantial evidence or substantial clinical experience to support th[ese] claim[s]." The FDA found these claims to be "unsubstantiated effectiveness claims" and that these and other misleading claims on the file card were "serious" violations and constituted misbranding. The FDA requested that Janssen "immediately cease dissemination" of these claims and come up with a plan for corrective action.[205]

432.    Janssen also used scientific literature to support misleading claims regarding the supposed low abuse potential of tramadol. Despite significant contrary evidence (that ultimately led to tramadol's classification as a controlled substance), a Janssen-funded study compared the abuse liability of tramadol, NSAIDs, and hydrocodone, perversely concluding that, despite the significant differences in physical and psychological effects, that the abuse potential of tramadol and NSAIDs was equivalent.[206]

433.    At a 2004 Orlando, Florida meeting of the AAPM, KOL Dr. Lynn Webster presented a Cephalon-sponsored study that promoted the use of fentanyl-based short-acting opioids to address

---

[204] *See Duragesic Hospital Sales Force Cycle III Presentation* (Sept. 17, 2002).

[205] Warning Letter from Thomas W. Abrams, Director, DDMAC, to Ajit Shetty, CEO, Janssen Pharmaceutica (Sept. 2, 2004), https://millerlawpc.com/wp-content/uploads/2017/10/Opioid-Complaint-Exhibits-51-111.pdf (as Exhibit 60).

[206] Edgar H. Adams, et al., *A Comparison of the Abuse Liability of Tramadol, NSAIDs, and Hydrocodone in Patients with Chronic Pain*, 31 J. Pain & Symptom Mgmt. 465 (2006), https://cdhs.udel.edu/files/2022/08/A-Comparison-of-the-Abuse-Liability-of-Tramadol-NSAIDs-and-Hydrocodone-in-Patients-with-Chronic-Pain.pdf.

breakthrough pain in patients with chronic noncancer pain.[207] Cephalon then used this study in its sales trainings.

434.    One of the key studies on which Cephalon relied to create a market for its short-acting fentanyl products was "Prevalence and Characteristics of Breakthrough Pain in Opioid-Treated Patients with Chronic Non-Cancer Pain," written by Dr. Portenoy and other Cephalon consultants. The study promoted the idea of using "rescue dosing" of short-acting opioids for patients with chronic pain unrelated to cancer.[208]  Cephalon cited this study in branded and unbranded marketing.

435.    As late as 2018, Teva scientists, writing with co-authors working at ABDC's Xcenda subsidiary, published a study promoting the notion that the risk of opioid abuse is limited to a "sub-population" of those taking opioids long-term for chronic noncancer pain.[209]

### 9. Members of the False Narrative Enterprise used speakers' bureaus and programs to spread their deceptive messages.

436.    In addition to making sales calls, the Manufactuers' detailers also identified doctors to serve, for payment, on speakers' bureaus and to attend programs with speakers and meals paid for by the Manufacturers.

437.    These speaker programs and associated speaker trainings served three purposes: (1) as an incentive to doctors to prescribe, or increase their prescriptions of, a particular drug; (2) as an opportunity for doctors to be selected to attend forums at which the drug companies could further market to the speaker; and (3) as an opportunity for the doctors to market to their peers.

438.    The Manufacturers graded their speakers, and future opportunities were based on speaking performance, post-program sales, and product usage.

---

[207] Lynn Webster, Oral Transmucosal Fentanyl Citrate (OTFC) for the Treatment of Chronic Noncancer Pain: A Retrospective Survey of 100 Patients, Presentation at 21st Annual Meeting of the Am. Acad. of Pain Med. (Mar. 3-7, 2004).
[208] Russell K. Portenoy, et al., *Prevalence and Characteristics of Breakthrough Pain in Opioid-Treated Patients with Chronic Non-Cancer Pain*, 7 J. Pain 583 (2006), https://pubmed.ncbi.nlm.nih.gov/16885015/.
[209] Anna D. Coutinho, et al., *Long-term Opioid Users with Chronic Noncancer Pain: Assessment of Opioid Abuse Risk and Relationship with Healthcare Resource Use*, 14 J. Opioid Mgm't 131 (2018), https://pubmed.ncbi.nlm.nih.gov/29733099/ (hereinafter *Long-term Opioid Users with Chronic Noncancer Pain*).

\* \* \* \* \* \* \*

439.    The Manufacturers used the techniques described above in order to place the misleading messages (also described above) before doctors, patients, and health care payors. The intention and effect of this blitz of messaging was to increase opioid prescribing regardless of the consequences for public health and safety.

### E.    The Members of the False Narrative Enterprise misrepresented their involvement in promoting opioids.

440.    When accused of failing to monitor the distribution of hydrocodone and physicians prescribing excessive amounts, Abbott deliberately downplayed its role in driving the demand for hydrocodone by highlighting only the market share of its branded drugs. "Abbott's Vicodin brand accounts for less than 1 percent of all prescriptions filled for hydrocodone with acetaminophen products."[210] This statement misrepresented the role of Abbott's marketing in driving demand for hydrocodone products, even those that were generic.

441.    AbbVie reiterated a similar self-serving misrepresentation two years later: "AbbVie provides funding to numerous anti drug abuse organizations. Additionally, AbbVie advocates for responsible prescribing by healthcare professionals and appropriate use of Vicodin by legitimate patients through various educational efforts."[211]

442.    In August 2019, J&J stated to *Time* magazine that it did not cause the opioid crisis because its products "accounted for less than one percent of the total opioid prescriptions in Oklahoma as well as the United States." In April 2022, a J&J representative made a public statement that "[t]he company's actions related to the marketing and promotion of important opioid prescription

---

[210] Frank Eltman, *Victim's Kin in NY Pharmacy Killing Announce Suit*, San Diego Union-Tribune (Feb. 9. 2012, 3:38 AM), https://www.sandiegouniontribune.com/sdut-victims-kin-in-ny-pharmacy-killing-announce-suit-2012feb09-story.html.
[211] *Heroin: From Prescription to Addiction (Part 14)*, CBS News (June 27, 2014, 4:05 PM), https://www.cbsnews.com/amp/boston/news/heroin-from-prescription-to-addiction-part-14/.

medications were appropriate and responsible."[212] These statements misrepresent J&J's marketing strategies, particularly the company's work to change the standard of care surrounding opioid use generally.

443.    On August 30, 2019, Allergan claimed in a press release that "it recognizes the seriousness of the opioid abuse problem. Allergan has a history of supporting – and continues to support – the safe, responsible use of prescription medications."[213] On November 22, 2022, Allergan claimed that its "promotion and marketing of opioid medications were responsible and appropriate."[214] These statements misleadingly state that Allergan's marketing was not intended to illegitimately increase sales of dangerous opioids while ignoring or minimizing their risks.

444.    The Manufacturers' misrepresentations misled the public and ultimately delayed and frustrated an adequate response to the opioid crisis.

### F.    Members of the False Narrative Enterprise directly targeted hospitals.

445.    From the beginning, hospitals were directly targeted by the Manufacturers. Hospitals received mail and electronic communications from the Manufacturers containing the misrepresentations described above.

446.    Although this targeting is most apparent in the revised JCAHO pain standards that the Manufacturers orchestrated in order to promote opioid use, the targeting of hospitals began earlier.

447.    Internal documents from the 1995 "OxyContin Launch" orchestrated by Purdue and Abbott identified (1) hospital pharmacists as among their "audience," (2) hospitals among their

---

[212] Leah Willingham, *Johnson & Johnson Subsidiary Settles West Virginia Opioid Lawsuit for $99 Million*, PBS (Apr. 18, 2022, 3:58 PM), https://www.pbs.org/newshour/health/johnson-johnson-subsidiary-settles-west-virginia-opioid-lawsuit-for-99-million.

[213] *Allergan Announces Settlement with Two Ohio Plaintiffs in Federal Opioid Litigation*, AbbVie (Aug. 30, 2019), https://news.abbvie.com/news/press-releases/news-type/corporate-news/allergan-announces-settlement-with-two-ohio-plaintiffs-in-federal-opioid-litigation.htm.

[214] *Statement on Allergan Nationwide Settlement to Resolve Opioid-Related Claims*, AbbVie (Nov. 22, 2022), https://news.abbvie.com/news/media-statements/statement-on-allergan-nationwide-settlement-to-resolve-opioid-related-claims.htm.

"institutional targets," (3) an objective of "[f]ormulary acceptance in 75% of hospitals for first twelve months," and (4) an objective of developing a "successful distribution program" to hospitals. Purdue used Abbott's sales force to market OxyContin directly to doctors working in hospitals.

448.    The importance of targeting hospitals is illustrated by a study that "demonstrated that patients who receive an opiate prescription within 7 days of surgery are 44% more likely to still be using the medication one year after surgery than patients who do not receive an opioid prescription."[215]

449.    This marketing push was successful. Abbott, in a 1997 document, indicated that prescriptions written by "Abbott MD's" comprised 25% of all OxyContin prescriptions. Sales of OxyContin went from a mere $49 million in its first full year on the market to $1.2 billion in 2002.[216]

450.    In 1995, Abbott had concluded that the use of OxyContin for postoperative pain was inappropriate. Despite these concerns, Abbott recognized that a commercial relationship with Purdue to promote the purchase of vast amounts of OxyContin could be very profitable for Abbott.

451.    On January 1, 1996, Abbott entered into a "Co-Promotion Agreement" with Purdue to market OxyContin using a dedicated sales force focused on hospitals and their doctors. This agreement was in operation from 1996 to 2002, following which Abbott continued to receive a residual payment of 6% of net sales up through at least 2006.

452.    Internal documents from the 1995 "OxyContin Launch" indicate that Purdue and Abbott also intended it for a "secondary market . . . for non-malignant pain (musculoskeletal, injury and trauma)" and that it must be "reinforced that we do not want to niche OxyContin just for cancer pain."

---

[215] Cheryl Genord, et al., *Opioid Exit Plan: A Pharmacist's Role in Managing Acute Postoperative Pain*, 57 J. Am. Pharmacists Ass'n S92 (Jan. 2017), https://www.japha.org/article/S1544-3191(17)30016-X/fulltext (hereinafter *Opioid Exit Plan*).
[216] David Armstrong, *Secret Trove Reveals 'Crusade' to Make OxyContin a Blockbuster* (Sept. 22, 2016), https://www.statnews.com/2016/09/22/abbott-oxycontin-crusade/.

453.    Abbott's head of pain care sales, Jerry Eichhorn, taught his staff of sales representatives that OxyContin would "minimiz[e] the risk of dependence" and "lower[] euphoria," when, in fact, he had little knowledge of pharmacology and no basis for these statements.

454.    Instead of being forthcoming with information regarding the addictive nature of OxyContin, Abbott instructed its sales force representatives to avoid any discussion of abuse or diversion unless the detailed physician specifically brought the subject up first.[217]

455.    Abbott assisted Purdue in expanding the market for OxyContin by recruiting doctors to participate in studies on new uses of OxyContin. These studies were used to convince other doctors to prescribe OxyContin. For instance, in November 1997, Abbott distributed an "OxyContin post PCA" study to promote OxyContin use following surgery.

456.    Abbott's training materials described the statement regarding "iatrogenic addiction" (addiction arising out of a legitimate prescription) not as a warning about risk, but simply a "reminder to the physician that addiction as a result of legitimate medical use is very uncommon, and not to mistake tolerance, physical dependence, or attempt by the patient to obtain adequate analgesia as signs of addiction."

457.    Abbott provided its sales representatives with an OxyContin visual aid entitled "24 hours of pain relief THE HARD WAY," which included a graph depicting blood plasma concentrations of OxyContin over time as flatter than they actually were. The piece also asserted that "100% of all clinical patients were dosed Q 12 H in clinical trials," which was not true.

458.    Abbott provided its sales representatives with reprints to give to doctors, one of which was a piece written by Purdue's KOL, Dawn Marcus. The Marcus article advocated using long-acting opioids for the treatment of chronic pain and stated, without citation, "While studies report drug

---

[217] *Id.*

abuse/dependence/addiction is 3 to 19 percent of chronic pain patients, true addiction (psychologic dependency) is uncommon with the use of long-acting opioids for chronic pain."[218]

### G.    Deceptive marketing caused excessive opioid use.

459.    Pharmaceutical marketing and promotion is effective at changing the habits of prescribers and consumers.[219] Pharmaceutical manufacturers would be very unlikely to spend the large sums that they do on marketing were it not effective. The promotional activities described above thus drove an increase in opioid prescriptions.

460.    Indeed, KOL Dr. Portenoy has acknowledged that promotion directed at prescribers under the guise of education was designed to and, in fact, did influence prescribers' decisions. He has likewise admitted that the Manufacturers' use of his work (and similar work by others) was one of the contributing factors to the opioid crisis.

461.    These promotional activities included those of Front Groups that were funded and directed by the Manufacturers. A U.S. Senate report found that the financial contributions from opioid manufacturers and the resulting activities of the Front Groups "suggests, at the very least, a direct link between corporate donations and the advancement of opioids-friendly messaging."[220]

462.    Because marketing opioids to doctors was effective at making chronic opioid therapy a commonplace and often first-line treatment, opioid prescription rates have increased. While previously a small minority of opioid sales, today between 80 and 90% of opioids (measured by weight) are used for chronic pain.

---

[218] Dawn A. Marcus, *Treatment of Nonmalignant Chronic Pain*, 61 Am. Fam. Physician 1331 (2000), https://www.aafp.org/afp/2000/0301/p1331.html.

[219] *See, e.g.*, *How Drug Marketing May Influence Prescriptions*, Nat'l Inst. of Health (May 23, 2017), https://www.nih.gov/news-events/nih-research-matters/how-drug-marketing-may-influence-prescriptions; *Spending on Consumer Advertising for Top-Selling Prescription Drugs in U.S. Favors Those with Low Added Benefit*, Johns Hopkins Bloomberg Sch. of Pub. Health (Feb. 7, 2023), https://publichealth.jhu.edu/2023/spending-on-consumer-advertising-for-top-selling-prescription-drugs-in-us-favors-those-with-low-added-benefit.

[220] *Fueling an Epidemic Part Two*, *supra*.

463.    The increasing number of opioid prescriptions has led to increased rates of opioid misuse because there is a "parallel relationship between the availability of prescription opioid analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and associated adverse outcomes."[221] The opioid epidemic is thus "directly related to the increasingly widespread misuse of powerful opioid pain medications."[222]

464.    The increasing number of opioid prescriptions has led to increased numbers of patients who, even if they are not misusing prescription opioids, have nevertheless become physiologically and/or psychologically dependent on them.[223] Such patients are more difficult, time-consuming, and resource-intensive to treat for any medical condition (not just those related to substance use) with which they present. This difference is caused by the patients' opioid use.

465.    The increase in prescriptions (driven by aggressive marketing) leads to increased rates of overdose. In a 2016 report, the CDC explained, "Opioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses." Patients receiving opioid prescriptions for chronic pain account for most overdoses. For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "to revers[ing] the epidemic of opioid drug overdose deaths and prevent[ing] opioid-related morbidity."[224]

466.    The progression from prescription opioids to the use of illicit drugs, particularly heroin (and, more recently, fentanyl), is well documented.[225]

---

[221] Richard C. Dart, et al., *Trends in Opioid Analgesic Abuse and Mortality in the United States*, 372 New Eng. J. Med. 241 (2015), https://www.nejm.org/doi/pdf/10.1056/NEJMsa1406143.

[222] *See* Robert M. Califf, et al., *A Proactive Response to Prescription Opioid Abuse*, 374 N. Engl. J. Med. 1480 (2016), https://www.nejm.org/doi/full/10.1056/NEJMsr1601307.

[223] *See* Emily O. Dumas & Gary M. Pollack, *Opioid Tolerance Development: A Pharmacokinetic/Pharmacodynamic Perspective*, 10 The AAPS Journal 537 (2008), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2628209/pdf/12248_2008_Article_9056.pdf ("Long-term use of opioids can be problematic due to the rapid development of profound tolerance to the analgesic effects . . . .").

[224] Rose A. Rudd, et al., *Increases in Drug and Opioid Overdose Deaths – United States, 2000-2014*, 643 Morbidity & Mortality Wkly. Rep. 1378 (2016), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6450a3.htm.

[225] Theodore J. Cicero, et al., *The Changing Face of Heroin Use in The United States: A Retrospective Analysis of The Past 50 Years*, 71 J. Am. Med. Ass'n Psychiatry 821 (2014), https://jamanetwork.com/journals/jamapsychiatry/fullarticle/1874575.

467.    In a November 2019 study by the National Bureau of Economic Research, researchers from the University of Pennsylvania, the University of Notre Dame, and the Rand Corporation examined how the marketing of OxyContin at its introduction in 1996 affected the opioid crisis. At that time, certain states' regulations made the drug easier to prescribe, and Purdue concentrated its marketing efforts in those states.

468.    The study found that in states where Purdue focused its initial misleading marketing messages, OxyContin distribution was nearly twice as high as in similarly situated states with more stringent prescription requirements in which Purdue did not market aggressively.[226]

469.    The authors found that by 2000 the false marketing campaign had led to OxyContin sales 2.5 times higher in the targeted states than in the non-targeted states. Hence, the authors concluded that Purdue's false marketing had a direct effect on sales of OxyContin.[227]

470.    The authors also studied misuse and overdose death trends over time. When looking at overdose deaths, the authors found low overdose death rates across the non-targeted states and much higher rates in the states where Purdue had concentrated its false marketing.

471.    Based on their careful analysis, the authors concluded that the differences were attributable to Purdue's marketing.[228]

472.    Although this study used the natural experiment created by Purdue's decision to avoid marketing OxyContin in certain states, its conclusion applies to opioid marketing more broadly because the study demonstrates a quantifiable effect of the intensity of opioid marketing on adverse outcomes (e.g., overdose rates).

---

[226] Abby E. Albert, et al. "Origins of the Opioid Crisis and Its Enduring Impacts," NBER Working Papers 26500, Nat'l Bureau of Econ. Research (2019), https://www.nber.org/system/files/working_papers/w26500/w26500.pdf.
[227] *Id.* at 20.
[228] *Id.* at 37 (emphasis added).

473.    Put more simply, it is inconceivable from a business perspective that the Manufacturers would have spent billions of dollars marketing their drugs (which they did) if they did not receive a return on their investment in the form of higher sales. From this, one can only conclude that Enterprise members' marketing caused more opioids to be prescribed, which led to increased rates of opioid dependence (of which overdose is merely an extreme manifestation).

474.    The vector between Manufacturers' marketing and increased prescriptions is the reliance of doctors upon the false and/or misleading statements found made in Enterprise members' promotions. Reliance is the necessary connection between the two observed states of (a) increased marketing and (b) increased prescriptions because a prescription can only be written by a health care provider. Therefore, the causal relationship established by the studies discussed above necessarily implies reliance by prescribers.

### H.    The False Narrative Enterprise coordinated the scheme through the Pain Care Forum.

475.    The Pain Care Forum ("PCF") was a coalition of drugmakers, trade groups, and dozens of non-profit organizations supported by industry funding, including the Front Groups described in this Complaint. Lobbyists for members of the PCF quietly shaped federal and state policies regarding the use of prescription opioids for more than a decade. PCF members spent over $740 million lobbying in the nation's capital and in all 50 statehouses on an array of issues, including opioid-related measures.[229]

476.    The PCF was organized in 2005 by Purdue's Burt Rosen and others. Purdue, Cephalon, J&J, and APF were among its early participants. Members eventually included Abbott, Endo, Teva, Grünenthal, FSMB, PhRMA, and APPM.

---

[229] Matthew Perrone, *Pro-Painkiller Echo Chamber Shaped Policy Amid Drug Epidemic*, Ctr. for Pub. Integrity (Sept. 19, 2017), https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echo-chamber-shaped-policy-amid-drug-epidemic.

477.    The PCF allowed members of the False Narrative Entrprise to engage in coordinated conduct to ensure an oversupply of opioids. The PCF's entire purpose was coordinating industry activities surrounding pain and opioids. For instance, Rosen explained in 2005, "I think this could fill the vacuum of leadership in the community at large, and provide for some unified direction on issues of importance to the pain community." In the initial email to the founding members, Rosen explained that the goal was "to coordinate and focus commitments to actions regarding public policy issues that affect the treatment of pain."

478.    Members met monthly in Washington, D.C., but could also participate by phone. The meetings deliberately excluded media and no minutes were taken in order to keep the meetings off the record.

479.    In 2007, APF and Purdue collaborated on talking points for use at a Pain Care Forum meeting. Some of these talking points included "[o]verly restrictive regulatory policies impeded pain relief"; "doctors and people with pain" who "believe that opioid medications are addictive" constituted "barriers to effective pain care"; and opioid medications "give relief—not a 'high.'"[230]

480.    Members of the PCF worked together in an attempt to delay or halt the rescheduling of hydrocodone combination products such as Norco and Vicodin from Schedule III to Schedule II because the rescheduling, by imposing stricter requirements for prescribing and dispensing, would reduce sales. This effort was ultimately unsuccessful as hydrocodone was rescheduled in 2014.

481.    The Manufacturers used the PCF to "coordinate strategy and to address the FDAs REMS proposals." In 2007, Congress gave the FDA authority to require Risk Evaluation and Mitigation Strategies ("REMS") that would increase various safety measures for high-risk drugs, including requiring specialized training for prescribers. Around 2008, the FDA was contemplating a REMS program for long-acting and extended-release (LA/ER) opioids and asked the Manufacturers

---

[230] *Treatment Options*, *supra* at 5.

to form an Industry Working Group to coordinate their position. The FDA Industry Working Group meetings, however, were on the record and, because the Manufacturers are direct competitors, were attended by antitrust counsel. The FDA did not invite the distributors or Front Groups to participate. The PCF, therefore, created its own REMS Task Force that included these groups.

482.    The PCF's REMS Task Force reviewed a draft letter to the FDA recommending mandatory physician and pharmacist training and certification requirements as a prerequisite to prescribing and dispensing LA/ER opioids. The PCF, working with the HDA, deleted that part, stating "we shouldn't mention a 'certification' requirement for physicians (or anyone else for that matter.)" The final letter to the FDA did not mention the HDA's or the PCF's role in drafting the letter. The PCF also prepared form "recommendations" for its Front Group members to use to submit comments to the FDA on REMS. When one PCF member raised concern that the FDA "may feel it was rather duplicitous of the [industry members] to meet with [the FDA commissioner] and not mention that these were in the works," he was told, "It's the way things work" and there was a "need to keep silent on the congressional and media strategies."

483.    The Manufacturers collaborated through the PCF to coordinate opposition to the CDC's opioid prescribing guidelines before they were even issued. The CDC guidelines were "not good news" for the opioid industry and the PCF had formed a "broad work group" that included plans to "criticize the CDC process and expected outcomes" using "media efforts and recruiting patients and provider experts." Indeed, by this time the Manufacturers knew that state-implemented prescribing guidelines hurt their opioid sales. And since at least 2012 they and other PCF members, including the HDA, had worked together to convince the CDC that the true epidemic was untreated chronic pain, that it was the "#1 public health problem in the United States," was the true epidemic, and that it was "unclear" why what PCF members euphemistically referred to as "opioid-related problems" were "considered to be of epidemic proportions." Once the CDC released its guidelines,

the Manufacturers used the PCF to undermine the guidelines because they were concerned that the guidelines were "likely to dampen opioid sales in the US" and "impact[] prescription habits globally."

484.    Grünenthal USA's Dan Cohen led PCF's Abuse Deterrent Formulations Coalition, which presented to the PCF's Communications Working Group on conference calls and coordinated activities to promote use of prescription opioid ADFs (despite the fact that ADFs do nothing to ameliorate the risk of the most common route of misuse—oral ingestion of pills) along with other Manufacturers, including Janssen, Purdue, Endo, and Mallinckrodt.

485.    Participants in PCF actively communicated with employees of Indivior (then Rickett Benckiser) as evidenced by 2012 emails. These emails concerned interactions with individuals involved in the Researched Abuse Diversion and Addiction Surveillance program ("RADARS"). Purdue had created RADARS in 2001 to satisfy the FDA and the DEA that it was tracking misuse of its products, primarily OxyContin, and cases where healthcare providers were diverting the pills to their own use or to sell for illicit purposes. Purdue sold the RADARS system to Denver Health in 2005 , but even after the move to Denver Health, RADARS staffers have continued to argue against stricter limitations on prescription opioids before multiple legislatures, the FDA, and the DEA. They have also supported Purdue, other Manufacturers, and the Front Groups to continue the False Narrative Enterprise, including in authoring and co-authoring articles with Purdue, other opioid manufacturers, and the KOLs.

## I.    Defendants and the Manufacturers are members of the False Narrative Enterprise.

486.    The members of the False Narrative Enterprise did not accomplish their goal of driving up demand for and inappropriately increasing the supply of prescription opioids by acting alone. Instead, they collaborated with one another.

487.    The members of the False Narrative Enterprise had a common object to promote the manufacture, sale, distribution, dispensing, and use of prescription opioids. They had a meeting of the

minds and entered into an agreement on this common object. They had a common interest in this purpose, as each profited from the sale of opioids.

488.    The members of the False Narrative Enterprise turned a blind eye to the misconduct of the other Enterprise members in order to allow that misconduct to achieve their common purpose.

489.    Although some members of the False Narrative Enterprise have ceased engaging in some of the conduct alleged in this Complaint (e.g., by discontinuing certain opioid products), the Enterprise is ongoing. No member has tried to leave the Enterprise and indeed, the members continue to forward the goals of the Enterprise by, among other things, making false statements concerning their historical record and current practices of compliance with their duties to prevent excess use and diversion of prescription opioids.

490.    The conduct of the members of the False Narrative Enterprise was not merely parallel; they actively chose to support one another. For instance, when issues began to arise about abuse and diversion of Purdue's OxyContin, an internal Janssen email stated, "It was not [Janssen's] policy to advance language that would attack a competitor's product." [231] The email stressed the "need to have enough foresight to look towards the future of pain management."[232] In other words, what is bad for Purdue is bad for Janssen. This is, of course, in addition to J&J's interest in Purdue as a customer for Noramco APIs.

491.    At about the same time, Purdue sent a memorandum to its "Entire Field Force" instructing them about the agreement that Purdue and Janssen reached to not disparage one another's products or to raise competitors' drug diversion problems:

> This past week, we received a complaint from Janssen's president indicating that our representatives are discussing various ways in which the Duragesic patch is abused and diverted. . . . While abuse and diversion reports for OxyContin, Duragesic, and other pharmaceutical preparations may be part of the printed and electronic press, this

---

[231] Email from Bruce Colligen to Dennis Fitzgerald (Apr. 20, 2001).
[232] *Id.*

knowledge or information should not be discussed or used as part of the promotion of OxyContin. . . . Janssen Pharmaceuticals and Purdue have agreed that should either company have representatives who promote product out of label or out of policy, the name of the representative will be provided to the other company for investigation and disciplinary action if necessary. . . . I trust that this memo is clear.

492.    Not all of the coordinated conduct described in this Complaint was unlawful, but taken together, it establishes that members of the False Narrative Enterprise reached agreements, had a meeting of the minds, and had ample opportunity to collaborate on the predicate acts described below. This sheer extent and continuity of conduct over a period of many years allows the inference that the False Narrative Enterprise was and is an ongoing enterprise for purposes of RICO.

## V.    THE FALSE NARRATIVE ENTERPRISE HARMED PLAINTIFF AND OTHER HOSPITALS.

493.    Hospitals—legally and morally—are compelled to treat patients with opioid-related conditions and, as a result, have been directly and monetarily damaged by the excessive opioid use caused by the False Narrative Enterprise. Hospitals have suffered damages and will continue to be negatively impacted from their treatment of patients with opioid-related conditions.

494.    The actions of the False Narrative Enterprise increased the number of such patients.

495.    There are different categories of patients whose opioid use impacts hospital operations. Some patients may meet the diagnostic criteria for OUD. Other patients may have become physiologically and/or psychologically dependent on opioids without meeting the diagnostic criteria for OUD. Still others may present for care after a single episode of opioid use (e.g., an accidental overdose by an opioid-naïve patient). For most of these patients, their opioid use began with (and often was limited to) opioids that they were prescribed in accordance with the Enterprise's false narrative regarding the risks and benefits of opioids.

496.    The care required by opioid-dependent patients may take the form of treatment to counter the immediate effects of the opioid use (e.g., administration of naloxone to reverse an opioid

overdose), treatment of conditions brought about by the opioid use (e.g., care for infants with neonatal abstinence syndrome), or medication for OUD (e.g., daily doses of methadone or buprenorphine provided during a patient's hospital stay to ensure continuity of medication for OUD treatment).

497.    However, opioid-dependent patients may also present with other sorts of conditions, the treatment of which may be affected by their opioid dependence. For instance, a patient who has been on a high regimen of prescription opioids for a long period of time may present for a gallbladder removal. Or, the same patient may present in the emergency room with a traumatic injury following a vehicular accident. Care for these patients will be more complex and will place a greater burden on the hospital's resources than care for an equivalent patient receiving the same treatment but without the history of opioid use.

498.    Studies have shown that, "[c]ompared with opioid-naïve patients, opioid-tolerant patients will typically generate a greater workload for medical and nursing staff. . . . . They require more frequent consultations and prescription alterations."[233] "Opioid-dependent patients presenting for surgery will challenge a health care system to provide optimal patient care, requiring close communication among the surgical team, anesthesiologists, referring physicians, and pain specialists."[234] "The proportion of opioid-tolerant patients requiring acute pain management [e.g., in connection with surgery] has increased, often presenting clinicians with greater challenges than those faced when treating the opioid-naïve."[235] These include an "increased risk of awareness" and the

---

[233] GK Simpson & M Jackson, *Perioperative Management of Opioid-Tolerant Patients*, 17(4) BJA Education 124 (2017), https://www.bjaed.org/action/showPdf?pii=S2058-5349%2817%2930056-2; *see also* Joseph H. Donroe, et al., *Caring for Patients with Opioid Use Disorder in the Hospital*, 188 Can. Med. Ass'n J. 1232 (2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5135493/pdf/1881232.pdf ("The inpatient care of patient with opioid use disorder can be medically and psychosocially complex.").
[234] Klaus D. Torp & Robert L. McClain, *Perioperative Pain Control in the Opioid-Dependent Patient: Just Bite the Bullet?*, 10 Current Anesthesiology Reports 473 (2020), https://link.springer.com/article/10.1007/s40140-020-00425-2.
[235] C.A. Huxtable, et al., *Acute Pain Management in Opioid-Tolerant Patients: A Growing Challenge*, 39 Anaesthesia Intensive Care 804 (2011), https://journals.sagepub.com/doi/epdf/10.1177/0310057X1103900505.

concomitant need to take extra precautions to counteract that risk[236] as well as the need to monitor and respond to patients showing symptoms of opioid withdrawal.

499.    Plaintiff must expend more resources to treat opioid-dependent patients, in comparison to patients with similar diagnoses who are not opioid dependent. When comparing the two cohorts, the ratio of payments received—including from private payors—to charges billed is lower for the opioid-dependent cohort. This operational impact coincides with the increase of opioids circulating in the community and increases in the population of opioid-dependent patients.

500.    This is not just a matter of some patients not paying their bills. Instead, the financing mechanisms of modern healthcare set rates for types of treatment that are not always adjusted to reflect the condition of the particular patient receiving that treatment. If the same treatment for an individual patient becomes more complicated or expensive (as it does in patients with opioid dependency or OUD), then a healthcare provider's rate of realization declines.

501.    For example, it is increasingly common for individuals with OUD to present at a hospital with endocarditis, treatment for which may involve surgery followed by intravenous antibiotic treatment. This treatment requires the installation of an IV port; typically, a patient with such a port will be released and will receive their intravenous antibiotics on an outpatient basis. However, because IV ports provide a ready route for intravenous drug use, the standard of care for patients with IV ports who have a concurrent OUD is to conduct the entire course of treatment on an inpatient basis, with an associated additional burden on the hospital's operations.

502.    The structures by which medical care in hospitals is funded (generally by fixed fees for particular treatments) means that the operational impact of treating opioid-dependent patients cannot be passed along to patients or other payors. For example, if a floor nurse must visit an opioid-dependent patient staying in the hospital for some treatment eight times over the course of a shift to

---

[236] *Id.*

manage complications related to the patient's opioid use but would only have to visit an otherwise equivalent non-opioid-dependent patient four times over the course of the same shift, there is an impact on the hospital's operations. However, no funding mechanism for hospitals provides additional funding to account for the opioid-dependent patient's greater use of staff resources.[237]

503.    During admission, hospital professionals routinely consult with patients to assess which medications the patients are taking at home. As a result of the False Narrative Enterprise, hospitals can no longer trust patients to self-report their prescriptions and must take additional steps to independently verify their patients' purchases (such as by examining the PDMP).

504.    Additionally, individuals with OUD have presented and continue to present themselves to Plaintiff claiming to have illnesses and medical problems in order to obtain opioids. Plaintiff has incurred and continues to incur operational impacts related to the time and expense of identifying, diagnosing, testing, or otherwise attempting to treat these individuals.

505.    Hospitals must also treat opioid users who present in need of emergency care, a fact of which members of the False Narrative Enterprise were aware. This obligation arises under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, which requires hospital emergency departments that accept payments from Medicare to provide care to anyone seeking treatment for a medical condition, regardless of citizenship, legal status, or ability to pay. Under EMTALA, participating hospitals may not transfer or discharge patients needing emergency treatment except with the informed consent or stabilization of the patient or when their condition requires transfer to a hospital better equipped to administer the treatment. Similarly, if a

---

[237] *Cf.* Paul A. Taheri, et al., *Paying a Premium: How Patient Complexity Affects Costs and Profit Margins*, 229 Annals of Surgery 807 (1999), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1420827/pdf/19990600s00007p807.pdf (suggesting ways, in the trauma context, in which "it is the more medically complex cases that potentially compromise the economic position of the . . . institution").

pregnant opioid-dependent person presents for treatment, under EMTALA, the hospital must provide care for both the opioid-dependent parent and the opioid-dependent baby.

506.    This is no small burden. In 2017, an estimate 1.5 million emergency room visits were related to OUD.[238] Moreover, as with other patients, emergency care for opioid-dependent patients for any condition can be more complex than for similarly situated patients who are not opioid dependent.

507.    Plaintiff has purchased and continues to purchase and administer opioids marketed and sold by members of the False Narrative Enterprise. They have marketed and continue to market their opioid products directly to Plaintiff and other hospitals. Plaintiff is a direct customer and victim of the Enterprise members' fraudulent and unlawful marketing. Plaintiff and other hospitals have purchased the Manufacturers' opioids, have used them as deceptively marketed by the Enterprise, and have suffered damages as a direct and proximate result. Plaintiff would not have purchased the quantity of opioids it purchased had Plaintiff known the truth about the Enterprise's false marketing scheme, i.e. that the claims regarding the risks, benefits, and superiority of opioids for long-term use were untrue and unfounded.

508.    The financial impact on hospitals, including Plaintiff, includes, but is not limited to, the following:

    a.   operational losses suffered in connection with providing treatment to patients suffering from opioid-related conditions as the reason for presentation for care and/or as a comorbidity;

    b.   operational losses associated with patient counseling with respect to pain management, necessitated by overprescription to the general population and dissemination of false and misleading information to prospective patients and others; as hospitals and other providers question their patients' self-reporting, it necessitates that further steps be taken in all phases of diagnosis, treatment, and counseling;

---

[238] Utsha G. Khatri, et al., *Variation in Emergency Department Visit Rates for Opioid Use Disorder: Implications for Quality Improvement Initiatives*, 51 Am. J. Emergency Med. 331 (2022).

c.  the loss of revenue incurred by hospitals as a consequence of their obligation to provide care to patients suffering from opioid-related conditions;

d.  costs of opioids purchased by hospitals themselves, which were direct targets of the Enterprise's marketing campaigns;

e.  costs of training personnel in the proper treatment of drug overdoses;

f.  costs associated with training staff in the application of naloxone;

g.  operational losses suffered in relation to infants born with opioid-related medical conditions or born dependent on opioids due to drug use by mothers during pregnancy, including the costs of creating and maintaining special facilities and costs associated with increased staffing to observe infant behavior and adjust doses of medication used to manage withdrawal symptoms;

h.  costs associated with staff burnout, particularly in neonatal intensive care units, where staff suffer from PSTD, compassion fatigue, anger, addiction, and suicide;

i.  costs of providing additional personnel to respond to security concerns created by patients and others suffering from OUD and other forms of opioid dependency;

j.  costs of purchasing and maintaining additional equipment necessitated by the increased demands placed on hospitals as a result of the increased population of opioid-dependent patients and the expanded services hospitals provided in response; and

k.  costs of providing special programs over and above ordinary hospital services.

509.    The False Narrative Enterprise has caused a repeated and continuous injury. The damages have not occurred all at once but have continued to occur and have increased as time progresses. The harm is not completed, nor have all the damages been incurred until the wrongdoing ceases. The wrongdoing and unlawful activity of the members of the False Narrative Enterprise have not ceased.

510.    The harms suffered by Plaintiff and other hospitals were a direct and foreseeable result of the actions of the False Narrative Enterprise. Members of the False Narrative Enterprise, as sophisticated participants in the pharmaceutical industry, knew that treatment provided to opioid-dependent patients would be provided by hospitals such as Plaintiff and that those hospitals' operations would be negatively impacted thereby.

## VI.    <u>THE OPIOID CRISIS IS NOT OVER.</u>

### A.    <u>Continued Prescriptions and Overdoses</u>

511.    Opioid prescriptions in the United States are still far too high. Opioid prescriptions (in total dosage units) are much higher than they were before the marketing blitz began.



Source: Congressional Budget Office[239]

512.    In fact, MMEs per capita prescribed in 2020 in the United States were 334 per person -- more three times as high as they were in 1992 (106 per person).[240] Prescribing practices have improved from the peak of prescription rates in or around 2011 (well over 700 MME per person), but they have a long way to go to return to the baseline levels existing before the False Narrative Enterprise changed the national narrative on opioid prescribing.

513.    Opioid prescription rates in the United States are still considerably higher than those in other developed countries. In fact, "[t]he amount of prescription opioids dispensed per million

---

[239] Congressional Budget Office, "The Opioid Crisis and Recent Federal Policy Responses" (Sept. 2022),https://www.cbo.gov/publication/58532

[240] Johanna Catherine Maclean, et al., "The Opioid Crisis, Health, Healthcare, and Crime: a Review of Quasi-Experimental Economic Studies," National Bureau of Economic Research (Apr. 2022), https://www.nber.org/system/files/working_papers/w29983/w29983.pdf

people per day in the United States is approximately four times the median for member countries of the Organisation for Economic Co-operation and Development."[241]

514.    No doubt, opioid prescriptions in the United States are down from their peak in the early 2010s. This is partly due to changes in prescribing and distribution behavior. But part of this decline is also due to the appearance of competing products – specifically, increased supply of heroin and fentanyl.

515.    Opioid deaths are still increasing. Even when the data is limited just to prescription opioids, death rates are still climbing, although they appear to be hitting a plateau. In any event, they certainly have not started declining in any meaningful way. Overall opioid deaths are skyrocketing.



---

[241] Congressional Budget Office, "The Opioid Crisis and Recent Federal Policy Responses" (Sept. 2022),https://www.cbo.gov/publication/58532

Data limited to the United States. Source: American Institute of Chemical Engineers (2022).[242]

516.    While most deaths are now attributed to fentanyl and other synthetics (primarily distributed illegally), many of the persons using these products got their start, and developed their dependency, with prescription opioids.

**B.**    **Continued Activity of Front Groups and KOLs**

517.    Some members of the False Narrative Enterprise may not be expressly promoting specific products through direct marketing channels as they did in the past, but the perpetuation of the same false narrative continues, and Enterprise members continue to vigorously resist efforts to undo the effects of their fraudulent marketing.

518.    In March 2016, the Centers for Disease Control issued its new opioid guidelines (the "2016 Guidelines") urging doctors to limit prescriptions and, when possible, opt for non-opioid alternatives. For the first time, a respected agency was saying that the risks of painkillers greatly outweighed the benefits for the vast majority of chronic pain patients" "If benefits do not outweigh harms of continued opioid therapy, clinicians should optimize other therapies and work with patients to taper opioids to lower dosages or to taper and discontinue opioids."

519.    There was immediate pushback to the 2016 Guidelines by members of the False Narrative Enterprise, and the vigorous debate continues to this day.

520.    Many of the pro-opioid advocates spread false depictions of the 2016 Guidelines, such as portraying them as opposing mandatory limitations, when the truth is they are merely guidelines for best practices. The pro-opioid groups also maintain a narrative that the 2016 Guidelines imposed mandatory dosage reductions (or "forced tapering") of all patients presently receiving opioid prescriptions, which is also a complete falsehood. No one engaged in the national dialogue on opioids

---

[242] Benjamin Haslund-Gourley, et al., "Responding to the Opioid Epidemic," American Institute of Chemical Engineers (Sept. 2022), https://www.aiche.org/resources/publications/cep/2022/september/responding-opioid-epidemic

favors such a measure. They argue that opioid prescribing is no longer an issue since most deaths are now among patients taking illegally manufactured and distributed products, but they ignore the hard fact that deaths from legal prescription opioids have merely leveled off and have <u>never</u> declined, as well as the fact that prescription opioids have similar effects as their illegally-manufactured counterparts and can serve as a gateway drug.

521.    Perhaps the most outspoken of the present-day KOLs is Dr. Stefan G. Kertesz, an internist in Birmingham, Alabama, and associate professor at the University of Alabama. Kertesz was one of the two "experts" (along with Dr. Daniel Alford, of the School of Medicine at Boston University) on a "[a] multidisciplinary expert panel" formed by the AAPM, a notorious Front Group, to meet and "review the influence of the core recommendations of the guideline on pain management practices, principally regarding the estimated 5 to 8 million Americans with chronic pain currently on opioids."[243] In March of 2019, Kertesz was a lead author (along with four other physicians, including Alford) on a letter calling on the CDC to reiterate that its 2016 Guidelines were recommendations and were not binding. Kertesz and his allies have raised their concerns in both popular and academic publications as well as at various medical conferences. For instance, he co-authored an article published by STAT entitled "Strict limits on opioid prescribing risk the 'inhumane treatment' of pain patients."[244]

522.    The Washington Legal Foundation, a pharma-aligned group, opposed the 2016 Guidelines, saying the lack of disclosure was a "clear violation" of federal law. The Academy of Integrative Pain Management ("AIPM") (formerly the AAPM), a longstanding PCF participant, went

---

[243] Kroenke K, Alford DP, Argoff C, Canlas B, Covington E, Frank JW, Haake KJ, Hanling S, Hooten WM, Kertesz SG, Kravitz RL, Krebs EE, Stanos SP, Sullivan M. Challenges with Implementing the Centers for Disease Control and Prevention Opioid Guideline: A Consensus Panel Report. Pain Med. 2019 Apr 1;20(4):724-735, 725. doi: 10.1093/pm/pny307. Erratum in: Pain Med. 2022 Aug 31;23(9):1636. PMID: 30690556.

[244] Kertesz, SG and Gordon, AJ. "Strict limits on opioid prescribing risk the 'inhumane treatment' of pain patients." STAT. Feb. 24, 2017. https://www.statnews.com/2017/02/24/opioids-prescribing-limits-pain-patients/. Last viewed Sept. 23, 2022.

so far as to ask congressional leaders to investigate how the CDC had developed the guidelines and a House committee asked the CDC to turn over documents about its advisors.

523.    Many KOLs presently and formerly associated with industry-supported front groups were outspoken against the 2016 Guidelines. Some had managed to participate in federally-created advisory panels on pain management, such as the Interagency Pain Research Coordinating Committee (the "IPPCC") a 19-member panel coordinating pain research that had been created by the NIH in 2010. Industry-aligned participants included Richard Payne, a former APF board member, who questioned whether the experts advising the CDC had "conflicts of interests in terms of biases, intellectual conflicts that needed to be disclosed." They also included Myra Christopher, whose organization received funding from opioid drugmakers. In fact, her position was established through a $1.5 million gift from Purdue. Drs. Payne and Christopher had, at the height of opioid promotion in 2006, drafted a report on "Pain in America" touting the industry narrative. Long-time pharma industry KOL Scott Fishman is presently on the IPPCC.

524.    In 2016, after the adoption of the 2016 Guidelines, the industry (including Endo and the HDA) spent heavily lobbying for the legislation to create the Pain Management Best Practices Inter-Agency Task Force, a task force to review and update best practices on pain management and painkiller prescribing. Many of the task force members had ties to the opioid industry. For example, Dr. Rollin Gallagher had not only consulted for Purdue, Endo and Janssen in the early 2000s, but was then editor-in-chief of *Pain Medicine*, the AAPM's flagship publication; the AAPM received nearly $1.2 million from the five largest opioid manufacturers between 2012 and 2017. Dr. Jianguo Cheng, recent past president of AAPM, received a $24,600 consulting fee from Purdue in 2017, Purdue's 8th largest stand-alone payment that year. Cindy Steinberg is the policy director for the US Pain Foundation, which received $3 million from the five biggest opioid manufacturers from 2012 to 2017. Task force chair, Dr. Vanila Singh, had, in the past year, spoken at conferences for the AAPM and the American

Academy of Integrative Pain Management, a recently shuttered organization that had likewise received millions; her husband received nearly $67,000 from Covidien in 2014; and her 2017 financial disclosure showed she owned between $15,000 and $50,000 in J&J stock.

525.    Many Front Groups historically funded by the Manufacturers remain quite active in advocating against more restrictive prescribing practices. This includes the U.S. Pain Foundation ("USPF") and the American Chronic Pain Association, both funded by Janssen, Purdue and others. The USPF's President could be seen at what was ostensibly a "pro-patient" rally at Brandeis University in Waltham, Massachusetts on October 25, 2023, seeking the termination by the university of Andrew Kolodny, a professor and longtime advocate for more restrictive opioid prescribing practices. The Denver-based RADARS program created by Purdue back in 2001 also remains very active in pro-opioid advocacy and continues to argue against stricter limitations on prescription opioids before multiple legislatures and federal agencies.

526.    The pro-opioid advocacy movement has had some successes, such as the CDC's decision in 2022 to modify the 2016 Guidelines so as to clarify that they did not impose maximum daily dose of 90 MMEs (an extraordinarily high daily dosage). To be clear, the 2016 Guidelines never set a hard ceiling at 90 MME daily, although they were often falsely portrayed as doing so.

527.    The false narrative conspiracy never ended. No member of the False Narrative Enterprise, even those entering multi-billion dollar settlements with states and municipalities, have ever renounced the narrative they created, and which persists, nor have they taken any steps to affirmatively distance themselves from the conspiracy behind this narrative.

## VII.    CLASS ALLEGATIONS

528.    Pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this action on its own behalf and on behalf of all others similarly situated, as representative of the following Proposed Class:

All acute care hospitals in the United States that treated patients with opioid use order for four years preceding the commencement of this action. Excluded from the Class are any hospitals directly or indirectly owned or operated by Defendants or Defendants' affiliated entities.

529.    Available datasets identify acute care hospitals in the United States, rendering the members of the Proposed Class readily identifiable.

530.    According to CMS records, there are thousands of acute care hospitals in the United States, rendering the class so numerous that individual joinder of the members is impracticable. The members of the Proposed Class are geographically dispersed throughout the United States.

531.    There are questions of law and of fact common to all members of the Proposed Class as described below.

532.    Plaintiff's claims are typical of those of the Proposed Class as all members of the Proposed Class have suffered an operational impact on their hospitals from the increased population of opioid-dependent patients created by the False Narrative Enterprise. Plaintiffs' claims and those of the Proposed Class are based on identical legal theories concerning Defendants' conduct, which was common as to all members of the Proposed Class Plaintiffs and the members of the Proposed Class seek damages for the same sort of injuries to their operations caused by Defendants' conduct.

533.    Plaintiff and its counsel will fairly and adequately represent the interests of the members of the Proposed Class. Plaintiff has no interest antagonistic to, or in conflict with, the interests of the members of the Proposed Class. Plaintiff's counsel are highly experienced in the prosecution of class actions and complex litigation, including litigation against Defendants on behalf of numerous hospitals in various states throughout the country. Plaintiff's counsel have the financial resources necessary to adequately and vigorously litigate this class action.

534.    A class action is superior to all other available methods for fairly and efficiently adjudicating the claims of Plaintiff and the members of the Proposed Class. Plaintiff and the members

of the Proposed Class have been harmed in identical ways by Defendants' conduct. Although the members of the Proposed Class have each suffered extensive damages, these damages are still likely smaller than the expense and complexity of litigating on an individual basis against the numerous Defendants involving in the False Narrative Enterprise. Therefore, it is unlikely than any individual hospital would be able to obtain effective redress for the wrongs committed against that hospital by these Defendants.

535.    Common questions of law and fact predominate over individual questions. These questions include:

    a.    Did the Manufacturers manufacture prescription opioids?

    b.    Did members of the False Narrative Enterprise make misleading statements regarding the risks and benefits of prescription opioids?

    c.    Did McKinsey advise Manufacturers in methods to use to sell more prescription opioids?

    d.    Was the False Narrative Enterprise an association-in-fact that existed?

    e.    Was each Defendant a member of the False Narrative Enterprise?

    f.    Did the False Narrative Enterprise engage in activities beginning in the 1990s?

    g.    Were Front Groups, KOLs, and pill mills members of the False Narrative Enterprise?

    h.    Did the False Narrative Enterprise have an unlawful purpose to propagate falsehoods about the safety and benefits of opioids and the way they are or should be distributed and dispensed and to distribute and dispense opioids in violation of the Controlled Substances Act?

    i.    Did members of the False Narrative Enterprise engage in wire fraud?

    j.    Did members of the False Narrative Enterprise engage in mail fraud?

k.  Did members of the False Narrative Enterprise corrupt an official proceeding?

l.  Did Defendants conspire to support the conduct of the False Narrative Enterprise?

m.  Did Defendants benefit financially from their membership in the False Narrative Enterprise?

n.  Did the conduct of the False Narrative Enterprise increase the number of opioid-dependent individuals?

536.    In the alternative, this Court should certify an issues class under Rule 23(c)(4). Factual and legal questions regarding Defendants' conduct, including whether the False Narrative Enterprise existed and whether Defendants were members of it, whether Defendants committed predicate acts constituting a pattern of racketeering activity, and whether Defendants engaged in a conspiracy are common questions that can be efficiently and appropriate answered on classwide basis as to every member of the Proposed Class.

## VIII.    <u>CAUSE OF ACTION</u>

### Violation of Racketeering Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1961–1968)

537.    Plaintiff repeats, realleges, and incorporates by reference the preceding paragraphs of this Complaint, as if fully set forth herein.

538.    This claim alleges violations of 18 U.S.C. §§ 1962(c)–(d).

539.    At all relevant times, Plaintiff and the members of the Proposed Class were capable of holding legal or beneficial interest in property and so were each a "person" within the meaning of 18 U.S.C. §§ 1961(3), 1962(c).

1.    **Structure of the False Narrative Enterprise**

a.  **Name:** At all relevant times, there existed an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4), 1962(c) – to wit, an association-in-fact comprised of McKinsey and the Manufacturers as well as other

131

members – referred to herein as "The False Narrative Enterprise."

b. **Continuity**: The activities of the False Narrative Enterprise were continuous, beginning in the 1990s and continuing until at least within four years prior to the filing of this Complaint.

c. **Effect on Commerce**: The False Narrative Enterprise was engaged in, and its activities affected, interstate or foreign commerce.

d. **Membership**: The False Narrative Enterprise reflected several types of participants:

   i. **The Manufacturers**. The Manufacturers (Purdue, Janssen, Noramco, Endo, Teva, Allergan, Actavis, Mallinckrodt, Abbott, AbbVie, and Grünenthal) engaged in unlawful conduct to promote greater use of prescription opioids and conspired with other members of the False Narrative Enterprise.

   ii. **McKinsey.** McKinsey engaged in unlawful conduct related to the marketing of prescription opioids and conspired with other members of the False Narrative Enterprise to increase the sale of prescription opioids.

   iii. **Front Groups and KOLs**. The Manufacturers used the Front Groups and KOLs to stoke demand for opioids by falsely creating the impression of independent, third-party, authoritative validation of the Manufacturers' false claims.

   iv. **Pain Care Forum.** Members of the False Narrative Enterprise participated in and used the Pain Care Forum to develop and coordinate the unlawful activities of the False Narrative Enterprise and to promote various aspects of the scheme.

   v. **Corrupt Physicians and Pharmacies, a/k/a Pill Mills.** These participants unlawfully prescribed and dispensed prescription opioids.

### 2. The Common Purpose and Scheme of the False Narrative Enterprise

540. The purpose of the False Narrative Enterprise was to increase the sale of prescription opioids, thereby increasing the Enterprise members' revenues and profits. The Enterprise members agreed to work towards this purpose by propagating falsehoods about the safety, risks, and benefits of opioids, by unlawfully prescribing and dispensing opioids, and by conspiring to do these things.

541.    Knowing that prescription opioids were highly addictive as well as ineffective and unsafe for the treatment of chronic pain, McKinsey and other members of the False Narrative Enterprise joined together and engaged in a scheme to increase their profits and sales through repeated and systematic misrepresentations about the safety and efficacy of opioids for treating chronic pain.

542.    At all relevant times, members of the False Narrative Enterprise conducted (managed) or participated, directly or indirectly, in the conduct (management) of the Enterprise, through a pattern of unlawful or otherwise prohibited activity. Defendants, with full knowledge and purpose, also conspired with members of the Enterprise, in violation of 18 U.S.C. § 1962(d), to violate § 1962(c).

543.    There was regular communication between the members of the Opioid Promotion Enterprise in which information was shared, misrepresentations coordinated, and payments exchanged. This coordination, communication, and payment often required the use of the wires and mail given the geographic dispersal of the members of the False Narrative Enterprise.

544.    As public scrutiny and media coverage revealed how opioids ravaged communities throughout the United States, the Front Groups and KOLs did not challenge the Manufacturers misrepresentations, seek to correct their own previous misrepresentations, terminate their role in the False Narrative Enterprise, or disclose publicly that the risks of using opioids for chronic pain outweighed their benefits and were not supported by medically acceptable evidence.

545.    The Manufacturers could not have accomplished the purpose of the False Narrative Enterprise without the assistance of the Front Groups and the KOLs, who were perceived as "neutral" even while spreading misrepresentations about opioids.

546.    The impact of the False Narrative Enterprise is still in place, i.e., opioids continue to be prescribed and used for chronic pain, and the wave of opioid-dependent patients continues to consume Plaintiff's resources.

547.    The members of the False Narrative Enterprise had a common purpose and interest in the object of the scheme and functioned within a structure designed to effectuate the Enterprise's purpose.

### 3.    Pattern of Racketeering Activity

548.    Members of the False Narrative Enterprise engaged in multiple, repeated, and continuous criminal acts, including but not limited to:

a.  **Wire Fraud, 18 U.S.C. § 1343.** Members of the False Narrative Enterprise, in violation of § 1343, transmitted communications electronically to designated persons to assert and/or coordinate false claims regarding the benefits, risks, sale, and dispensing of prescription opioids with the overall aim of increasing sales of prescription opioids and collecting the resulting profits.

b.  **Mail Fraud, 18 U.S.C. § 1341.** Members of the False Narrative Enterprise, in violation of § 1341, transmitted communications by the mail to designated persons to assert and/or coordinate false claims regarding the benefits, risks, sale, and dispensing of prescription opioids with the overall aim of increasing sales of prescription opioids and collecting the resulting profits.

c.  **Obstruction of Official Proceedings, 18 U.S.C. § 1512(c).** Members of the False Narrative Enterprise, in violation of § 1512(c), corruptly obstructed, influenced, and/or impeded one or more official proceedings and/or attempted to do so. These proceedings included hearings before congressional committees, administrative proceedings before the FDA and the DEA, and proceedings before United States courts.

d.  **Violations of the Controlled Substances Act, 21 U.S.C. § 801,** *et seq.* Members of the False Narrative Enterprise, in violation of §§ 821, 822(b), and 841(a), knowingly prescribed and/or dispensed prescription opioids without authorization by, among other things, failing to comply with the procedures mandated by 21 C.F.R. Part 1306. Members of the False Narrative Enterprise, in violation of § 843(b), knowingly or intentionally used a communication facility (including the mail and wires) to facilitate the commission of the above violations of the CSA. Members of the False Narrative Enterprise, in violation of § 846, willingly agreed with at least one other person to a plan to knowingly commit one or more of the above violations of the CSA.

e.  **Violations of State Controlled Substances Laws.** Members of the False Narrative Enterprise violated state controlled substances laws that prohibit unauthorized dealing in controlled substances that are defined in section 102 of the Controlled Substances Act, including hydrocodone, oxycodone, and fentanyl.

549.    Members of the False Narrative Enterprise used the mail and wires to participate in the operation or management of the affairs of Enterprise, directly or indirectly, in one or more of the following ways:

a.  Creating and providing a body of deceptive, misleading and unsupported medical and popular literature about the risks and benefits of opioids, electronic and print advertisements about opioids, sales and promotional training materials about opioids, and CMEs and speaker presentations about opioids that understated the risks and overstated the benefits of long-term use;

b.  Making inaccurate assertions that their promotion of prescription opioids had always been done in a manner that was safe and nonmisleading;

c.  Identifying and targeting prescribers who were likely to write more prescriptions of opioids and for higher doses even where those prescribers' conduct rendered many of their prescriptions suspect, dangerous, or inappropriate;

d.  Selecting, cultivating, promoting, and paying KOLs, Front Groups, and Trade Associations;

a.  Paying KOLs to serve as consultants or on the Manufacturers' advisory boards, to serve on the advisory boards and in leadership positions of Front Groups, and to give talks or present CMEs;

b.  Paying significant amounts of money to leaders and individuals associated with Front Groups;

c.  Donating to Front Groups to support talks or CMEs;

d.  Disseminating many of their false, misleading, imbalanced, and unsupported statements through unbranded materials that appeared to be independent publications from Front Groups;

e.  Sponsoring CME programs put on by Front Groups that focused exclusively on the use of opioids for chronic pain;

f.  Developing and disseminating pro-opioid treatment guidelines with the help of the KOLs as authors and promoters and the help of the Front Groups as publishers and supporters;

g.  Encouraging Front Groups to disseminate their pro-opioid messages to groups targeted by the Manufacturers', such as the elderly, and then funding that distribution;

h.  Concealing their relationship to and control of Front Groups and KOLs;

i. Lobbying for less stringent regulation of the marketing and prescrbing of pharmaceutical products.

j. Communicating with other members of the False Narrative Enterprise via e-mail, telephone, and written communications regarding the management, operation, and/or participation in the enterprise and in the unlawful statement regarding the risks and benefits of prescription opioids;

k. Communicating with state agencies, federal and state courts, and private insurers regarding their misrepresentations regarding risks and benefits of using opioids for chronic pain;

l. Receiving monies through the mails and wires, including payments for prescription opioids; and

m. Sending the prescription opioids themselves through the mails as well as the associated bills of lading, invoices, shipping records, reports, and correspondence.

550.    For the False Narrative Enterprise to work, its members had to agree to implement similar tactics regarding fraudulent promotion of the use and sale of prescription opioids. This conclusion is supported by the fact that members of the False Narrative Enterprise financed, supported, and worked through the same KOLs, Front Groups, and Trade Associations and often collaborated on and mutually supported the same publications, CMEs, presentations, and prescription guidelines. This conclusion is further supported by the fact that many of the Manufacturers received the same advice from McKinsey regarding how to "turbocharge" their opioid sales.

551.

552.    Members of the False Narrative Enterprise who participated in official proceedings corruptly obstructed, impeded, or influenced those proceedings in one or more of the following ways:

a. Making misrepresentations regarding the safety or efficacy of prescription opioids;

b. Making misrepresentations regarding their own actions to comply with controlled substances laws and otherwise prevent opioid diversion and misuse; and

c. Soliciting the support of supposedly "neutral" witnesses or groups—that members of the False Narrative Enterprise actually financed and/or

controlled—to testify and/or submit comments in support of increased opioid use and looser regulations of opioid sales.

553.    Such proceedings included, but are not limited to:

   a.    Congressional testimony, lobbying, and submission of materials to members of Congress in association with the Ensuring Patient Access and Effective Drug Enforcement Act, the Military Pain Act, the National Pain Policy Act;

   b.    Congressional testimony seeking to modify the "80/20" that limited Noramco's access to the U.S. market; and

   c.    Testimony and submissions in connection with FDA administrative actions, including those surrounding the creation of the ER/LA opioid REMS.

554.    Members of the False Narrative Enterprise conspired to and did violate their obligations under the CSA and its state equivalents in one or more of the following ways:

   a.    Unlawfully prescribing and/or dispensing prescription opioids; and

   b.    Failing to report and halt CSA violations by other members of the False Narrative Enterprise and, in some cases, actively facilitating other members' violations.

555.    The Pill Mills conducted and participated in the conduct of the False Narrative Enterprise, directly or indirectly, by unlawfully prescribing and/or dispensing prescription opioids. The Manufacturers conspired with the Pill Mills to whom they directly promoted opioids. McKinsey aided the Manufacturers in identifying prescribers at Pill Mills that the Manufacturers should target.

556.    The scheme devised and implemented by the members of the False Narrative Enterprise amounted to a common course of conduct intended to increase sales of prescription opioids by encouraging the prescribing and use of opioids for chronic pain. The scheme was a continuing course of conduct, and many aspects of it continue through to the present.

557.    Each member of the False Narrative Enterprise agreed, with knowledge and intent, to the overall objective of the enterprise and participated in the common course of conduct to commit unlawful acts for the purpose of increasing the sales of prescription opioids.

558.    The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from the sale of highly addictive and dangerous drugs. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

559.    The Enterprise members' conduct was not merely parallel. While certain members of the False Narrative Enterprise engaged in similar conduct (e.g., various Manufacturers made similar misrepresentations regarding the safety and efficacy of prescription opioids), they engaged in that conduct while communicating and coordinating with one another.

560.    The elements of these predicate acts occurred within the United States and/or the predicate acts violated U.S. statutes with extraterritorial reach.

### 4.    Conspiracy

561.    Even if a Defendant did not personally commit a predicate act, each Defendant conspired with other members of the False Narrative Enterprise in violation of 18 U.S.C. § 1962(d).

562.    Each Defendant, whether or not it personally committed a predicate act, agreed to participated in the False Narrative Enterprise, with knowledge that at least one member of the enterprise intended to (and did) commit at least two predicate acts.

563.    For instance, each Defendant knew and intended that the Pill Mills would prescribe and/or dispense prescription opioids in violation of the CSA. This knowledge and intent can be inferred because Defendants could not profit from prescription opioids unless they were actually prescribed and dispensed.

### 5.    Consequences

564.    By reason of the above-referenced violations of 18 U.S.C. § 1962(c)–(d), Plaintiff was injured in its business or property within the meaning of 18 U.S.C. § 1964(c) and is entitled to assert

this claim and to recover threefold the damages they sustained and the cost of the suit, including reasonable attorneys' fees, as well as such other appropriate relief as the Court may provide.

## IX.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff asks that the Court:

A.    Certify the Proposed Class or the alternative issues class and appoint Plaintiff as the class representative;

B.    Enter judgment against Defendants, jointly and severally, and in favor of Plaintiff and the class;

C.    Award compensatory damages in an amount sufficient to fairly and completely compensate Plaintiff and the members of the class for all damages; treble damages; pre-judgment and post-judgment interest as provided by law and at the highest legal rate;

D.    Award such equitable relief against Defendants as the Court should find appropriate;

E.    Award Plaintiff its cost of suit, including reasonable attorneys' fees as provided by law; and

F.    Award such further and additional relief as the Court may deem just and proper under the circumstances.

## X.    **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: July 12, 2024                     Respectfully Submitted,


                                         */s/ Steven N. Williams*
_____

    Steven N. Williams (State Bar No. 175489)
    Kai'Ree K. Howard (State Bar No. 351730)
    **STEVEN WILLIAMS LAW, P.C.**
    201 Spear Street, Suite 1100
    San Francisco, CA 94105
    Telephone: (415) 697-1509
    Email:  swilliams@stevenwilliamslaw.com
        khoward@stevenwilliamslaw.com

Warren Burns *(pro hac vice to be submitted)*
Darren Nicholson *(pro hac vice to be submitted)*
**BURNS CHAREST, LLP**
900 Jackson St., Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002
wburns@burnscharest.com
dnicholson@burnscharest.com

Korey A. Nelson *(pro hac vice to be submitted)*
**BURNS CHAREST, LLP**
365 Canal Street, Suite 1170
New Orleans, LA 70130
Telephone: (504) 799-2845
Facsimile: (504) 881-1765
knelson@burnscharest.com

John W. (Don) Barrett *(pro hac vice to be submitted)*
David McMullan, Jr. *(pro hac vice to be submitted)*
Richard Barrett *(pro hac vice to be submitted)*
Sterling Aldridge *(pro hac vice to be submitted)*
**BARRETT LAW GROUP, P.A.**
P.O. Box 927
404 Court Square North
Lexington, Mississippi 39095
Tel: (662) 834-2488
Fax: (662) 834-2628
dbarrett@barrettlawgroup.com
dmcmullan@barrettlawgroup.com
rrb@rrblawfirm.net
saldridge@barrettlawgroup.com

Charles J. LaDuca *(pro hac vice to be submitted)*
David L. Black *(pro hac vice to be submitted)*
Monica Miller *(pro hac vice to be submitted)*
Jennifer E. Kelly *(pro hac vice to be submitted)*
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Avenue, NW, Suite 200
Washington, DC 20016
Telephone: (202)789-3960
charles@cuneolaw.com
dblack@cuneolaw.com
monicam@cuneolaw.com
jkelly@cuneolaw.com

Steve Martino *(pro hac vice to be submitted)*
**TAYLOR MARTINO, P.C.**
51 St. Joseph St.
Mobile, AL 36602
Telephone: (251) 433-3131
SteveMartino@taylormartino.com

*Attorneys for Plaintiff*